**IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | |
|---|---|
| BACKPAGE.COM, LLC, | ) |
| | ) |
| Plaintiff, | ) |
| | ) No. 15 C 06340 |
| v. | ) |
| | ) Judge John J. Tharp, Jr. |
| SHERIFF THOMAS J. DART, | ) |
| | ) |
| Defendant. | ) |

**ORDER**

For the reasons explained more fully in the Statement below, the plaintiff's motion for temporary restraining order [4] is granted. A separate order shall issue setting forth the terms of the TRO. A status hearing is set July 28, 2015 at 9:00 a.m., for the purpose of scheduling a hearing on the motion for preliminary injunction. The motions for leave to appear pro hac vice [12], [13], [14], [15], [16] and motions to file oversized briefs [9], [19] are granted. ENTER TRO.

**STATEMENT**

I.  Background

Plaintiff Backpage.com, which operates a website devoted to online classified advertising, seeks to enjoin Cook County Sheriff Thomas Dart's extra-judicial, extra-legislative efforts to eliminate classified advertising for "adult" or "escort" services because, Dart maintains, those ads are largely, if not entirely, thinly disguised (and sometimes undisguised) solicitations for prostitution. And by facilitating the sex trade, Dart maintains, the ads also promote the human trafficking and exploitation of children that often accompany it. At issue in this case are letters Dart sent to the CEOs of Visa and Mastercard to "request" that they "cease and desist" allowing their credit cards "to be used to place ads on websites like Backpage.com, which we have objectively found to promote prostitution and facilitate online sex trafficking."

In the letters, Dart notes that he is "charged with eradicating such trafficking" in the Chicago area. He explains that Congress and the courts have been unhelpful in regulating sites such as Backpage.com but that other "institutions" have the "moral, social, and legal right" to address the problem. Dart invokes the credit cards' user and merchant "Terms of Use" that give the credit card companies the right to cancel or block transactions or activities that can impair the brand's reputation, and he then discusses the legal obligations of "financial institutions" to file Suspicious Activity Reports for suspected human trafficking and sexual exploitation of minors, and possible more (according to a federal prosecutor he quotes). An endnote points to federal statutes including the money laundering statute. Dart requests that each company provide "within

the next week" the contact information for a person with who he can work on "this issue." The letters are on official letterhead.

Within 48 hours of receiving the letters, both Visa and MasterCard elected to entirely disallow the use of their credit cards on all of Backpage.com, not just in its "adult" advertising section. Sheriff Dart declared victory, releasing a lengthy press statement touting his "demand" as the reason "Visa and MasterCard have agreed to stop processing payments" for Backpage. Dart "commends" the companies for "defunding this criminal enterprise."

Much of the advertising on Backpage is free, but it charges for posting ads for adult services, as well as across all categories for, among other things, recurrent ads and premium placement. With American Express having already terminated its services in April,[1] and Visa and MasterCard following suit in July, Backpage's primary revenue stream has been cut off. Backpage users can still pay for ads with Bitcoin, and Backpage also created a private system of "credits,"[2] but there is no credit card option available anymore. Before Dart's outreach, the companies had allowed their cards to be used on Backpage.com for 11 years. To prevent disruption to its customers, Backpage has stopped charging for ad placement, but it cannot remain in business long without its ad revenue.

Visa and MasterCard withdrew authorization for use of their credit cards at Backpage.com as a result of Dart's request. MasterCard's press statement stated that it severed ties with Backpage "based on a request from the Cook County Sheriff's office" that "confirmed" brand-damaging activities, and Visa explained that it had "received allegations from U.S. law enforcement that the merchant backpage.com is linked to child prostitution and human trafficking."

On July 22, Backpage filed suit against Dart, claiming his actions violate its rights of freedom of speech and due process. Backpage requested an immediate TRO to curtail any further efforts by Dart to put Backpage out of business, and ultimately an injunction that would require him to, among other things, retract his prior letters to the credit card companies and inform them of any court decision to the effect that his "requests" had been unlawful.

