**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | |
|---|---|
| BACKPAGE.COM, LLC,<br><br>        Plaintiff,<br><br>    v.<br><br>THOMAS J. DART, Sheriff of Cook County, Illinois<br><br>        Defendant. | No. 1:15-cv-06340<br><br>Judge John J. Tharp, Jr.<br><br>Magistrate Judge Young B. Kim |

**<u>BACKPAGE.COM'S REPLY IN SUPPORT OF
MOTION FOR PRELIMINARY INJUNCTION</u>**

**TABLE OF CONTENTS**

**Page(s)**

I. INTRODUCTION ................................................................................................................ 1

II. ARGUMENT ....................................................................................................................... 3

    A. The Court Has Decided All Issues Necessary For a Preliminary Injunction. ......... 3

    B. The Court Should Not Consider Sheriff Dart's Assertion that Visa and MasterCard's Terminations Were "Wholly Voluntary." ......................................... 3

    C. Backpage.com Clearly Has Standing, and Sheriff Dart's Arguments About "Causation" and "Redressability" Misunderstand the Law of Standing. ............... 4

    D. *Bantam Books* and Its Progeny Do Not Require That Third-Parties' Actions Were Involuntary, but Instead Establish an Objective Test of Whether Officials' Actions Reasonably Can Be Interpreted as a Threat. .............. 7

    E. Requiring Proof That the Card Companies Acted "Wholly Involuntarily" Would Eviscerate a Section 1983 Prior Restraint Claim. ..................................... 13

III. CONCLUSION .................................................................................................................. 14

i

## TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*ACLU v. City of Pittsburgh*,
    586 F. Supp. 417 (W.D. Pa. 1984) ................................................................. 5, 8, 13

*Bantam Books, Inc. v. Sullivan*,
    372 U.S. 58 (1963) .................................................................................... *passim*

*Bart v. Telford*,
    677 F.2d 622 (7th Cir. 1982) ................................................................................ 11

*Burgess v. Lowery*,
    201 F.3d 942 (7th Cir. 2000) .................................................................................. 3

*Carlin Commc'ns, Inc. v. Mountain States Tel. & Tel. Co.*,
    827 F.2d 1291 (9th Cir. 1987) .................................................................. 11, 12, 14

*Council for Periodical Distributors Ass'n v. Evans*,
    642 F. Supp. 552 (M.D. Ala. 1986) .................................................................... 6, 9

*County of Cook v. Wells Fargo & Co.*,
    2015 WL 4397842 (N.D. Ill. July 17, 2015) ........................................................... 5

*Ctr. for Democracy & Tech. v. Pappert*,
    337 F. Supp. 2d 606 (E.D. Pa. 2004) .................................................................... 5

*Denius v. Dunlap*,
    209 F.3d 944 (7th Cir. 2000) .................................................................................. 3

*Drive In Theatres, Inc. v. Huskey*,
    435 F.2d 228 (4th Cir. 1970) ................................................................................ 13

*Fairley v. Andrews*,
    578 F.3d 518 (7th Cir. 2009) ................................................................................ 11

*Hammerhead Enter., Inc. v. Brezenoff*,
    707 F.2d 33 (2d Cir. 1983) ................................................................................... 10

*Jackson v. Metro. Edison Co.*,
    419 U.S. 345 (1974) .............................................................................................. 14

*Lexmark Int'l, Inc. v. Static Control Components, Inc.*,
    134 S. Ct. 1377 (2014) ........................................................................................... 5


*Okwedy v. Molinari*,
    333 F.3d 339 (2d Cir. 2003)......................................................................................10

*Penthouse Int'l, Ltd. v. McAuliffe*,
    610 F.2d 1353 (5th Cir. 1980) ................................................................................8, 9

*Playboy Enter. Inc. v. Meese*,
    639 F. Supp. 581 (D.D.C. 1986)..................................................................................9

*Rattner v. Netburn*,
    930 F.2d 204 (2d Cir. 1991).......................................................................................10

*Rossignol v. Voorhaar*,
    316 F.3d 516 (4th Cir. 2003) .............................................................................13, 14

*Surita v. Hyde*,
    665 F.3d 860 (7th Cir. 2011) .....................................................................................11

