**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS**

BACKPAGE.COM, LLC,        )
                                          )
                Plaintiff,        )
                                          )
      v.                              )        Case No.  15 C 06340
                                          )
THOMAS J. DART,               )
Sheriff of Cook County, Illinois,     )
                                          )
                Defendant.      )

**<u>DEFENDANT'S PRE-HEARING BRIEF</u>**

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ............................................................................................................. iii

INTRODUCTION ............................................................................................................................ 1

BACKGROUND ............................................................................................................................. 2

I.      BACKPAGE.COM. .................................................................................................... 2

II.     COOK COUNTY SHERIFF TOM DART. ................................................................ 3

III.    CREDIT CARD COMPANIES STOP DOING BUSINESS
WITH BACKPAGE. ................................................................................................. 4

       A.      American Express. ........................................................................................ 4

       B.      The relationship of Visa and MasterCard with Acquiring Banks. ........................ 5

       C.      MasterCard. ................................................................................................. 5

       D.      Visa. ............................................................................................................. 6

IV.    SHERIFF DART'S LETTERS. ................................................................................... 7

LEGAL STANDARD ..................................................................................................................... 7

ARGUMENT ................................................................................................................................... 8

I.      A PRELIMINARY INJUNCTION IS UNNECESSARY AND
INAPPROPRIATE. .................................................................................................... 8

       A.      Sheriff Dart is willing to send a letter clarifying his request to Visa and
MasterCard. ................................................................................................. 8

       B.      Backpage cannot establish that a preliminary injunction would cause Visa
and MasterCard to reverse their decisions. .............................................. 9

II.     PLAINTIFF IS UNLIKELY TO PREVAIL ON THE MERITS. ..................................... 9

       A.      Sheriff Dart has the right to speak out against illegal conduct. ............................. 9

       B.      Sheriff Dart's letters were not a threat. ................................................................... 12

       C.      Sheriff Dart's letters did not coerce Visa and MasterCard to involuntarily
discontinue their relationships with Backpage. ....................................... 13

i

**Page**

III.   THE BALANCE OF EQUITIES AND THE PUBLIC INTEREST
       UNQUESTIONABLY CUT AGAINST A PRELIMINARY
       INJUNCTION. ............................................................................................................ 14

CONCLUSION ...................................................................................................................... 15

## **TABLE OF AUTHORITIES**

**Page(s)**

**Cases**

*ACLU v. City of Pittsburgh,*
    586 F. Supp. 417 (W.D. Pa. 1984) ................................................................ 11

*Am. Family Ass'n, Inc. v. City and County of San Francisco,*
    277 F.3d 1114 (9th Cir. 2002) ................................................................ 9, 11

*Bantam Books, Inc. v. Sullivan,*
    372 U.S. 58 (1963) ................................................................ 10, 12

*Carlin Commc'ns, Inc. v. The Mountain States Tel. & Tel. Co.,*
    827 F.2d 1291 (9th Cir. 1987) ................................................................ 11

*Chicago United Indus., Ltd. v. City of Chicago,*
    445 F.3d 940 (7th Cir. 2006) ................................................................ 8, 9

*Council for Periodical Distrib. Ass'n v. Evans,*
    642 F. Supp. 552 (N.D. Ala. 1986) ................................................................ 11, 12

*Drive-In Theatres, Inc. v. Huskey,*
    435 F. 2d 228 (4th Cir. 1970) ................................................................ 11

*Ezell v. City of Chicago,*
    651 F.3d 684 (7th Cir. 2011) ................................................................ 8

*Goodman v. Illinois Dep't of Fin. & Prof'l Regulation,*
    430 F.3d 432 (7th Cir. 2005) ................................................................ 7, 9

*Hammerhead Enterprises Inc. v. Brezenoff,*
    707 F.2d 33 (2d Cir. 1983) ................................................................ 12, 14

*Henderson v. Huibregtse,*
    281 F. App'x 557 (7th Cir. 2008) ................................................................ 13

*Mazurek v. Armstrong,*
    520 U.S. 968 (1997) ................................................................ 8

*McLaughlin v. Watson,*
    271 F.3d 566 (3d Cir. 2001) ................................................................ 11

*Nelson v. Miller,*
    570 F.3d 868 (7th Cir. 2009) ................................................................ 9

iii

**Page(s)**

*Okpalobi v. Foster*,
    244 F.3d 405 (5th Cir. 2001) ............................................................................ 8

