# EXHIBIT 17

AFFIDAVIT OF STACA SHEHAN

COMMONWEALTH OF VIRGINIA    )
                            )   SS
CITY OF ALEXANDRIA          )

NOW COMES THE AFFIANT, Staca Shehan, being first duly sworn under oath, deposes and states that I can testify to the following information, and if I were called to testify, my testimony would be:

1. I am currently employed as Executive Director of the Case Analysis Division ("CAD") at The National Center for Missing and Exploited Children® ("NCMEC") and have been employed by NCMEC since July 1999. I have held various positions in NCMEC and worked in CAD since 2006. In 2011, I was named Director of CAD and was promoted to Executive Director in 2015. As Executive Director, I am responsible for supervising CAD's analysts and support personnel, including the processing of CyberTipline® and missing children reports related to child sex trafficking. The information contained in this affidavit is based on my own personal, first-hand knowledge and on information to which I have access and believe to be accurate in my role as Executive Director of CAD.

2. NCMEC is a private, nonprofit corporation created to help find missing children, reduce child sexual exploitation, and prevent child victimization. NCMEC employs over 325 individuals and works with hundreds of volunteers to fulfill its mission of serving as the national clearinghouse for families, victims, private industry, law enforcement, and other professionals on information related to missing and exploited children issues. NCMEC works with domestic and international federal, state, and local law enforcement agencies; the U.S. Department of Justice; non-profit organizations, and child-serving professionals to fulfill its mission on child-related issues. NCMEC is not an agency or instrumentality of the United States government, and no NCMEC staff are employees of the United States government or any law enforcement agency.

3. Based on our clearinghouse role, NCMEC has unique knowledge and experience concerning child sex trafficking, the psychological and physical harm suffered by its victims, and how traffickers or "pimps" use online classified advertising to facilitate and encourage the purchasing of children for sexual victimization.

4. NCMEC's Case Analysis Division provides services to victims, families, law enforcement and the public to help prevent child abduction, recover missing children, and combat child sexual exploitation. A central program of CAD is NCMEC's Child Sex Trafficking Team.

5. Established in 2011, NCMEC's Child Sex Trafficking Team provides technical assistance to law enforcement agencies, first responders, and service providers in identifying, locating, and providing recovery planning to victims of, and children at risk for, child sex trafficking. NCMEC receives reports regarding child sex trafficking through the intake of missing child cases, requests

1

for analytical assistance, and reports to NCMEC's CyberTipline. Using publicly available search tools and information from law enforcement and the public, NCMEC staff work to link cases of possible child sex trafficking to missing child cases where the child is at risk for being trafficked.

6. NCMEC's Child Sex Trafficking Team regularly provides technical assistance to federal, state, and local law enforcement in child sex trafficking matters. In particular, NCMEC supports the FBI's Innocence Lost National Initiative by providing 24/7 analytical support and technical assistance during Operation Cross Country, an action led by the FBI to help locate and recover victims of child sex trafficking. During Operation Cross Country, NCMEC acts as a clearinghouse and resource center to provide information and real-time analytical support to law enforcement and victim specialists in the field. In June 2014, for example, NCMEC's Child Sex Trafficking Team provided assistance for Operation Cross Country VIII, which over the course of one week resulted in the recovery of 168 child victims of sex trafficking and the arrest of 281 suspected traffickers and their associates.

7. NCMEC launched the CyberTipline in 1998, to serve as the national online clearinghouse for tips from the public relating to child sexual exploitation. The CyberTipline allows the public to report online and via toll-free telephone the enticement of children for sexual acts, extra-familial child sexual molestation, child pornography, child sex tourism, child sex trafficking, unsolicited obscene materials sent to a child, misleading domain names, and misleading words or digital images on the Internet. CAD staff review CyberTipline reports received from the public and online companies concerning child sex trafficking.

8. CAD staff also work with law enforcement, service providers, and other non-profits on awareness, intervention, and recovery planning relating to victims of child sex trafficking.

9. Federal law, specifically 18 U.S.C. § 2258A, requires certain entities known as Electronic Service Providers ("ESPs") to report instances of apparent child pornography discovered on their systems or servers to NCMEC's CyberTipline. ESPs are generally defined as any service that provides to public users the ability to send or receive wire or electronic communications. No federal or state law imposes a comparable requirement to report child sex trafficking.