In support of its complaint, Backpage attached Dart's press release and copies of the letters to Visa and MasterCard, all of which are now part of the pleadings for all purposes. In support of the TRO motion, Backpage submitted an affidavit from its CEO, Carl Ferrer, and numerous exhibits that document longstanding efforts by Dart to force or pressure Backpage.com and Craigslist.com to abandon their "adult" classifieds, through lawsuits, lobbying, and public pressure. Among other points, Ferrer attests that credit card companies' withdrawal has "cut off nearly all revenue to Backpage.com" across its entire website, including "ads for dating, housing, services, trades, and sales of goods." Backpage has also put into evidence the record of its own history of interactions with Sheriff Dart, including attempts to cooperate with him, as well as Dart's public statements about Backpage and other providers of

---

[1] It is not clear on the current record that American Express was also lobbied by Dart, although Backpage apparently believes that it was.

[2] The credits could be purchased with payments sent through the mail. However, Sheriff Dart also has written to the Chief Postal Inspector asking him to use "all available means" to prevent the postal service from being used "for sex trafficking via Backpage.com."

online classified advertising. In one media report, a spokesman for Dart states (with apparent satisfaction) that Backpage knows its "business model is on the brink of destruction" and is "gasping for air."

The Sheriff has moved to dismiss Backpage's complaint and also filed a brief in opposition to the TRO request. Dart has not submitted any evidence. The Court heard the parties' oral arguments on July 23, 2015.

II. Discussion

To obtain a TRO or a preliminary injunction, the moving party must demonstrate that it has no adequate remedy at law, that it will suffer irreparable harm relief is denied, and that it has some likelihood of success on the merits. *See Ezell v. City of Chicago*, 651 F.3d 684, 694 (7th Cir. 2011). "If the moving party meets these threshold requirements, the district court weighs the factors against one another, assessing whether the balance of harms favors the moving party or whether the harm to the nonmoving party or the public is sufficiently weighty that the injunction should be denied." *Id*. "These considerations are interdependent: the greater the likelihood of success on the merits, the less net harm the injunction must prevent in order for preliminary relief to be warranted." *Judge v. Quinn*, 612 F.3d 537, 546 (7th Cir.2010).

In arguing that it is likely to succeed on the merits, Backpage contends that Dart's actions constitute precisely the type of informal prior restraint condemned as a First Amendment violation in *Bantam Books, Inc. v. Sullivan*, 372 U.S. 58 (1963).[3] In that case, the Supreme Court held that the informal but coercive notices (often followed up with visits from police officers) sent to distributors of books deemed "objectionable" by a state commission amounted to a system of informal censorship violated the First Amendment rights of the publishers who sued to stop the interference.

On the other hand, Dart vigorously disputes Backpage's likelihood of success on the merits. Dart argues, *inter alia*: (1) Backpage has no First Amendment interest of its own at stake and therefore no standing; (2) there is no First Amendment protection for the content at issue; and (3) Dart did not threaten the credit card companies and therefore the *Bantam Books* line of cases is not applicable to his conduct.

As a threshold matter, there is no "standing" impediment to Backpage's First Amendment claim. It is well settled that traditional notions of third party standing are relaxed in the First Amendment context. *See Sec of St. of Md. v. Joseph H. Munson Co.*, 467 U.S. 947, 956 (1984). Backpage may stand in the shoes of its users in seeking relief from the burden placed on their freedom of speech as a result of not being able to use credit cards to access Backpage's forum. Here, Backpage meets the "relaxed" third-party standing requirements because its Backpage's commercial injury gives it "sufficient injury-in-fact to satisfy the Article III case-or-controversy requirement" and it can "reasonably be expected properly to frame the issues and present them with the necessary adversarial zeal." *Id.* at 956. In addition, Backpage's own status as, in essence, a publisher (it does not create any content) gives it a direct First Amendment injury. *See Bantam*, 372 U.S. at 64 n.6 (publishers suffered First Amendment injury even though

---

[3] The Court does not find it necessary to evaluate Backpage's separate due-process claim at this time.