**Rules**

Fed. R. Civ. P. 65(b)(2)..........................................................................................................1

LR 78.3 ..................................................................................................................................1

**Regulations**

Jeff Hermes, *Backpage.com Obtains TRO to Stop Interference With Payment
    Processing for Adult Ads*, MLRC MEDIA LAW LETTER, July 2015, at 39 ................................14

Backpage.com files this reply in support of its motion for preliminary injunction.[1]

## I. INTRODUCTION

The Court's TRO orders resolved all the issues necessary to enter a preliminary injunction now – finding a likelihood of success on the merits, irreparable harm, and that the balance of hardships and public interest weigh in favor of immediate injunctive relief. Order [29] at 3-6. The TRO accomplished an important first step by restraining Sheriff Dart from doing anything further to induce financial institutions to terminate services for Backpage.com. But the TRO expires August 21, 2015, and a broader preliminary injunction is necessary to counteract Sheriff Dart's actions while this suit proceeds.[2]

For preliminary injunctive relief, the Court has suggested one issue may still be open, *i.e.*, that the Court might need "further evidence regarding the credit card companies" and whether they involuntarily withdrew business from Backpage." *Id.* at 4 n.4. Sheriff Dart raised this issue in the context of standing, asserting that causation and redressability are lacking here supposedly because "any action by the credit card companies was wholly voluntary" and unrelated to his

---

[1] The Court granted the TRO on July 24, 2015 [29], [30], but did not decide the preliminary injunction motion, instead scheduling a hearing for August 20, 2015 [31], and, in the interim, extending the TRO for the maximum time allowed under Fed. R. Civ. P. 65(b)(2) [32]. The Court allowed the parties to submit prehearing briefs by August 14, 2015, advising how they intend to proceed and witnesses they will call, if any [31]. However, Backpage.com has not had an opportunity to reply to Sheriff Dart's opposition to the preliminary injunction motion [26], and does so now, to address the one question the Court left unresolved and so as not to waive its right to reply. *See* LR 78.3.

[2] Backpage.com will address the appropriate scope of injunctive relief in its August 14, 2015 submission. But, in brief, the proposed preliminary injunction is broader than the TRO because, as the Court has recognized, a threat cannot be erased or its effects remedied simply by saying: "Don't do it again." *See* Order at 4 n.4 (the TRO "cannot un-ring that bell"). Thus, the Court should take the next step of ordering Sheriff Dart to retract his letters and provide the Court's order to all parties he previously contacted. This relief is important to allow a fair opportunity to reinstate the status quo as it stood before Sheriff Dart's extralegal prior restraint. *See id.* (noting it is possible "the credit card companies would reprise their business relationships with Backpage if Dart's actions were pronounced unconstitutional").

1

cease-and-desist demands. *Id.* at 4, 5. The Sheriff's argument is flatly contradicted by the record – Visa and MasterCard stated they cut off Backpage.com *because of* the Sheriff's demands. More importantly, his argument is both wrong and irrelevant under the law.

*Bantam Books, Inc. v. Sullivan*, 372 U.S. 58 (1963), and its progeny *do not* require proof that third-parties who respond to informal government coercion did so "wholly involuntarily." To the contrary, courts have uniformly rejected arguments such as Sheriff Dart's and held that third-parties' motivations for complying with public officials' entreaties are not relevant. What matters is: (1) whether a public official took actions that could reasonably be interpreted as threatening adverse action against third parties (as the Court has found Sheriff Dart did); and (2) the consequences that followed, *i.e.*, whether speech rights were infringed (as the Court has also found is the effect of Visa's and MasterCard's terminations). This is so because the law presumes that "[p]eople do not lightly disregard public officers' thinly veiled threats … if they do not come around." *Id.* at 68. Indeed, imposing a requirement that a plaintiff must show a third-party acted "wholly involuntarily" would destroy the First Amendment protections of *Bantam Books*. Government officials target third-parties – as Sheriff Dart targeted Visa and MasterCard – for the very reason that the third parties do not have incentives to protect others' constitutional rights, but have ample reason to avoid government sanctions or investigation.