*Penthouse Int'l, Ltd. v. McAuliffe*,
    610 F.2d 1353 (5th Cir. 1980) ........................................................................ 11

*Penthouse International Ltd. v. Meese*,
    939 F.2d 1011 (D.C. Cir. 1991) ............................................................. 10, 13

*R.C. Maxwell Co. v. Borough of New Hope*,
    735 F.2d 85 (3d Cir. 1984) .................................................................... 10, 14

*Rattner v. Netburn*,
    930 F.2d 204 (2d Cir. 1991) ........................................................................ 12

*Suarez Corp. Indus. v. Rodd*,
    202 F.3d 676 (4th Cir. 2000) ................................................................ 10, 15

*Winter v. Nat'l Resource Defense Council*,
    555 U.S. 7 (2008) ................................................................................... 14, 15

*X-Men Sec., Inc. v. Pataki*,
    196 F.3d 56 (2d Cir. 1999) .......................................................................... 11

## <u>INTRODUCTION</u>

Backpage.com ("Backpage") claims that two multi-billion dollar corporations, Visa and MasterCard, were coerced by a single letter from Sheriff Dart, who admits that he has no authority over these companies. Discovery in this case has shown that to be false. American Express ("Amex") had independently severed ties with Backpage's adult services section long before Sheriff Dart's letters. Likewise, MasterCard was already investigating Backpage and taking steps to discontinue its relationship with the site out of concern for its own brand image and reputation. And Visa has provided sworn testimony in this case that, "At no point did Visa perceive Sheriff Dart to be threatening Visa with prosecution or any other official state action, nor did Visa base its decision [to cease doing business with Backpage] on any such threat." (Ex. 19, Visa Affidavit, ¶ 4.)[1] As a result, Backpage cannot prevail on the merits here.

Not only does Backpage stand no chance of establishing the two principal issues identified in the Court's order—threat and involuntariness—other factors necessary for a preliminary injunction are also absent. It is undisputed that Backpage has no First Amendment right to exhort illegal conduct. And that is the only conduct that Sheriff Dart has ever criticized. Moreover, the principal impact of Visa's and MasterCard's decisions is on revenue from precisely such ads. Any minimal impact on Backpage's revenues from legitimate ads, which still can be purchased with Amex and a variety of other means, cannot overcome the countervailing equities of protecting innocent women and children who would continue to be exploited and trafficked via Backpage's adult section. Encouraging a forum that criminals use to market children and women in the sex trade is directly contrary to the public interest.

---

[1] Documents cited herein are included in the accompanying Appendix in Support of Defendant's Pre-Hearing Brief and are referenced by tab. Defendant's witness list is attached to this Brief at Exhibit A.

# BACKGROUND

## I.    BACKPAGE.COM.

You can buy a car, purchase a musical instrument, or find a roommate through Backpage. You can also buy or rent a person for sex.  Children and women are sold for sex on Backpage every day.  Backpage freely admits this.  It has repeatedly acknowledged, including in this lawsuit, that each and every month, there are hundreds of instances where it appears that a minor is being advertised for sale for sex on its site.  (Compl. ¶ 25; Ex. 17, NCMEC Aff. ¶¶ 20-23.) Indeed, Backpage optimizes traffickers' ability to post ads by helping criminals modify ads to avoid police scrutiny and ignoring recommended improvements.  (*Id*. ¶¶ 22, 24-26, 31-33.)

Backpage touts itself as assisting law enforcement in its efforts to stamp out child prostitution and human trafficking.  (Compl. ¶¶ 23–26.)  But law enforcement agencies across the country say that the opposite is true.  They say that the most often-used and successful means of connecting would-be purchasers of women and children for illegal sex to their victims is through Backpage.  (Exs. 26-28, Boston P.D. Affidavit, ¶ 5 ("Backpage.com is the number one site in Boston for prostitution and sex trafficking."); Alameda County D.A. Affidavit, ¶ 8; Seattle P.D. Affidavit, ¶ 8).)  This is a lucrative business for Backpage.  It makes tens of millions of dollars every year and is reported to be the leading website for advertising prostitution in the U.S., generating more than 70% of prostitution-advertising revenue on the Internet.[2]

That Backpage is consistently used for these illegal purposes has been noted not only by local law enforcement, but also by the National Association of Attorneys' General ("NAAG") and members of Congress.  (Ex. 13, NAAG Aff. and Letters.)  NAAG has repeatedly told Backpage that its so-called efforts to prevent the use of its platform for prostitution, including