10. Some ESPs voluntarily submit reports concerning child sex trafficking to the CyberTipline. Backpage began making company reports relating to suspected child sex trafficking ads to the CyberTipline in October 2010.

11. After the public or an ESP makes a report concerning child sex trafficking to NCMEC, a CAD staff member uses conventional and publicly-available "open source" search engines to try to identify information pertaining to the victim or alleged trafficker, as well as a possible geographic location where the alleged child sex trafficking has occurred. These reports are made available to law enforcement in the identified potential geographic location for their independent review and possible investigation.

12. In 2014, NCMEC processed over 8,600 CyberTipline reports related to child sex trafficking. More than 1,800 missing child cases reported to NCMEC in that same year involved suspected or confirmed child sex trafficking. Over the past five years, NCMEC has seen a 1,432%

2

increase in reports of suspected child sex trafficking to the CyberTipline. One in six endangered runaway cases reported to NCMEC in 2014 were likely sex trafficking victims. This is an increase from one in seven cases reported in 2013.

13. Of the child sex trafficking reports submitted by members of the public to the CyberTipline, more than sixty four percent (64%) relate to Backpage ads.

14. NCMEC's statistics are based on information we receive in our clearinghouse role, and our numbers represent only a fraction of child sex trafficking victims in the United States.

15. Child sex trafficking involves the recruitment, harboring, transportation, provision, obtaining, or advertising of a minor child for the purpose of a commercial sex act. Traffickers often prey on a child's vulnerability and use psychological pressure and intimidation to control the child for financial benefit relating to their sexual exploitation. Purchasers of children for sex encompass all racial, socio-economic and cultural statuses. Child sex trafficking has devastating consequences for its minor victims, including long-lasting physical and psychological trauma, disease or even death.

16. NCMEC knows that child sex trafficking often involves a missing child. Many child sex trafficking victims are runaways who are exploited by traffickers and the individuals who purchase them for sex. I am aware of more than 300 cases in the last several years in which NCMEC was advised that a missing child reported to NCMEC was trafficked for sex in an ad posted on Backpage. As a result of the frequency of these connections, Backpage's website is often the first place we search online when providing technical assistance on a missing child case in which child sex trafficking is suspected.

17. Child sex trafficking does not just occur in foreign countries or large metropolitan cities. Children are trafficked for sex in every state across the United States. Previously, the majority of child sex trafficking occurred when children were solicited and sold for sex on the streets, at casinos and truck stops, and in other physical locations. From what I am able to observe, it appears most child sex trafficking currently occurs online. Traffickers advertise children online for sex and recruit children online. Online advertising sites have created a virtual shopping venue where children can be easily bought and sold for sex. Purchasers "shop" online for sex with children from the privacy of their homes, via cell phones, or while in hotel rooms.

18. Online classified ad sites such as backpage.com allow traffickers to remain anonymous and to easily locate customers to consummate their sale of children for sex. Travel or movement is a frequent part of child sex trafficking victimization and assists traffickers in maintaining control over a victim, meeting the demand of customers and attempting to avoid law enforcement detection. Through online trafficking, traffickers can easily update an existing ad with a new location and quickly move a child to another geographic location where they will endure countless days and nights of abuse, sexual torture and violence.

19. Backpage has an "escorts" section that hosts ads consisting of a headline, the poster's age, photographs and/or videos, and brief text regarding the services being sold. The photographs and videos in the escort ads often are sexually suggestive and feature partially-clad individuals, at times

3

with their faces obscured, and their breasts, buttocks, and/or genital areas prominently featured. The ads also feature text that unambiguously describes the sexual experience being sold.

20. Law enforcement has confirmed to NCMEC that Backpage escort ads containing the following language were advertising a child for sex:

- "Hi GUYS I'm NEW TO [ ], NOT TO THE LIFE, YOUNG HOT (u need that) THAT YOUNG GIRL LOOK/BODY SKILLS OF A WELL TRAINED WOMAN FETISH ALERT-LIL-GIRL-ROLE PLAY//DRESS UP, MORE DOM., THAN SUBMISSIVE."

- "Enjoy both me and my girlfriend for an hour of the most pleasure you can experience as one man."

- "I enjoy catering to mature gentlemen. My body is a gentleman's playground."