3

cease-and-desist notices were sent only to distributors); *Drive In Theatres, Inc. v. Huskey*, 435 F.3d 228, 229 (4th Cir. 1970) (allowing, without specifically discussing standing, the claim of theater owner injured with loss of business as a result of ban on adult-rated movies).[4]

Nor does the Court accept Dart's argument that standing is lacking because there is no protected First Amendment interest at stake here at all. Clearly First Amendment protection does not extend to exhortations to illegal conduct— Dart's stated concern. *E.g., United States v. Williams*, 553 U.S. 285, 297 (2008) ("Offers to engage in illegal transactions are categorically excluded from First Amendment protection."). But here, there is no dispute that *all* of the advertisements on Backpage.com are affected; Backpage cannot collect its normal fees for even the most benign advertisements, and therefore will be unable to host any when the money runs out. Given that Dart sought to "defund" Backpage, not just shut down its adult sections, based wholly on the content[5] of some ads, Dart cannot maintain that the First Amendment is not implicated by his actions, even if he were correct that none of Backpage's "escort ads" themselves are protected. (The Court need not decide.)

The only remaining question with respect to the plaintiff's likelihood of success on the merits is whether Backpage will be able to establish a First Amendment violation—that is, whether Dart's actions are the type of informal prior restraint that the *Bantam Books* line of cases prohibits. And, as the parties' oral arguments made clear, that involves two main questions: (1) whether Dart's letter constitutes a threat, and (2) whether the credit card companies involuntarily withdrew business from Backpage. The plaintiff has a better than negligible—but not certain— chance of proving that both answers are "yes."

The threat at issue in *Bantam Books* came from Rhode Island's Commission to Encourage Morality in Youth, which had no direct authority to prosecute or impose sanctions on the distributors it entreated to stop circulating certain books. Despite simply requesting "cooperation" from book distributors, the Commission's actions effectively suppressed the circulation of the objectionable books entirely because of the Commission's official status, its coercive language, and its practice of sending police to follow up with the distributors. As the Supreme Court explained, "though the Commission is limited to informal sanctions—the threat of invoking legal sanctions and other means of coercion, persuasion, and intimidation—the record amply demonstrates that the Commission deliberately set about to achieve the suppression of publications deemed 'objectionable' and succeeded in its aim." 372 F.3d at 67.

---

[4] As to the additional Article III requirements of causation and redressability, *see Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560-61 (1992), both have been alleged but cannot be resolved absent further evidence regarding the credit card companies. The letters likely were a but-for cause of the terminations (the companies said as much), and although the Court cannot un-ring that bell with an injunction, at this point the TRO request is limited to stopping Dart from any further defunding efforts. Redressability with respect to Visa and MasterCard can be set aside for now. However, it is at least possible that the credit card companies would reprise their business relationships with Backpage if Dart's actions were pronounced unconstitutional after a merits ruling. Backpage is not the only player with a financial interest in the outcome.

[5] As Backpage notes, Dart's judgment that the escort ads are illegal—and therefore not protected by the First Amendment—was not tested with due process or subjected to any oversight because of the informal channels through which he censored them.

The same principle applies in this case. Dart did not directly threaten the companies with an investigation or prosecution. But by writing in his official capacity on Sheriff's Department letterhead, requesting a "cease and desist," invoking the legal obligations of "financial institutions" to cooperate with law enforcement, and requiring ongoing contact with the companies, among other things, it could reasonably be inferred that Dart brought the weight of his office to bear on his "request" that the companies stop their association with Backpage altogether. And even if it is true that Dart has no jurisdiction over the credit card companies,[6] he could certainly refer an investigation to the appropriate authority. *See Okwedy v. Molinari*, 333 F.3d 339, 344 (2003) (2d Cir. 2003) Moreover, the credit card companies were not privy to Dart's candid admission when they read the letters and acted accordingly.