This case as it stands is solely against Sheriff Dart; Backpage.com has not asserted claims against Visa or MasterCard. The card companies' subjective motivations can have no bearing on Backpage.com's claims, which focus on government actions to impose an extralegal prior restraint. The record – most importantly the public statements of Dart that he set out to "defund" Backpage.com and the card companies' admissions that they complied with his demands – provides ample grounds to enter a preliminary injunction.

2

## II. ARGUMENT

### A. The Court Has Decided All Issues Necessary For a Preliminary Injunction.

The Court already has held that Backpage.com showed a likelihood of success that Sheriff Dart's letters to Visa and MasterCard affected an unconstitutional informal prior restraint of speech under *Bantam Books*. *See* Order at 4-5. The Court rejected Dart's arguments that "there is no First Amendment protection for the content at issue," and "Backpage.com has no First Amendment interest of its own at stake and therefore no standing." *Id.* at 3-4. The Court also held Backpage.com has established irreparable injury, *id.* at 5 ("free-speech injuries are irreparable almost by definition"), the "hardships clearly weigh more heavily on [Backpage.com] and its users," and found "specious" the Sheriff's arguments that the public interest is not harmed because Backpage.com has had to offer ads for free to counteract the Sheriff's actions, *id.* at 6.

In his opposition, Sheriff Dart also claimed qualified immunity, Dart Response [26] at 8-9, but that affirmative defense is irrelevant now. The doctrine of qualified immunity does not apply to claims for equitable relief. *Denius v. Dunlap*, 209 F.3d 944, 959 (7th Cir. 2000); *see also Burgess v. Lowery*, 201 F.3d 942, 943-44 (7th Cir. 2000) ("There is no immunity from a suit for [equitable] relief. …").

### B. The Court Should Not Consider Sheriff Dart's Assertion that Visa and MasterCard's Terminations Were "Wholly Voluntary."

Sheriff Dart has raised only one other argument to avoid preliminary injunctive relief, and the Court has indicated its willingness to consider further argument and evidence on this one point: whether Visa's and MasterCard's terminations may have been "wholly voluntary" and unrelated to the Sheriff's demand letters. Order at 4, 5; *see* Dart Response at 7 (asserting "each company independently and voluntarily chose to break ties with persons seeking to place paid

3

ads with [Backpapge.com]").[3]  Even if the Sheriff had any plausible basis for his assertion, this is not a relevant issue under *Bantam Books* or established principles of standing.

First, and most obviously, Sheriff Dart has no basis to contend that "any action by the credit card companies" terminating use of their cards and blackballing Backpage.com "was wholly voluntary" and had nothing to do with his letters.  *See* Order at 4, 5.  As the Court has observed, the "signs point in the other direction," given that "[t]hese companies had worked with Backpage for more than a decade, and they terminated their relationships because of Dart's letters."  Order at 5.  The card companies stated publicly that they terminated Backpage.com *because of* Sheriff Dart's actions.  *See* Zycherman Decl. [7] Exs. H, J. And Sheriff Dart proclaimed publicly that the companies' decision to "defund" Backpage.com resulted from his cease-and-desist letters.  *See* Complaint Ex. A [2].

C. **Backpage.com Clearly Has Standing, and Sheriff Dart's Arguments About "Causation" and "Redressability" Misunderstand the Law of Standing.**

Sheriff Dart asserted his argument about supposed "voluntary" action by Visa and MasterCard as part of his challenge to Backpage.com's standing.  Dart Response at 6-8.  He has not contended *Bantam Books* requires Backpage.com to prove the card companies' actions were "wholly involuntary," nor could he because, as discussed below, this is not a requirement.  From the outset, however, Sheriff Dart fundamentally misunderstands constitutional standing.[4]

---

[3] At the TRO hearing, the Court said it was "thinking about … whether there does need to be an evidentiary submission with respect to … the reasons for the card companies' actions and whether they ascribe any of their actions to the conduct of the sheriff," but indicated it was "not clear … whether that's relevant or … necessary."  *See* Transcript (July 23, 2015), at 59:12-21. Later, the Court wrote in the TRO Order that whether "the credit card companies involuntarily withdrew business from Backpage" is one of the "main questions" to determine, Order at 4, and allowed Sheriff Dart to take discovery on this issue.  With due respect and as discussed in this brief, the Court's initial reticence was correct.