---

[2] *See* Ex. 1, http://www.nytimes.com/2012/03/18/opinion/sunday/kristof-where-pimps-peddle-their-goods.html, citing Ex. 16, http://aimgroup.com/2012/02/24/sites-set-combined-record-for-online-prostitution-ad-revenue/.

child prostitution, are entirely ineffective.  (*Id.*)  It has urged Backpage to close down the innocently-named "adult" section of its website to eliminate an easy tool for criminals to market and buy and sell women and children for sex.  (*See id.*)

The National Center for Missing and Exploited Children ("NCMEC"[3]) has had a similar experience.  NCMEC reports that it has seen a 1,432% increase in reports of suspected child sex trafficking over the past five years.  (Ex. 17, NCMEC Aff. ¶ 12.)  Of the child sex trafficking reports submitted by the public to NCMEC's CyberTipline, the majority relate to Backpage ads.  (*Id.* ¶ 13.)  NCMEC has asked Backpage again and again to make modest changes to its site to make it harder for sex traffickers to use—all to no avail.  (*Id.* ¶¶ 28-33.)

Even worse, Backpage sometimes keeps ads up on its site even when it has been told they reflect possible child sex trafficking.  (*Id.* ¶ 12.)  By doing so, Backpage enables criminals to continue purchasing children for rape and other sexual exploitation.  (*Id.*)  Some child victims have brought suits against Backpage, detailing how "pimps" sold them to be raped hundreds of times a year by "johns" who bought them through Backpage.  (Ex. 15, 2d Am. Compl., D. Mass., 14-13870, Doc. 22.)  But Backpage has repeatedly succeeded in having those cases dismissed—not because the facts alleged were untrue—but on legal standing grounds.  (*See*, *e.g.*, Ex. 14, Mem. & Order, D. Mass., 14-13870, Doc. 53.)

## II.     COOK COUNTY SHERIFF TOM DART.

Here in Cook County, Sheriff Tom Dart maintains the Vice and Special Operations Units of the Cook County Sheriff's Police, which actively pursue human trafficking cases.  These

---

[3] NCMEC serves as the national clearinghouse for families, victims, private industry, law enforcement, and other professionals on information related to missing and exploited children.  NCMEC assists law enforcement and others in reducing child sexual exploitation, preventing child victimization, and eliminating child sex trafficking and child pornography.  (Ex. 17, NCMEC Aff. ¶¶ 2-10).

Units regularly conduct prostitution stings and demand suppression operations to apprehend "johns" who solicit sex and "pimps" who sell prostitutes.

When Backpage began hosting "adult" ads, Sheriff Dart tried to work with it to assist his efforts to curtail sex trafficking. He had numerous discussions with Backpage. He suggested that it use additional methods of identifying the individuals who used Backpage for unlawful sex trafficking, including by requiring identification of ad purchasers through the use of credit cards. But when he learned that Backpage was not using robust credit card identification or any other effective means of prohibiting the use of its site for the sale of women and children for sex, he asked Backpage to take down the "adult" section of its website.

In over 800 cases, Sheriff Dart's team has tested the legality of the "business" advertised in the adult section of Backpage, and *each and every time* has made an arrest for crimes ranging from prostitution to child trafficking.[4] Notably, Sheriff Dart's office has never arrested anyone in connection with an ad placed in a section other than the "adult" section of Backpage.

## III. CREDIT CARD COMPANIES STOP DOING BUSINESS WITH BACKPAGE.

### A. American Express.

Unbeknownst to Sheriff Dart and his staff, in early 2015 (at the latest), Amex began evaluating whether it wanted to continue to be associated with Backpage, apparently given concerns that Backpage facilitated illegal activities. Backpage states that in April 2015, Amex told Backpage that it would no longer allow its cards to be used to post ads in the "adult" section of its site. (Compl. ¶ 43.) In June 2015, when Sheriff Dart learned of this decision, he wrote Amex to thank it for its leadership in the effort to stamp out the sex trafficking taking place

---

[4] *See* Cook County Sheriff's Police Department Police Reports, bates stamped CCSO 1401-3114, the contents of which will be summarized in testimony at the hearing. Other police departments have had similar experiences. (Ex. 28, Seattle P.D. Affidavit, ¶ 7 (Seattle P.D. "has not once found that the individual posting or responding to one of our decoy ads in the adult section of Backpage.com was in fact seeking any type of innocent, legal activity.").)

through Backpage's adult ads. (Ex. 20, 6/30/15 Ltr. to Amex, CCSO06320.) Amex continued to let its cards to be used on the other, legitimate portions of Backpage. (Ex. 21, 6/26/15 Email re "Conversation recap from Amex," CCSO9596.) Dart never raised any complaint or issue with Amex regarding that decision.