- "LET'S PARTY!*I LOVE TO MAKE . . . –THOSE TOES CURL - - - - -!!* - - - - - - INDULGE * THESE.SORT-.-.- THICK THIGHS, PULL THIS LONG RED HAIR & SLAP THIS FATT JIGGLEY AZZ!"

- "You pay to get it just how you like it, and juicy and waiting on you - - - I promise your going to enjoy me. . ."

21. Many escort ads reported by Backpage to NCMEC for suspected child sex trafficking include comments submitted to Backpage by individuals identifying themselves as family members of the children featured in the escort ads:

- "No the girl in the is 16 shes my cousin she ra[n] away from home two months ago. . . The copys r trying to get her and her pimp She is a runaway She got tattoos of her pimp on her lower stomach and upper right eyebrow."

- "The following posting is of my son, age 15 dressed in drag. You will delete this posting today before I contact the [ ] Attorney General's Office."

- "This ad has photos of my 16 year old sister who currently being trafficked and we are trying to get home. We have an active investigation going on and am trying to get her away from her pimp and bring her home. Please stop allowing whoever it is to post her. She only a minor and we want her home."

22. Based upon information known to me, even after Backpage reports a possible child sex trafficking ad to NCMEC, Backpage often does not remove the ad from public view and it remains live on its website for potential customers. Backpage does not appear to implement any measures to block traffickers from placing new ads for the same reported child or prevent the trafficker from using the same email address, telephone number, credit card information, or photographs found in the ad just reported by Backpage for possible child sex trafficking victimization.

4

23. Members of the public are able to utilize the "Report Ad" feature on Backpage, and some indicate frustration at reporting ads of their children to Backpage without the ads being removed from public view:

- "My name is [ ] and my wife is [ ]. Your website has ads featuring our 16 year old daughter [ ], posing as an escort. – She is being pimped out by her old bf, and she is underage. – I have emailed the ad multiple times using your website, but have gotten no response. . . . – For God's sake, she's only 16. Her bf is having her use a prepaid card. You need better means of age verification. Stuff like this shouldn't be allowed to happen."

- "Please remove this. This is my 16 year old daughters picture. I e-mailed already. Whoever's posting this please block there card or email from posting."

24. Backpage provides users with the ability to report an ad by clicking on the "Report Ad" button. Until recently, however, when a user clicked on the "Report Ad" button, Backpage delivered the following message: "If you accidently reported this ad, do not worry. It takes multiple reports from multiple people for an ad to be removed."

25. Subsequent to the "Report Ad" message being referenced in other state and federal court filings in which Backpage is a defendant, Backpage revised this message to the following: "Ad Reported. Thank you, your report has been received."

26. Backpage ads require a person posting an ad to enter their age. Backpage does not take steps that some other online advertising sites take to verify the submitted age is true. When an individual posting an ad enters an age under 18 years old, an error message is generated that reads "Oops! Sorry, the ad poster must be over 18 years of age." Even after being put on notice that an individual was attempting to post an escort ad for a child, Backpage enables the poster to update the age field using an age that is 18 years old or older and post the same ad using the same text and photographs and/or videos that were provided when the age entered was under 18 years old.

27. Based upon the information NCMEC has received from law enforcement, private organizations, victims, and families, NCMEC believes the reports of child sex trafficking submitted by Backpage constitute only a small fraction of the children trafficked and victimized online at backpage.com.

28. An integral part of NCMEC's role as a national clearinghouse and resource center is our voluntary initiatives with the Internet industry. NCMEC regularly meets with online companies in an effort to help reduce the proliferation of child pornography and sexual exploitation online and to allow members of the online industry to take proactive steps to limit the accessibility of child pornography images on the Internet, reduce child sexual exploitation, and prevent future victimization.

29. Between 2010 and 2013, NCMEC engaged in numerous discussions and meetings with Backpage regarding child sex trafficking ads on its website and how Backpage's website facilitates and encourages an online environment for child sex trafficking. These meetings included

5

Backpage's owners and operational and legal executives. I attended the majority of these meetings.