Another potential distinguishing feature of *Bantam Books* is the clear finding in that case that the book distributed had not cooperated voluntarily with the Commission's request to stop circulating certain titles. Here, Dart contends that any action by the credit card companies was wholly voluntary. But for purposes of a TRO, enough signs point in the other direction. These companies had worked with Backpage for more than a decade, and they terminated their relationships because of Dart's letters. The Court cannot state as a matter of law that the letters were not a threat. *See Okwedy*, 333 F.3d at 344 ("intent" and "effect" of potentially threatening letter not resolvable on motion to dismiss). Whether Dart coerced the companies or simply educated them has not yet been definitively established, but given the timing of the withdrawals and the companies' public statements, at the very least it is clear on this record that the companies did not act spontaneously.

Accordingly, Backpage has established a more-than-negligible likelihood of success on the merits of its claim that Dart's informal lobbying of the credit card companies violated the First Amendment by imposing an informal prior restraint on the advertisements hosted by Backpage.com.

Backpage has also made a sufficient showing of irreparable harm. Although there are no figures in the record yet, Backpage's CEO has attested that the Backpage's entire business hangs in the balance. There is no dispute that revenue from ad sales is Backpage's lifeblood, and the drastic reduction in sales because Backpage cannot accept credit cards is enough of a commercial injury to constitute irreparable harm: damages will not suffice if the business goes under. Moreover, there is the already discussed First Amendment injury incurred by the users and by Backpage as the "publisher"; free-speech injuries are irreparable almost by definition. *See, e.g., Nuxoll ex rel. Nuxoll v. Indian Prairie School Dist. # 204*, 523 F.3d 668, 669 (7th Cir. 2008) (citing, *inter alia*, *Elrod v. Burns*, 427 U.S. 347, 373 (1976)). In the short term, when Backpage is hosting advertisements for free, there is not yet a noticeable chilling effect. But the whole forum is jeopardy of disappearing. The inquiry is not whether the injury has already occurred, but whether irreparable harm will be suffered without a TRO. Enough of a showing has been made.

---

[6] When the merits of this case are resolved, Backpage will have to contend with the Sheriff's candid, and somewhat surprising, admission on the record that there is no investigatory or prosecutorial action within his jurisdiction that he could take vis-à-vis the credit card companies. The credibility of any purported "threat" would seem to be lessened by such an admission.

Finally, there is the balance of hardships and the public interest to consider. The hardships clearly weigh more heavily on the plaintiff and its users. Backpage's business is imperiled, and the users are in imminent jeopardy of losing a forum for protected (as well as unprotected) speech. Sheriff Dart has made no argument, and has provided no evidence, that prostitution, trafficking, and sexual exploitation of minors will be reduced significantly reduced by Backpage's demise; indeed, it appears that an oft-used tool for identifying lawbreakers (by Dart and other law enforcement agencies) will be lost if Backpage were to fold. Dart makes no claim of harm from a TRO. As for the public interest, Dart contends that public interest is best served right now because "the public is able to use Backpage.com for free." Curious as it is for Dart to equate the public interest with *more* access to Backpage.com, the argument is specious, for the record suggests that Backpage is in jeopardy of going under as a result of Dart's tactics.

The Court makes no judgment as to the merits of Backpage's claims, and any factual findings it has made are preliminary only and not binding in any proceedings on the merits. *See Michigan v. U.S. Army Corps of Engineers*, 667 F.3d 765, 782 (7th Cir. 2011). Backpage is entitled to a TRO to enjoin any further efforts by to "defund" its business until a full hearing can be held on its request for preliminary injunction.

Entered: July 24, 2015

John J. Tharp, Jr.
United States District Judge