[4] In its TRO Order, the Court held that "there is no 'standing' impediment to Backpage's First Amendment claim," correctly noting that publishers have standing to assert First

For standing, the law is clear that Backpage.com need only establish that harm to the company and its users is "fairly traceable" to Sheriff Dart's conduct. *Lexmark Int'l, Inc. v. Static Control Components, Inc.*, 134 S. Ct. 1377, 1391 n.6 (2014) ("Article III standing … requires only that the plaintiff's injury be fairly traceable to the defendant's conduct," "[p]roximate causation is not a requirement"); *see also County of Cook v. Wells Fargo & Co.*, 2015 WL 4397842, at *8 (N.D. Ill. July 17, 2015) ("Proximate causation is a higher bar than Article III standing's 'fairly traceable' requirement."). Backpage.com unquestionably has standing under the applicable standard. Indeed, the Court has already decided this. *See* Order at 4 n.4 ("[t]he letters likely were a but-for cause of the terminations (the companies said as much)").

Moreover, courts in *Bantam Books* cases have uniformly rejected public officials' efforts to challenge standing, including rejecting the same arguments about causation and redressability Sheriff Dart makes. In *Bantam Books* itself, the Supreme Court observed that the plaintiff-publisher unquestionably had standing, reasoning (as this Court has) that free speech protections extend to publishers, and explaining that "pragmatic considerations argue strongly for the standing of publishers" because they have a "greater economic stake" than third-parties subject to government pressure who may have insufficient interests to resist censorship. *See* 372 U.S. at 64 n.6; *see also ACLU v. City of Pittsburgh*, 586 F. Supp. 417, 421 (W.D. Pa. 1984) (rejecting mayor's argument that only vendors had standing to challenge his actions to remove an issue of *Hustler* from newsstands, noting that, "[f]or fear of reprisals," vendors who are subject to government pressure "may hesitate to challenge an unconstitutional abridgement of their right[s]"); *Ctr. for Democracy & Tech. v. Pappert*, 337 F. Supp. 2d 606, 646-48 (E.D. Pa. 2004) (ISPs and Internet users had standing to challenge Pennsylvania attorney general's informal

---

Amendment rights on their own and on behalf of persons who speak or receive speech, but said it was "set[ting] aside" the issue of redressability for the time being. Order at 3-4 & n.4.

demands to block websites the AG believed displayed child pornography), *aff'd in part and vacated in part on other grounds*, 827 F.2d 1483 (11th Cir. 1987).

*Council for Periodical Distributors Ass'n v. Evans*, 642 F. Supp. 552 (M.D. Ala. 1986), is most on point. In that case, an Alabama state district attorney argued that publishers of adult magazines and others lacked standing to challenge his actions of holding meetings, making veiled threats of prosecution, and seeking to obtain consent decrees from retailers to prevent sales of magazines he found objectionable. The court rejected the defendants' arguments about causation and redressability based on their contention that "the local merchants acted independently" in acceding to the state attorney's demands. *Id.* at 560. It held that, notwithstanding that some retailers indicated they removed the challenged magazines voluntarily "as a 'show of good faith,'" "[a]ctual injury to the plaintiffs" (publishers, readers, and others) was "'fairly traceable' to actions by the district attorney" because retailers removed the magazines after the district attorney's actions. *Id.* The court also had no difficulty rejecting the defendants' arguments about redressability:

> [T]he relief requested is likely to redress any actual and threatened injury to first amendment freedoms raised by the plaintiffs. The precise injury alleged is unlawful prior restraint …. That injury would indeed be remedied by a declaratory judgment stating that [the district attorney's] actions imposed an unlawful prior restraint … and an injunction halting his efforts to coerce and extort self-censorship from local merchants. These remedies, of course, would not ensure that the distributor or any of the retailers would choose to resume trade in sexually explicit magazines. However, such relief would ensure that the decision whether to do so would be made free of coercion and without prior restraint.

*Id.*

Backpage.com's claims for harm to its First Amendment interests and those of its users unquestionably are "fairly traceable" to Sheriff's Dart's actions. His attempt to impose some higher standard of causation is wrong under the law. Moreover, the relief Backpage.com seeks for its claims against the Sheriff will redress the harms he has caused. A declaration and

injunction holding that his actions were an unconstitutional prior restraint will inform the card companies that they need not fear his veiled threats and should not terminate services as a result. Backpage.com also asserts damage claims against Sheriff Dart, which can provide redress for losses resulting from his actions (though not fully remedying First Amendment harms).