But Backpage took advantage of a loophole to make an end-run around Amex's decision. Backpage allowed users to buy "credits" with Amex and use them to post adult ads. When Amex learned of this, ███████████████████████████████████████████████ ████████████████████████████████████

**B.      The relationship of Visa and MasterCard with Acquiring Banks.**

The relationship between merchants that accept credit cards and Visa and MasterCard is not a direct one. Neither Visa nor MasterCard issues credit cards, extends credit to customers, or contracts with "Merchants" like Backpage. Visa and MasterCard instead provide the technological payment process by which banks can provide credit and debit card services for *their* customers. Merchants contract directly with financial institutions for credit card services, not with Visa or MasterCard. These institutions, known as "Acquirers," initiate and maintain contracts with Merchants for the purpose of accepting and processing credit card transactions. Where, as here, a Merchant is removed as an active one, that decision is implemented by an "Acquirer" bank, and not Visa or MasterCard.

**C.      MasterCard.**

Again unbeknownst to Sheriff Dart, ████████████████████████████████████ ████████████████████████████████████████████████████████████████ █████████████████████████████████████████████████████

─────────────────────────

█████████████████████████████ *see also* Ex. 22, 6/29/15 to 7/13/15 Email chain, CCSO6945–6947.

███████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

██████████████████████████████████████

███████████████████████████████████████████

████████████████████████████████████████

████████████████████████████

Approximately one week later, on June 29, MasterCard received the letter from Sheriff Dart advising it of Amex's prior actions regarding Backpage and alerting it to his concerns about sex trafficking occurring via the "adult" section of Backpage's site. ████████

████████████████████████████████████████████████

██████████████████████████████████████████

███████████████████████████████████████

**D.     Visa.**

According to Visa, its rules prohibit its cards from being used for illegal or other activity that may impair the goodwill or reputation of the Visa brand. ████████████████

██████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

███████████████████████████████████████████

█████████████████████████████████████████

██████████████████████████

6

Visa has testified unconditionally that its decision was independent: "[A]t no point did Visa perceive Sheriff Dart to be threatening Visa with prosecution or any other official state action, nor did Visa base its decision on any such threat." (Visa Aff. ¶ 4, Ex. 19.)

## IV.    SHERIFF DART'S LETTERS.

On June 29, Sheriff Dart wrote letters to Visa and MasterCard, inviting them to look into how their cards were being used to facilitate sex trafficking, and asking that they consider ceasing to do business with Backpage. (Exs. 4, 3 (6/29/15 Letter to C. Scharf, 6/29/15 Letter to A. Banga).) He noted that the companies already banned the use of their cards for certain gambling and marijuana transactions and asked them to consider the "cost to your image" of being associated with ads for sex trafficking. He also invited them to follow the example of Amex, which "decided to stop allowing its cards to be used to buy ads in the adult section of Backpage.com." (*Id.*)

The letters contain no explicit threat; in fact, they do not identify any action Sheriff Dart might take. Instead, he invited the companies to become his partners "in the fight to help protect vulnerable and victimized women and children" and asked them to identify someone "that I can work with on this issue." On their face the letters pertain only to the "adult" section of the site. However, to resolve any ambiguity, Sheriff Dart is willing to send a letter making clear that his letters had nothing to do with any other section of Backpage. (*See* Letter, attached as Ex. 18.)[6]

## LEGAL STANDARD

A preliminary injunction is "an extraordinary and drastic remedy, one that should not be granted unless the movant, *by a clear showing*, carries the burden of persuasion." *Goodman v.*

---

[6] Dart would have already sent this letter but, out of an abundance of caution with respect to the Court's temporary restraining order, has waited to obtain the Court's permission to do so. We believe this letter moots any issue with respect to the preliminary injunction Backpage seeks.