30. These meetings generally encompassed an update on Backpage reporting to NCMEC provided by Carl Ferrer of Backpage. During these meetings, Backpage representatives repeatedly professed to being committed to substantially reducing child sex trafficking on the website. At these meetings, I discussed items and information noted by NCMEC staff concerning Backpage's reports, including escort ads that remained online after being reported to NCMEC by Backpage for suspected child sex trafficking and ads that depicted nudity or apparent pornographic content. During these meetings, NCMEC recommended preventative measures to Backpage to reduce the likelihood that children could be trafficked on its website.

31. After more than a dozen meetings with Backpage, NCMEC memorialized in writing and provided to Backpage several of its recommended preventative measures and recommendations, as follows:

    a. At the time an ad is created and submitted by a user, but prior to the ad being posted online:

        i. Take steps internally to verify the identity and age of the user who submitted the ad

        ii. Take steps internally to verify the identity and age of any individual depicted in the ad

            1. For example, develop an internal process to compare visual characteristics of an individual depicted in an ad with their photo in a government issued identification that they provide

        iii. Prohibit the use of gift cards, pre-paid credit cards or other anonymous purchasing tools as a form of payment for ads

        iv. Require and validate a user's email address when they are creating/submitting an ad

        v. Require and validate a phone number when a user is creating/submitting an ad

        vi. Capture the user's IP address at the time an ad is created and/or submitted

        vii. Ensure the ad is compliant with established Terms of Service

        viii. Enforce a no nudity policy for images contained within ads

        ix. Implement a moderator review system to examine all submitted ads for possible child sex exploitation

      x.     If a user changes an existing ad, prior to the ad being re-posted, capture the updated IP address and conduct an additional moderator review for Terms of Service violations

  b.    Prior to an ad being posted, if a possible minor is believed to be featured within a submitted ad or an ad is believed to involve possible child sexual exploitation:

      i.     Not post the ad or allow it to go "live" on the site

      ii.    Conduct searches of internal systems to identify and review all other ads that may be associated by phone number, email address, credit card information, images depicted within the ad, or any other identifiers

      iii.   Report the possible child sex exploitation to law enforcement and/or the CyberTipline (www.cybertipline.com)

      iv.   Retain the relevant material related to the possible child sexual exploitation to provide to law enforcement upon the receipt of legal process

      v.     Digitally hash the photos that were submitted within the ad to allow for comparison with other ads for review and possible removal. Those hashes can be utilized to prevent future Terms of Service violations

      vi.   Flag identifiers associated with the ad such as phone number, email address, credit card information, photos, identity of the user or person depicted within the ad, etc. to prevent future Terms of Service violations

  c.    Once an ad has been posted publicly, if there is suspected child sexual exploitation within the ad:

      i.     Remove the ad from public view

      ii.    Conduct searches of internal systems to identify and review all other ads that may be associated by phone number, email address, credit card information, images depicted within the ad, or any other identifiers

      iii.   Report the possible child sexual exploitation to law enforcement and/or the CyberTipline (www.cybertipline.com)

      iv.   Retain the relevant material related to the possible child sexual exploitation to provide to law enforcement upon the receipt of legal process

      v.     Digitally hash the photos that were submitted within the ad to allow for comparison with other ads for review and possible removal. These hashes can be utilized to prevent future Terms of Service violations

    vi.    Flag identifiers associated with the ad such as phone number, email address, credit card information, photos, identity of the user or person depicted within the ad, etc. to prevent future Terms of Service violations

32. Backpage rejected most NCMEC's recommended preventative measures. NCMEC's last meeting with Backpage occurred on August 27, 2013.

33. Despite NCMEC's meetings with Backpage, Backpage has made minimal, but largely ineffectual, adjustments to its business practices relating to escort ads. Backpage voluntarily reports only selective information to NCMEC regarding suspected child sex trafficking ads and has refused to adopt additional measures to reduce the incidence of child sex trafficking on the site, including use of technology widely implemented within the online industry to help reduce child sexual exploitation.

I declare under penalty of perjury that the foregoing is true and correct to the best of my information and belief.

_____    August 14, 2015
STACA SHEHAN
Executive Director
Case Analysis Division
The National Center for Missing and Exploited Children
699 Prince Street
Alexandria, VA 22314

_____    August 14, 2015
NOTARIZED    DATE
City of Alexandria
Commonwealth of Virginia

The foregoing instrument was subscribed and sworn before me this 14th day of August, 2015 by Staca Shehan.

_____
Notary Public
My commission expires: September 30, 2016
VA Notary Registration # 104859

8