> **D.** *Bantam Books* **and Its Progeny Do Not Require That Third-Parties' Actions Were Involuntary, but Instead Establish an Objective Test of Whether Officials' Actions Reasonably Can Be Interpreted as a Threat.**

Even though Sheriff Dart has asserted his arguments about causation and supposed "voluntary" actions of the card companies only in the context of standing (and is wrong on that score), it is important to understand that *Bantam Books* did not impose any requirement that a plaintiff must prove that third parties subject to the officials' coercion acted involuntarily in complying. No court has held or suggested this is a requirement of a First Amendment prior restraint claim under *Bantam Books*, while many have rejected such arguments.

First, *Bantam Books* did not impose any such requirement. At one point in that decision, the Supreme Court mentioned the trial court had "found as a fact" that a distributor's "compliance with the Commission's directives [objecting to certain books and asking for "cooperation" to preclude distribution] was not voluntary." 372 U.S. at 68. The Court did not say nor suggest that such a finding was *required* to establish a claim of an informal prior restraint, but mentioned this as underscoring the "general rule" that "[p]eople do not lightly disregard public officers' thinly veiled threats to institute criminal proceedings against them if they do not come around." *Id.* *Bantam Books* focused on the *government's actions* and whether they reasonably could be interpreted as implicit threats to suppress speech.[5]

---

[5] The Supreme Court's opinion focuses throughout on the actions of the Rhode Island commission, *see, e.g.*, 372 U.S. at 67 (the commission "deliberately set about to achieve the suppression of publications deemed 'objectionable' and succeeded in its aim" (footnote omitted)), and whether they reasonably could cause third-parties to suppress speech, *id.* at 64 n.6

7

No case applying *Bantam Books* has required a plaintiff to show third-parties' actions were involuntary, but many cases have rejected officials' arguments their actions were not a prior restraint because third-parties' actions allegedly were voluntary. Many cases illustrate this.

In *Penthouse International, Ltd. v. McAuliffe*, 610 F.2d 1353 (5th Cir. 1980), the Fulton County attorney sought to defend his practice of sending deputies to make selected warrantless arrests at stores selling certain magazines by contending "that the retailers and distributors voluntarily removed the publications in question from their shelves." *Id.* at 1360. The Fifth Circuit rejected this argument, holding that under *Bantam Books* courts must "look past the form of a transaction and examine its substance." *Id.* Given the county attorney's actions and that they "were almost completely effective in driving the suspect publications from the newsstands of Fulton County," the court held that they had "created an informal system of prior restraint." *Id.* at 1361. It did not inquire about or require proof that the stores targeted by the county attorney and his deputies acted involuntarily.

In *ACLU v. Pittsburgh*, 586 F. Supp. at 417, the court "reject[ed] as untenable the City's position that the vendors voluntarily removed the publications from their shelves." *Id.* at 422. In granting injunctive and declaratory relief, the court found it sufficient that "the Mayor deliberately set about to achieve the suppression of a publication he personally deemed objectionable [an issue of *Hustler*] and succeeded in his aim." *Id.* at 421-22. It did not require any showing vendors acted involuntarily, but instead observed: "Both human experience and the facts of this case demonstrates that the mere threat of police action will in most cases result in the threatened person desisting from the contemplated action." *Id.* at 422.

---

("the direct and obviously intended result of the Commission's activities was to curtail the circulation … of books published by appellants"); *id.* at 66, 68-69 (focusing on the commission's letters and finding it "untenable" and "naive" for the state to assert they were not implicit threats).

*Playboy Enterprises, Inc. v. Meese*, 639 F. Supp. 581 (D.D.C. 1986), also rejected the government's argument that retailers voluntarily removed *Playboy*, *Penthouse* and other publications from their stores after the Attorney General's Commission on Pornography sent letters intimating the retailers would be identified in the commission's report as "engaged in the sale of pornography." *Id.* at 583. The court wrote: "While defendants argue that distributors voluntarily decided not to sell the magazine[s], it seems more than ironic that many of the decisions not to sell were made *after the Commission's letters were sent out.*" *Id.* at 585 (emphasis in original). Indeed, one retailer (7-Eleven) said it voluntarily withdrew the challenged magazines from its stores, *id.* at 583-84, but that made no difference for the court's preliminary injunction, which required the Meese Commission to retract its prior letters to *all* retailers. *Id.* at 587-88 (because "the record should be absolutely clear" and should "put to rest" any concerns of retailers about being identified as purveyors of pornography).