*Illinois Dep't of Fin. & Prof'l Regulation*, 430 F.3d 432, 437 (7th Cir. 2005) (quoting *Mazurek v. Armstrong*, 520 U.S. 968, 972 (1997)). To obtain an injunction, Backpage must show that it has: "(1) no adequate remedy at law and will suffer irreparable harm if a preliminary injunction is denied and (2) some likelihood of success on the merits." *Ezell v. City of Chicago*, 651 F.3d 684, 694 (7th Cir. 2011). Only if the movant meets these threshold requirements, the court then considers "whether the balance of harms favors the moving party or whether the harm to the nonmoving party *or the public* is sufficiently weighty that the injunction should be denied." *Id.*

In addition, a preliminary injunction must be effectual. *Okpalobi v. Foster*, 244 F.3d 405, 427 (5th Cir. 2001) (denying preliminary injunction request "[b]ecause these defendants have no powers to redress the injuries alleged"). And a defendant can render a requested injunction moot through its actions, including actions "after the suit was filed." *Chicago United Indus., Ltd. v. City of Chicago*, 445 F.3d 940, 946 (7th Cir. 2006).

## ARGUMENT

## I.  A PRELIMINARY INJUNCTION IS UNNECESSARY AND INAPPROPRIATE.

Backpage's sole harm is that Visa and MasterCard terminated their relationships with the website. The evidence is clear—and the letter proposed by Dart only makes more clear—that Backpage's requested injunction would have no effect on that purported harm.

### A.  Sheriff Dart is willing to send a letter clarifying his request to Visa and MasterCard.

Backpage has misrepresented Dart's position and intent with respect to his letters. He did not threaten prosecutorial action. And Dart limited his criticisms to Backpage's adult ads. He never complained about any other ads, such as for buying cars or finding a roommate. But, to solve any confusion, Dart has offered to send the attached letter to Visa and MasterCard. (Ex. 18.) It explains that his prior letters addressed only illegal activity taking place via adult

ads.  Dart also explains—exactly as he has told this Court—that his letter could not be a threat because "I have no authority over financial institutions[.]"  This therefore moots Backpage's request for a preliminary injunction.  *Chicago United Indus.*, 445 F.3d at 946 ("measures taken by the City after the suit was filed" rendered the injunction moot).

### B.    Backpage cannot establish that a preliminary injunction would cause Visa and MasterCard to reverse their decisions.

Where, as here, a preliminary injunction would have no effect, it is not an appropriate remedy.  *Goodman*, 430 F.3d at 437; *Nelson v. Miller*, 570 F.3d 868, 882 (7th Cir. 2009) (a court's power to grant injunctive relief survives only if such relief is actually needed).  Backpage will not be able to establish that Visa or MasterCard will reverse its action upon entry of a preliminary injunction.  Indeed, the evidence suggests the opposite.  ████████████ ████████████████████████████████████████████████████████ ██████████████████████████████████████████████████ An injunction on Dart's later speech would have no effect on the company and would therefore be inappropriate.[7]

## II.    PLAINTIFF IS UNLIKELY TO PREVAIL ON THE MERITS.

### A.    Sheriff Dart has the right to speak out against illegal conduct.

It cannot be contested that "public officials may criticize practices that they would have no constitutional ability to regulate, so long as there is no actual or threatened imposition of government power or sanction."  *Am. Family Ass'n, Inc. v. City and County of San Francisco*, 277 F.3d 1114, 1125 (9th Cir. 2002).  Requiring a plaintiff to prove a threat or coercion

---

[7] Backpage may argue that the preliminary injunction is not moot because Dart might "threaten" other financial institutions.  But there is a strong presumption that state actors will not continue "objectionable behavior" absent an injunction.  *See Chicago United Indus.*, 445 F.3d at 947 ("[W]hen the defendant is not a private citizen but a government actor, there is a rebuttable presumption that the objectionable behavior will *not* recur if the injunction is lifted." (citation omitted)).

"recognizes that a balance must be struck between the citizen's right to exercise his First Amendment rights and the public official's personal First Amendment rights, as well as his duty to speak out about matters of public concern." *Suarez Corp. Indus. v. Rodd*, 202 F.3d 676, 688, n.13 (4th Cir. 2000). Plaintiff here relies primarily upon the Supreme Court's decision in *Bantam Books, Inc. v. Sullivan*, 372 U.S. 58 (1963), but ignores the many subsequent decisions affirming that, absent any threat or coercion, the speech of public officials does not violate the First Amendment as a matter of law. And *Bantam Books* dealt with viewpoint discrimination, not an effort to curb exhortations to illegal activity. Dart respectfully suggests that this Court should not accept Backpage's invitation to extend *Bantam Books* beyond where any other court has applied it.