And in *Evans*, 642 F. Supp. at 552, the court rejected the state district attorney's contention that he "sought only voluntary cooperation" from retailers to stop selling magazines he considered objectionable. *Id.* at 564. The court found the government's contentions "simply defy reality" and were "unworthy of credence," again emphasizing "the critical importance of 'look[ing] through forms to the substance." *Id.* at 563, 564. And, although some retailers indicated they had removed the challenged magazines voluntarily, *id.* at 560, that made no difference, because the court recognized the local merchants "selected to 'cooperate' were those least likely to resist" the district attorney's threats, *id.* at 563-64.

As these and other cases demonstrate, under *Bantam Books* the test for establishing a First Amendment violation based on an informal prior restraint turns on whether a government official's actions can *reasonably be interpreted* as intimating some threat of adverse action to

9

suppress speech. The Second Circuit has made this clear in a series of cases beginning with *Hammerhead Enterprises, Inc. v. Brezenoff*, 707 F.2d 33 (2d Cir. 1983):

> Where comments of a government official *can reasonably be interpreted* as intimating that some form of punishment or adverse regulatory action will follow the failure to accede to the official's request, a valid claim [for violation of First Amendment rights] can be stated.

*Id.* at 39 (emphasis added).[6] That court later applied this analysis in *Rattner v. Netburn*, 930 F.2d 204, 206, 209-10 (2d Cir. 1991), where it reversed summary judgment dismissal of plaintiff's claims against a village official who wrote the chamber of commerce threatening adverse action for running the plaintiff's ads criticizing village authorities in the chamber's newsletter. It found the official's letter could reasonably be interpreted as intimating a threat and the chamber "immediately capitulated" and blocked further ads by the plaintiff. Likewise, in *Okwedy v. Molinari*, 333 F.3d 339, 340-42, 344 (2d Cir. 2003), the court reversed dismissal of a plaintiff's claims against the Staten Island borough president for his letter to a billboard company objecting to the plaintiff's ads. The court found the billboard company "could reasonably have believed [the borough president] intended to use his official power to retaliate against it if it did not respond positively to his entreaties" even though the president had no authority to restrict them.

The cases under *Bantam Books* reflect two key principles. First, a plaintiff's claim challenging a governmental informal prior restraint – such as Backpage.com's claims against Sheriff Dart here – focuses on *the government's actions*, not third parties reasons' for capitulating to government demands. Second, the test for assessing the validity of government

---

[6] In *Hammerhead*, the Second Circuit concluded a New York City administrator's letters to retailers objecting to a board game contained no threat of official sanction and observed that no stores refused to sell the game as a result of the letters. 707 F.2d at 38-39. But, importantly here, the court applied the objective test of whether public officials' actions "can reasonably be interpreted" as intimating threats, and it expressly declined to hold that a showing "that any one was in fact intimidated" is a "requisite element[] of a First Amendment violation." *Id.* at 39 & n.7.

10

actions is objective – whether the actions can reasonably be interpreted as an explicit or implicit threat of adverse action against third parties if they do not "come around."

This tracks other First Amendment case law regarding claims against government authorities for actions threatening to chill a plaintiff's own speech. In this context, as the Seventh Circuit has said, "We apply an objective test: whether the alleged conduct by the defendants would likely deter a person of ordinary firmness from continuing to engage in protected activity." *Surita v. Hyde*, 665 F.3d 860, 878 (7th Cir. 2011); *see also Fairley v. Andrews*, 578 F.3d 518, 525 (7th Cir. 2009). And, though "[t]he effect on freedom of speech may be small, … since there is no justification for harassing people for exercising their constitutional rights it need not be great in order to be actionable." *Bart v. Telford*, 677 F.2d 622, 625 (7th Cir. 1982).[7]