*Penthouse International Ltd. v. Meese*, 939 F.2d 1011 (D.C. Cir. 1991) is illustrative. There, the Attorney General's Commission on Pornography sent letters asking companies to cease selling Penthouse magazines. Even though the letters appeared on official Justice Department stationary, used the word "allegations," and instructed the recipient to contact an attorney, the court held that they did not violate the First Amendment because they contained no threat to prosecute or "intimation of intent to proscribe the distribution of the publications." *Id.* The court distinguished *Bantam Books*, explaining that the Supreme Court "has never found a government abridgement of First Amendment rights in the absence of some actual or threatened governmental power or sanction." *Id.*[8] Backpage's assertion that Dart's letter was a threat because it was written on official letterhead, used the words "cease and desist," and cited statutes is, therefore, a proposition the case law has already rejected.

---

[8] *See also R.C. Maxwell Co. v. Borough of New Hope*, 735 F.2d 85, 88–89 (3d Cir. 1984) (holding that letter from borough official to billboard owner requesting removal of plaintiff's ads but lacking "enforceable threats" did not violate First Amendment, and distinguishing *Bantam Books* because the Supreme Court "stressed . . . the trial judge's factual finding that distributors cooperated with the Commission only out of fear of prosecution").

Similarly, in *Am. Family Ass'n*, 277 F.3d at 1125, in response to an ad placed by the plaintiff religious advocacy group, the San Francisco Board of Supervisors wrote a letter "denouncing [the group's] hateful rhetoric." The Board then went further, passing resolutions calling for the "Religious Right to take accountability for the impact of their long-standing rhetoric denouncing gays and lesbians" and urging area stations not to broadcast ads involving homosexual "conversion." *Id.* at 1119–20. The Ninth Circuit, however, affirmed dismissal of the claim because there was "no sanction or threat of sanction if the Plaintiffs continued to urge conversion of homosexuals or if the television stations failed to adhere to the Defendants' request." *Id.* at 1125.[9]

In sum, "[w]hen a public official is sued for allegedly causing a third party to take some type of adverse action against plaintiff's speech, we have held that defendant's conduct must be of a particularly virulent character. It is not enough that defendant speaks critically of plaintiff or even that defendant directly urges or influences the third party to take adverse action. Rather, defendant must 'threaten' or 'coerce' the third party to act." *McLaughlin v. Watson*, 271 F.3d 566, 573 (3d Cir. 2001).[10] Backpage stands no chance of carrying its burden on this issue.

---

[9] *See also X-Men Sec., Inc. v. Pataki*, 196 F.3d 56, 70–71 (2d Cir. 1999) (disparaging, accusatory, or untrue statements do not state a First Amendment claim in absence of threats, intimidation, or coercion).

[10] The other cases Backpage cites are likewise inapposite. They involve direct threats of prosecution or actual prosecution. *See*, *e.g.*, *Carlin Commc'ns, Inc. v. The Mountain States Tel. & Tel. Co.*, 827 F.2d 1291, 1293, 1295 (9th Cir. 1987) (letter from district attorney stated direct and explicit threat of prosecution should phone company continue providing line for an adult entertainment company); *Penthouse Int'l, Ltd. v. McAuliffe*, 610 F.2d 1353, 1357, 1360 (5th Cir. 1980) (county solicitor general arrested and prosecuted store owners who sold magazines he deemed to be obscene and threatened to do same to others); *Drive-In Theatres, Inc. v. Huskey*, 435 F. 2d 228 (4th Cir. 1970) (direct threats of arrest and actual prosecution of theatre owners who displayed certain movies); *Council for Periodical Distrib.*, 642 F. Supp. at 555 (district attorney directly threatened prosecution of distributor and store owners unless they stopped selling certain magazines); *ACLU v. City of Pittsburgh*, 586 F. Supp. 417, 426 (W.D. Pa. 1984) (mayor's letter explicitly threatened prosecution of magazine and news dealers who sold magazine, followed by police visits to vendors).

**B.**     **Sheriff Dart's letters were not a threat.**

Backpage has asserted that whether a communication constitutes a threat is a purely objective question.  Backpage is wrong.  In *Bantam Books* itself, the trial court and the Supreme Court reviewed both the objective and subjective evidence to determine if there was a threat of official state action.  372 U.S. at 63 (stressing the subjective basis for one owner's compliance: "to avoid becoming involved in a 'court proceeding' with a 'duly authorized organization'").  Plaintiffs' contrary position would mean that MasterCard could have ended its relationship with Backpage for any reason, yet Sheriff Dart should be punished for it.  Unsurprisingly, courts—including in decisions Backpage cites—routinely consider the recipient's state of mind when determining whether a communication constituted a threat.[11]

But there is no evidence that the credit card companies considered the letters to be a threat—in fact, the evidence is otherwise.  By the time MasterCard received Sheriff Dart's letter,

███████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████  And Visa has testified that "At no point did Visa perceive Sheriff Dart to be threatening Visa with prosecution or any other official state action, nor did Visa base its decision on any such threat."  (Ex. 19, Visa Affidavit, ¶ 4.)