Indeed, Visa's and MasterCard's motivations for terminating card services are immaterial, as the Ninth Circuit held in *Carlin Communications, Inc. v. Mountain States Telephone & Telegraph Co.*, 827 F.2d 1291 (9th Cir. 1987). In that case, a Maricopa County attorney wrote Mountain Bell threatening to prosecute if the company continued to provide Carlin's adult-themed 976 service. *Id.* at 1293. The court held that, "[w]ith this threat, Arizona 'exercised coercive power' over Mountain Bell and thereby converted its otherwise private conduct into state action for purposes of § 1983." *Id.* at 1295 (quoting *Blum v. Yaretsky*, 457 U.S. 991, 1004 (1982)). The court went on to hold that the phone company's motivations for complying with the county attorney's demand were irrelevant.

---

[7] The cases involving government threats against individuals for *their* exercise of free speech rights may require more of a showing of a threat because, as discussed, parties defending their own rights have much greater incentives to resist government pressure than do third parties who are urged to suppress others' speech. In either situation, however, an objective test applies.

11

> Mountain Bell insists that it remains an unresolved question of fact whether the county attorney's letter was the real motivating force behind the termination. Even if unresolved, this factual question is immaterial.
>
> In *Peterson v. City of Greenville*, 373 U.S. 244 (1963), a city ordinance required restaurants to segregate their customers by race. As to the particular restaurateur involved, there was evidence that he knew of the ordinance but not that he segregated his customers *because* of the ordinance. The Court found that the segregation was state action "*even assuming*, as respondent contends, *that the manager would have acted as he did independently of the existence of the ordinance*." *Id.* at 248 (emphasis added). Simply by "command[ing] a particular result," the state had so involved itself that it could not claim the conduct had actually occurred as a result of private choice. *Id.* The same conclusion applies here. *Cf. Bantam Books, Inc. v. Sullivan*, 372 U.S. 58, 68 (1963) (state could not argue that bookseller was free to ignore letter threatening prosecution if he continued to carry "objectionable" books).

*Id.* (parallel citations omitted). The court concluded the county attorney's actions were precisely the sort of informal prior restraint barred under *Bantam Books*. *Id.* at 1296.[8]

So, too, whether Visa and MasterCard may have had other motivations in terminating use of their cards on Backpage.com is immaterial for the claims asserted here *against Sheriff Dart*. It is "clear … that the companies did not act spontaneously," as they had worked with Backpage for more than a decade, and they terminated their relationships because of Dart's letters." Order at 5. These circumstances, combined with Sheriff Dart's stated purpose to "defund" Backpage.com and the veiled threats of his letters is all that is required to establish a claim under *Bantam Books* and justify a preliminary injunction.

---

[8] Mountain States later adopted a policy to exclude *all* adult entertainment from its 976 network, which the Ninth Circuit found did not constitute state action. *Id.* at 1296-97. "[T]he initial termination of Carlin's service was unconstitutional," because "the *state* may never *induce* Mountain Bell" "to exclude Carlin's messages from its 976 network," but it does not follow that the company may never independently decide to exclude such messages. *Id.* (emphasis in original). This holding of *Carlin Communications* is not relevant here, however, for two reasons. First, Carlin only sued Mountain States, not the county attorney, while Backpage.com has thus far sued only Sheriff Dart. Second, Mountain States' later-enacted policy barred all adult entertainment, not merely Carlin's messages, whereas MasterCard and Visa announced they were blocking use of their cards on just one website – Backpage.com.

12

### E. Requiring Proof That the Card Companies Acted "Wholly Involuntarily" Would Eviscerate a Section 1983 Prior Restraint Claim.

To impose a requirement for Backpage.com's suit against Sheriff Dart that it must establish Visa and MasterCard acted wholly involuntarily would effectively eviscerate claims challenging officials' extralegal informal prior restraints under Section 1983.