This is no surprise.  Sheriff Dart's letters were not intended as a threat.  They are silent as to any action Dart would or could take with respect to the companies.  Rather, they describe the sex trafficking and exploitation that occur via Backpage adult ads and appeal that the companies take steps to prevent their cards from being used to facilitate such conduct.  Dart called upon the

---

[11] *See, e.g.*, *Hammerhead Enterprises Inc. v. Brezenoff*, 707 F.2d 33, 38–39 & n.7 (2d Cir. 1983) (considering whether letter in fact intimidated recipient); *Rattner v. Netburn*, 930 F.2d 204, 210 (2d Cir. 1991) (giving great weight to testimony of letter recipients regarding whether they perceived a threat of official state action); *Council for Periodical Distrib. Ass'n v. Evans*, 642 F. Supp. 552, 565 (N.D. Ala. 1986) (stressing that "the local merchants believed they risked criminal prosecution if they failed to cooperate").

companies' "moral, social and legal right to step up on this pervasive problem and make a fundamental and everlasting difference." And he asked the companies to consider the "cost to your image" of allowing their cards to be used to facilitate prostitution and trafficking. (Ex. 3, 6/29/15 Letter to A. Banga at 3.) And he asked for help: a request to identify someone "that I can work with on this issue." (*Id.*)[12]

      **C.**     **Sheriff Dart's letters did not coerce Visa and MasterCard to involuntarily discontinue their relationships with Backpage.**

The evidence adduced in this case shows that Visa and MasterCard's decisions to discontinue providing services to Backpage were wholly voluntary, just like Amex's. Where government speech to a third party has no coercive effect, and that party makes an "independent business decision," a plaintiff's claim of prior restraint fails as a matter of law. *Henderson v. Huibregtse*, 281 F. App'x 557, 580–81 (7th Cir. 2008) (because newspaper independently "was not inclined" to sell subscription to plaintiff regardless of the challenged government speech, there was no redressable harm.) ***First,*** by the time MasterCard received Sheriff Dart's letter, ▮ ▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬

     ***Second,*** Visa and MasterCard are multibillion-dollar companies with access to legal teams. These corporations could not possibly be coerced by a county sheriff without jurisdiction over them. And the recipients of the Sheriff's letters, Visa and MasterCard, were not even the final decisionmakers on continuing to do business with Backpage; they were banks that had the merchant contracts with Backpage.

---

[12] Not only did Sheriff Dart's letters not violate Backpage's First Amendment rights, his advocacy constitutes *Sheriff Dart's* constitutionally protected advocacy. *E.g.*, *Penthouse*, 939 F.2d at 1015–16.

**Third**, Sheriff Dart had no enforcement authority over Visa and MasterCard. This alone is sufficient to deny Backpage's motion.[13] Nor did Sheriff Dart have any communications with, or jurisdiction over, the European acquiring banks.

## III. THE BALANCE OF EQUITIES AND THE PUBLIC INTEREST UNQUESTIONABLY CUT AGAINST A PRELIMINARY INJUNCTION.

Even if a plaintiff demonstrates the requisite likelihood of success—which Backpage cannot do here—a preliminary injunction should be denied if the balance of equities and public interest weigh heavily against such relief. *See Winter v. Nat'l Resource Defense Council*, 555 U.S. 7 (2008) (reversing preliminary injunction *without regard to plaintiffs' likelihood of success or irreparable injury* because the balance of equities and public interest "plainly outweigh[] the interests advanced by the plaintiffs").

Here, the balance of equities is not even close. On the one hand, there is a website that wants carte blanche to advertise illegal conduct under the guise of "adult services." Such ads receive no First Amendment protection. In fact, when 150 FBI arrests for human trafficking resulted in the rescue of 100 sexually exploited children, James Larkin, Backpage's controlling shareholder, e-mailed the FBI claiming that it had "arrested half my customers in your stupid, pointless 'raid.'" (Ex. 2, *Backpage.com's Jim Larkin: "FBI Human-Trafficking Raid Hurt My Customer Base,"* Newslo (July 30, 2013).)