The point of an informal prior restraint is to put pressure on third parties who have few incentives to resist, thereby accomplishing censorship indirectly when the government cannot do so directly. *See Bantam Books*, 372 U.S. at 64 n.6 ("The distributor who is prevented from selling a few titles is not likely to sustain sufficient economic injury to induce him to seek judicial vindication of his rights."); *accord Drive In Theatres, Inc. v. Huskey*, 435 F.2d 228, 230 (4th Cir. 1970) (noting the ease with which a sheriff imposed his will to ban X- and R-rated movies because local theatres' interests "may be insufficient to warrant … protracted and onerous … litigation" (quoting *Freedman v. Maryland*, 380 U.S. 51, 59 (1965)). This is all the more true when the official demanding "cooperation" is a sheriff or other law enforcement officer. *See ACLU v. Pittsburgh*, 586 F. Supp. at 422 ("the mere threat of police action will in most cases result in the threatened person desisting from the contemplated action"); *Rossignol v. Voorhaar*, 316 F.3d 516, 526 (4th Cir. 2003) ("The effect of a police presence on a store owner … is not hard to imagine" given that they "often feel a keen need to stay on the right side of local law enforcement."). And, law enforcement pressure is likely to be even more effective when leveled at financial institutions (such as Visa and MasterCard and their affiliated banks) that are closely scrutinized and regulated and for which any one merchant is relatively insignificant to their overall operations.

If third parties can avoid further pressure by saying they acted independently or had some other motivation for acceding to government demands, they would always have reason to say

that. Again, a threat cannot be erased merely by declaring that it was improper; third parties such as Visa and MasterCard still have incentives to stay on the "good side" of law enforcement. They also have reason to try to avoid claims for having participated with government in an unconstitutional prior restraint – Section 1983 permits claims against a private party when there is a "nexus" between the state and the private party's action. *See Jackson v. Metro. Edison Co.*, 419 U.S. 345, 351 (1974); *Carlin Commc'ns*, 827 F.2d at 1295; *Rossignol*, 316 F.3d at 527 ("The whole purpose of the Ku Klux Klan Act [which became § 1983] was to prevent public authorities from violating constitutional rights through the use of nominally private means.").

Informal and indirectly-aimed prior restraints – such as what Sheriff Dart thus far has accomplished in this case by avoiding judicial oversight – are perhaps the most troubling of all government attempts to censor. As one commentator wrote about this Court's TRO orders:

> [G]iven the limited interests which third parties have at stake in cases like these, virtually any expression of government displeasure can be enough to shut down speech. Even without a threat of imminent legal action, the mere fear of future friction with state or federal authorities can be enough to convince a vendor or payment processor that providing services is not worth the trouble. Hopefully, as Backpage.com's case moves forward, the court will recognize that fact and apply the principles of *Bantam Books* accordingly.

Jeff Hermes, *Backpage.com Obtains TRO to Stop Interference With Payment Processing for Adult Ads*, MLRC MEDIA LAW LETTER, July 2015, at 39.

Under *Bantam Books* and Section 1983, a victim of an informal prior restraint of government (such as Backpage.com here) should not – and must not – be required to prove that third parties acted involuntarily. Constitutional free speech protections would be hollow if that were so.

### III. CONCLUSION

The Court should grant preliminary injunctive relief to counteract Sheriff Dart's actions to impose an unconstitutional prior restraint and enable a return to the status quo that existed

before his actions. The record as it stands and the Court's findings and conclusions in the TRO orders amply support a preliminary injunction. Visa and MasterCard's motivations in terminating services in response to Sheriff Dart's demand letters are irrelevant under the law.

Dated: August 5, 2015.

       Respectfully submitted,

      By: *s/ James C. Grant*
        James C. Grant (admitted *pro hac vice*)
        Ambika K. Doran (admitted *pro hac vice*)
        DAVIS WRIGHT TREMAINE LLP
        1201 Third Avenue, Suite 2200
        Seattle, WA 98101
        Telephone: (206) 622-3150

        Robert Corn-Revere (admitted *pro hac vice*)
        Ronald G. London (admitted *pro hac vice*)
        Lisa B. Zycherman (admitted *pro hac vice*)
        DAVIS WRIGHT TREMAINE LLP
        1919 Pennsylvania Ave., N.W., Suite 800
        Washington, D.C. 20006
        Telephone: (202) 973-4200

        Christopher F. Allen
        PAUL HASTINGS LLP
        71 S. Wacker Drive
        Chicago, IL 60606
        Telephone: (312) 499-6000

        Attorneys for Plaintiff Backpage.com, LLC