On the other side of the ledger is the chief law enforcement officer of a major metropolitan area who has the right to speak on a key matter of public concern: the exploitation and sex trafficking of women and minors. Sheriff Dart's own First Amendment right—and

---

[13] *See R.C. Maxwell*, 735 F.2d at 88–89 (letter from borough secretary-treasurer borough to owner of a billboard requesting the removal of plaintiff's billboards but lacking "enforceable threats" did not violate First Amendment); *Hammerhead*, 707 F.2d at 39 (relying on fact that defendant had no power to impose sanctions on merchants who did not comply with request).

public duty—to speak out against sex trafficking must be respected. *E.g.*, *Suarez Corp. Indus. v. Rodd*, 202 F.3d 676, 688, n.13 (4th Cir. 2000). A letter from a public official that educates a corporation about a social problem, and seeks support in combating that problem, is core government speech that should not be suppressed by a preliminary injunction.

In addition, the rights and safety of the victims of Backpage's adult ads "plainly outweigh[] the interests advanced by the plaintiffs." *See Winter*, 555 U.S. at 26. The evidence of the unquestioned harm Backpage's ads inflict on women, children, and communities across the country is overwhelming. According to Senator Mark Kirk, Backpage is the "nation's most active sex trafficking website . . ., where an estimated 70% of the sex trafficking transactions are arranged." (Ex. 5, 8/7/15 Letter from M. Kirk *et al.* to Attorney General Loretta Lynch) Granting a preliminary injunction to support a profit center that is the central hub for the sale of women and children for sex in America is directly contrary to the public's interest.

## CONCLUSION

The evidence that will be presented at the preliminary injunction hearing will demonstrate conclusively that there is no basis for Backpage's requested injunction. The injunction will be entirely ineffectual, and the letter Sheriff Dart proposes to send moots any issue. Moreover, Backpage has no likelihood of success on the merits, and all the equities weigh against it. Accordingly, Sheriff Dart respectfully requests that the Court deny Backpage's injunction.

Dated:  August 14, 2015

Respectfully submitted,


By: /s/ Zachary D. Holmstead
ANITA ALVAREZ
STATE'S ATTORNEY OF COOK COUNTY
Daniel F. Gallagher, Jr.
Sisavanh B.Baker
Jill Ferrara
ASSISTANT STATE'S ATTORNEYS
500 Richard J. Daley Center
Chicago, IL  60602
Telephone:     (312) 603-7998

Hariklia Karis (*pro hac vice*)
Barack S. Echols
Zachary D. Holmstead
KIRKLAND & ELLIS LLP
300 North LaSalle
Chicago, IL  60654
Telephone:     (312) 862-2000

*Attorneys for Defendant*
*Thomas J. Dart, Sheriff of Cook County*

16

EXHIBIT A

## DEFENDANT DART'S WITNESS LIST

Defendant Sheriff Thomas J. Dart respectfully submits the below list of witnesses anticipated to be called to testify at the August 20, 2015 preliminary injunction hearing.

**1.** **Witnesses that may be called live (or via deposition or affidavit if unavailable).**

Deputy Chief Michael Anton, Cook County Sheriff's Office

Sheriff Thomas J. Dart, Cook County Sheriff's Office

Carl Ferrer, Backpage.com

Elizabeth McDougall, Backpage.com

Cara Smith, Cook County Sheriff's Office

**2.** **Witnesses expected to provide testimony via affidavit.**

Casey Bates, Deputy District Attorney, Alameda County District Attorney's Office

Martin Elliott, Senior Director of Visa U.S.A., Inc.

Donna M. Gavin, Sergeant Detective and Commander, Human Trafficking Unit, Boston, Massachusetts

James E. McPherson, Executive Director of the National Association of Attorneys General

Staca Shehan, Executive Director of the Case Analysis Division of The National Center for Missing and Exploited Children (NCMEC)

Thomas Umporowicz, Detective-Sergeant, Vice/High Risk Victims Unit, Seattle, Washington

Human Trafficking Task Force Sergeant for the Seattle Police Department

Corporate Representative (TBD), American Express

Corporate Representative (TBD), MasterCard

Additional Law Enforcement Authorities (TBD)

## **<u>CERTIFICATE OF SERVICE</u>**

I hereby certify that on this 14th day of August, 2015, I caused the foregoing to be electronically filed with the Clerk of the court using the CM/ECF System which will send notification of such filing to all counsel of record in this matter.

/s/ Zachary D. Holmstead
Zachary D. Holmstead