1

```
 1                    IN THE UNITED STATES DISTRICT COURT
                        NORTHERN DISTRICT OF ILLINOIS
 2                          EASTERN DIVISION

 3
       BACKPAGE.COM, LLC,                    )
 4                                           )
                    Plaintiff,               )
 5                                           )
             vs.                             ) Docket No. 15 C 6340
 6                                           )
       THOMAS J. DART, Sheriff of            )
 7     Cook County,                          )
                                             ) Chicago, Illinois
 8                                           ) August 13, 2015
                    Defendant.               ) 10:07 a.m.
 9

10                  TRANSCRIPT OF PROCEEDINGS - MOTION
                  BEFORE THE HONORABLE JOHN J. THARP, JR.
11
       APPEARANCES:
12
       For the Plaintiff:        DAVIS WRIGHT TREMAINE LLP
13                               BY:  MR. JAMES C. GRANT (by phone)
                                 1201 Third Avenue
14                               Suite 2600
                                 Seattle, Washington  98101
15
                                 PAUL HASTINGS LLP
16                               BY:  MR. CHRISTOPHER FRANCIS ALLEN
                                 71 South Wacker Drive
17                               Suite 4500
                                 Chicago, Illinois  60606
18
19     For the Defendant:        COOK COUNTY STATE'S ATTORNEY'S
                                 OFFICE
20                               BY:  MS. JILL VOSICKY FERRARA
                                      MR. DANIEL FRANCIS GALLAGHER
21                               500 Richard J. Daley Center
                                 Chicago, Illinois  60602
22
23     Court Reporter:          KELLY M. FITZGERALD, RMR, CRR
                                 Official Court Reporter
24                               219 S. Dearborn Street, Suite 1420
                                 Chicago, Illinois  60604
25                               312-818-6626
                                 kelly_fitzgerald@ilnd.uscourts.gov
```

```
1
    APPEARANCES:        (Continued)
2

3   For the Defendant:          KIRKLAND & ELLIS LLP
                                BY:  MS. HARIKLIA KARIS, P.C.
4                                    MR. BARACK S. ECHOLS
                                     MR. ZACHARY D. HOLMSTEAD
5                               300 North LaSalle Street
                                Chicago, Illinois  60654
6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

1          THE CLERK:  Backpage.com v. Dart, 15 CV 6340.

2          MR. ALLEN:  Good morning, Your Honor.  Christopher

3    Allen on behalf of Backpage.com.  Mr. Grant should be joining

4    by phone as well.

5          MR. GALLAGHER:  Good morning, Your Honor.  My name is

6    Daniel Gallagher.  I'm an Assistant State's Attorney appearing

7    on behalf of the defendant, Sheriff Dart.

8          This is also Jill Ferrera, an Assistant State's

9    Attorney who is appearing.

10          I wanted to introduce to the Court three special

11    Assistant State's Attorneys that have been appointed in this

12    case.

13          Carrie Karis.

14          MS. KARIS:  Good morning, Your Honor.

15          THE COURT:  Good morning.

16          MR. GALLAGHER:  Barack Echols.

17          MR. ECHOLS:  Good morning, Your Honor.

18          THE COURT:  Good morning.

19          MR. GALLAGHER:  And Zachary Holmstead.

20          MR. HOLMSTEAD:  Good morning.

21          THE COURT:  Good morning.

22          I'm sorry.  Who are we getting on the line?

23          MR. ALLEN:  Jim Grant for Backpage.com.

24          MR. GRANT:  This is Jim Grant.

25          THE CLERK:  Yes.  Mr. Grant, you have now been

1    conferenced into Judge Tharp's courtroom.  Please hold for

2    further instructions.

3              MR. GRANT:  Good morning.

4              THE COURT:  All right.  Good morning, everyone.

5         Mr. Grant, can you hear us all right?

6              MR. GRANT:  I can, thank you.

7              THE COURT:  All right.  I've got the sheriff's motion

8    to compel compliance with discovery requests.  There was

9    some -- which was filed late yesterday evening.  At that point

10   there was some -- or in the written submission there's some

11   indication that there might have been ongoing communication.

12             Is there any update, Mr. Gallagher?

13             MR. GALLAGHER:  No, Your Honor.

14             THE COURT:  Okay.

15             MR. GRANT:  May I, Your Honor?

16             THE COURT:  Yes.

17             MR. GRANT:  Well, as of yesterday, we had spoken with

18   the sheriff's counsel on two occasions about two single

19   issues.  We had addressed both of those issues.  I had

20   indicated at the end of our last call that, yes, we were

21   willing to consider whatever specific other issues they had to

22   raise, but we didn't know what those were.  And until we saw

23   these motion papers, we had no idea what the additional issues

24   were.

25             THE COURT:  Well, what did you understand the issues

1   to be?

2            MR. GRANT:  Well, initially we had two conversations

3   with the sheriff's office.  They raised an issue about the

4   fact that we had redacted the names of the inquiring banks

5   working with Backpage.com and the processors.  And we

6   explained we did that because of the nature of the litigation

7   and the pressure that's been brought to bear on anyone having

8   financial dealings with Backpage.com.

9            We also pointed out at the time that we might revisit

10  that issue based on productions from MasterCard and Visa.  And

11  as it turns out, they have identified the banks, and we've

12  already agreed with the sheriff's counsel that we would

13  produce the unredacted versions of those documents subject to

14  our request that they be treated as attorneys' eyes only at

15  this stage because of those concerns.  In any event, we think

16  we've resolved that issue.

17           And then in the most recent call yesterday they asked

18  questions of us about communications with American Express.

19  We explained that we have provided everything we have in terms

20  of communications, written communications with American

21  Express, and there are no additional documents.

22           So those are the two issues we had addressed.  And,

23  as I say, we had asked if there were other specifics would

24  they explain those to us so that we can at least meet and

25  confer about that, but we haven't.

1           THE COURT:  Mr. Gallagher?

2           MR. GALLAGHER:  That's incorrect, Judge.  Yesterday

3    we had a long conversation, which Ms. Karis was involved in as

4    well and Mr. Holmstead, and it involved not only the

5    redactions; it involved all of the answers to interrogatories.

6    It involved everything that -- all of our discovery really.

7    And the first conversation that we had with him before

8    yesterday, we couldn't get past the redaction situation.  They

9    told us they weren't going to -- when you see what they

10   actually presented to us, there was nothing.  There was no

11   information whatsoever.  They even redacted the dates that

12   they received letters.

13          We couldn't get past that.  So we said, well, we'll

14   have to take depositions because we want to find out what

15   knowledge you have about the various different cutoff dates

16   for American Express, MasterCard and Visa.  And Mr. Grant said

17   that if we sent him notices of deposition, we can do that, but

18   he would probably object to our notices.  So we got nowhere.

19          Yesterday we talked to him again for a long time.

20   And we discussed not only the redactions, not only the

21   depositions, but we talked about the answers to

22   interrogatories.  We talked about all portions of the

23   discovery, and we got nowhere.  And, as you know, this case is

24   set for trial a week from today, and we're on an expedited

25   discovery schedule.  And we don't have time to play games with

1    people who don't want to produce the documents that need to be

2    produced in this case.  And that's what we are getting, is

3    we're getting the runaround.  And under those circumstances,

4    we felt it was necessary to come before this Court and present

5    this motion to the Court.

6              MR. GRANT:  Your Honor?

7              THE COURT:  Yes.

8              MR. GRANT:  I'm at a distinct disadvantage obviously

9    since we're raising a number of issues that have not been

10   raised.  The discussions yesterday were no more extensive than

11   to say from the sheriff's office that we object to your

12   discovery responses generally without telling us what it was

13   they were objecting to, except the two issues I raised.

14             The comments -- I'm sorry -- of Mr. Gallagher that we

15   had redacted dates is simply untrue.  In any event, the

16   redaction issue is something we've resolved.

17             What we've tried to do from the outset of this case

18   since the Court's status conference hearing is to work

19   cooperatively with the defendant's counsel.  We, in fact,

20   initiated a meet and confer with them immediately after the

21   Court's order, asked them at that time whether they planned

22   any depositions at all.  They said they did not.  We were

23   trying to schedule so that we could understand what we could

24   do when to get things completed.

25             Now we're facing production from them of over 14,000

1    pages four and five days later than agreed, which we've had

2    approximately a day to look at and are trying to prepare for

3    the Court's hearing.

4              THE COURT:  All right.  Well, let's cut to the chase.

5              First, with respect to the redaction issue, I

6    understand from your filing that's off the table.

7              MS. KARIS:  It is not entirely off the table,

8    Your Honor.  Carrie Karis.

9              It is not entirely off the table because when we had

10   the meet and confer conference yesterday, it was not entirely

11   clear to us if all redactions are now being withdrawn.  If, in

12   fact, all redactions are now being withdrawn, we agreed it is

13   off the table.

14             What we were told is they have reconsidered the

15   redactions, and they will be changing some of the redactions.

16   Whether that means all or not is unclear.  Perhaps Mr. Grant

17   can clarify that for us.  And if, in fact, they're going to

18   produce the documents in their entirety -- and for the Court's

19   benefit, this is the entirety of the production that we got in

20   response to all of those requests, literally a quarter inch of

21   documents.  But if all the redactions here are going to be

22   changed, then we can take that issue off the table.

23             THE COURT:  Are you maintaining -- are you

24   withdrawing all your redactions, Mr. Grant, or there's some

25   that you feel are still appropriate?

1      MR. GRANT:  Well, we maintain all privilege

2  redactions, and there are portions of them that are privilege

3  redactions.  We are taking out all the redactions that relate

4  to identification of the processors and the acquirers, and

5  those are the other redactions.  So, yes, the privilege

6  redactions remain.

7      THE COURT:  And when you are referring to privilege,

8  you're referring to attorney-client privilege?

9      MR. GRANT:  Attorney-client and work product, yes.

10      THE COURT:  All right.  I think that that should

11  address the issue.

12      All right.  The other issues seem to relate largely

13  to I think two categories of information.  There's information

14  about communications with not only American Express but Visa

15  and MasterCard relating to the issues in this case and the

16  sheriff's letters to those companies, any communications

17  Backpage has had with those companies, any interim

18  communications Backpage has had about those communications,

19  that sort of thing.  I put that all in one bucket.

20      In another bucket I think could be categorized

21  information that relates to communications between Backpage

22  and law enforcement or about law enforcement in terms of the

23  nature of the advertising in the adult services portion of the

24  website.

25      Speaking to the first bucket, the Visa, MasterCard,

1    American Express related communications.  Mr. Grant, is it

2    Backpage's position that all of that information has been

3    produced?  When you were going through your assessment of the

4    status you indicated that you had produced all of the American

5    Express communications that you had, but you did not refer to

6    the other communications that would relate to the other cards.

7    What's the status of your production in that regard?

8              MR. GRANT:  So the answer is yes, Your Honor.  In

9    terms of the communications about termination with Visa,

10   MasterCard and American Express, we have produced the

11   communications that we have.  And I'll note one exception to

12   that, but I'll come back to that.

13             But we have relatively few communications.  We gave

14   the termination notices that we have, and we gave the

15   communications with American Express.  You need to understand

16   that Backpage actually does not communicate with the card

17   issuers, and so we have no further communications to provide.

18             Now, the one exception that I mentioned is we did

19   have communications with MasterCard and with Visa, at least

20   letters that we sent to them after the termination and having

21   to do with, you know, the issues that have arisen because of

22   this lawsuit.  We did not produce those because they are --

23   they postdate the actions of the lawsuit.

24             THE COURT:  Okay.  Hang on.

25             MR. HOLMSTEAD:  Your Honor, Zach Holmstead.

1        THE COURT:  Hold on.

2        All right.  Mr. Grant, the requests that relate to

3   the credit card company actions and communications from

4   Sheriff Dart don't -- aren't exclusive to whether Backpage has

5   communications with those companies but also seek internal

6   communications within Backpage about those issues.  Have those

7   documents or communications, to the extent they exist, been

8   produced?

9        MR. GRANT:  I'm sorry.  I forgot to pick up on that

10  piece of it, Your Honor.

11       The extent to which we have internal communications,

12  and we do, involve attorneys.  And so we have attorney-client

13  privileged information, but we don't have anything that's

14  non-privileged in -- responsive to that.

15       THE COURT:  All right.

16       Counsel?

17       MR. HOLMSTEAD:  Zach Holmstead, Your Honor.

18       With respect to Visa and MasterCard, Backpage refused

19  to produce any documents except those immediately around

20  July 1st, when the termination by Visa and MasterCard

21  decisions were made.

22       We since have received productions from MasterCard.

23  And there are communications from counsel that represent

24  Backpage in this case to MasterCard asking them to reverse

25  their actions and specifically discussing Sheriff Dart's

1    letter.  So we know that there are additional communications

2    that have not been produced.

3              THE COURT:  Mr. Grant?

4              MR. GRANT:  That's the letter that I was just

5    referring to that we had not produced initially because we

6    thought it not responsive because it has to do with our

7    reactions to the actions of Sheriff Dart.  I was not aware

8    that MasterCard had included that within its production.  But

9    in terms of other communications with Visa or MasterCard, we

10   have them.  We produced what we have.

11             THE COURT:  All right.  Well, here's what needs to

12   happen with respect to that bucket of material.

13             No. 1, I want to be clear, internal communications

14   are included within the requests.  If you have internal

15   communications that are privileged, then you need to produce a

16   privilege log identifying those communications.  And I'll

17   require that to be produced by the end of the day tomorrow.

18             To the extent Mr. Grant is representing on behalf of

19   his client that other responsive documents have been produced,

20   that representation is of record, and I won't require any

21   further certification, understanding that I certainly would

22   not expect to see Backpage come in with some evidence that

23   hasn't been produced at a preliminary injunction hearing or

24   subsequently, for that matter.

25             With respect to the pre-complaint/post-complaint

1    dichotomy, that dichotomy is not a relevant dichotomy.

2    Post-complaint writings can certainly be relevant to

3    understanding issues that occurred before the complaint was

4    filed.  So that's not -- that rationale is not relevant to the

5    issue of what is responsive or not.  The document is

6    responsive if it is responsive without regard to whether it

7    was written before or after the fact.

8              So I understand, Mr. Grant, you're saying you've only

9    got the one letter.  That letter should be produced just to

10   make sure we're talking about the same letters between the

11   parties.  And if there are any other letters that have not

12   been produced based on that dichotomy that are not

13   privileged -- well, I don't know how your communications --

14             MR. GRANT:  Right.

15             THE COURT:  -- would be privileged with the credit

16   card companies, they would need to be produced as well.

17             MS. KARIS:  Your Honor --

18             MR. GRANT:  Your Honor, there are actually two

19   letters.  We will produce both of those.  I will also

20   double-check to see if there are any other communications with

21   Visa or MasterCard post the termination.

22             Can I raise one question as well about the privilege

23   log?

24             THE COURT:  Yes, but hold off one second.

25             Counsel?

1          MS. KARIS:  Your Honor, one issue that I would like

2    to bring to the Court's attention that we discussed yesterday

3    with Mr. Grant, on the representation that they have no

4    internal communications or e-mails because there really are no

5    e-mails at all in their production, Mr. Grant suggested that

6    Backpage does not maintain documents prior to July 1st, which

7    is why they put the date restriction on their responses.

8          I did ask for some letter from counsel indicating

9    whether they had a backup server that doesn't keep any

10   communications prior to July 1st, if we can get that

11   representation as well.  I mean, it appeared from our

12   discussion yesterday that the request for documents was very

13   limited and the places that were searched to find responsive

14   documents were likewise very limited.  And we want to make

15   sure that nowhere no one at Backpage has responsive documents

16   rather than a handful of individuals whose laptops perhaps may

17   not contain these communications.  So if we can get from

18   counsel, consistent with his representation that there are no

19   documents, where they searched and the breadth of their

20   document retention policy, I think that would be very helpful

21   to us, because candidly it seems implausible to us based on

22   MasterCard's production, which suggests that there's ongoing

23   dialogue with Backpage concerning the issue of terminating

24   Backpage well before Sheriff Dart's letter ever went out, that

25   communication is nowhere in their file.  Perhaps it's all

1    privileged and we'll see it on this log, but I want to make

2    sure that we're actually looking at more than just a couple of

3    people's laptops because we were consistently told yesterday

4    about the time limitations in getting these materials

5    produced.  But that doesn't obviate the need for us to

6    actually get responsive documents.

7                MR. GRANT:  May I?

8                THE COURT:  Yes.

9                MR. GRANT:  Thank you.

10               First of all, I'm not quite sure what she's speaking

11   of.  We did not say that we only retained documents back to

12   July 1.  And we very certainly have produced e-mails.

13               In terms of the search that we conducted, we searched

14   everyone's files that were related to dealings with

15   Sheriff Dart or having any dealings with credit card companies

16   or the terminations, so we believe we've done a thorough

17   search under the circumstances.

18               If what she is speaking about is the fact that our

19   document retention systems delete e-mails after a 90-day

20   period, that is true.  It's a standard practice in many

21   companies, so we can't produce communications that we simply

22   don't have.  And I'm not aware of any communications with

23   MasterCard that were prior to the sheriff's termination.  If

24   there's something specifically she's referring to, I can

25   certainly address that, but I don't know what that is.

1          THE COURT:  All right.  It's not my intention to be

2     deposing you here, Mr. Grant, but the obvious alternative is,

3     you know, for the sheriff to do a 30(b)(6) of an IT person or

4     records custodian.  Is there no backup archive of e-mails

5     maintained by Backpage?

6          MR. GRANT:  My understanding, Your Honor, is that

7     there is not a backup system that maintains e-mails through

8     the e-mail server once they've been deleted from the systems.

9     There are backups for other portions of the website,

10     obviously, and for functioning of the website, but that's not

11     what we're addressing here.  I will commit to go follow-up on

12     that and ensure that that's accurate.  But in my

13     understanding, that's not the case.

14          MR. HOLMSTEAD:  Your Honor, if I --

15          THE COURT:  Hold on.

16          Mr. Grant, I want you to check on that and confirm

17     that question for the defendant.

18          That said, look, this is expedited discovery.  You're

19     not going to get everything relevant.  And the idea, frankly,

20     that you're going to be able to search e-mail archives, if

21     e-mail archives exist, before an expedited hearing is probably

22     not realistic or realistically feasible.  I think you have a

23     right to understand if that sort of thing exists, which is why

24     I'm requiring Mr. Grant to provide that information to you, to

25     confirm that and provide that information to you.  But even if

1    there is an e-mail archive, I'm not foreclosing the

2    possibility, but, you know, it's August 13th.  We're talking

3    about going to a hearing in a week.  Based on my experience in

4    prior life, that's not a realistic time frame to search e-mail

5    archives.

6            All right.  Somebody was wanting to speak.

7            MR. HOLMSTEAD:  Yes, Your Honor.

8            MR. GRANT:  Your Honor --

9            THE COURT:  Hold on, Mr. Grant.

10           Mr. Holmstead, is that it?

11           MR. HOLMSTEAD:  It is.  Thank you, Your Honor.

12           THE COURT:  All right.

13           MR. HOLMSTEAD:  The e-mails in the production are

14    only e-mails that are favorable to Backpage's position,

15    including an e-mail from their CEO's account in June 2011.

16           Moreover, if the document retention policy is 90

17    days, the plaintiffs will allege that AmEx made its decision

18    on April 30th.  30 days would be July 30th, well after the

19    filing of the complaint in this matter.

20           THE COURT:  Okay.  Well --

21           MR. GRANT:  Your Honor -- I'm sorry.

22           THE COURT:  Yes, go ahead.

23           MR. GRANT:  We do retain documents for -- in

24    different collections, in different places, and we do have

25    some that date back to 2011.  In fact, we have communications

1   with the sheriff's office, and we have collected and produced

2   those documents.  What we were talking about was e-mails

3   within the traditional system and how that system works, and

4   I've explained that.

5        And it is certainly not true that we have only

6   produced favorable documents.  What we produced is everything

7   that had to do with dealings with the sheriff's office and

8   that includes many commendations from the sheriff's office,

9   which just happens to be the case, with the exception we did

10  not produce individual subpoenas and responses.  But I

11  understand the defendants did not request those at this stage.

12       THE COURT:  All right.  You know, the fact that

13  favorable information has been -- has only been produced, you

14  know, might mean that production is incomplete.  It might mean

15  that that's all they've got.  It might mean that's all they

16  ever had.  Maybe that's all they keep.  I don't know.  It may

17  be that that e-mail is kept in a file folder in a paper file

18  somewhere versus an e-mail archive.  Those are all issues that

19  you will be able to address more fully in the context of

20  non-expedited discovery as the case moves forward through

21  discovery.

22       MR. GRANT:  Your Honor --

23       THE COURT:  What we're talking about here is

24  expedited discovery, which is discovery that is -- you know,

25  what's reasonable to get your hands on in this context is not

1   the same as what's reasonable to get your hands on in the

2   context of full-blown discovery.

3          So I think, again, Mr. Grant's representations, with

4   the caveats that I have asked him to explore and the

5   production of a privilege log, I think suffice for the moment.

6   It may be half a loaf for you.  There's not going to be more,

7   perhaps, but -- there's not going to be more.  Again, I would

8   not expect to see information brought to bear by Backpage as

9   evidence that has not been produced.

10         All right.  I want to address the second bucket of

11  information, which is -- goes to, you know, communications

12  about the nature of the ads on the escort -- or adult services

13  section.

14         While that information is unquestionably relevant to

15  some issues in the case, like damages in particular and

16  perhaps other sorts of remedies, I don't think it is

17  particularly relevant to the question of prior restraint.  You

18  know, there might be a Backpage.com internal communication

19  that says, you know, 95 percent of our ads we think are, you

20  know, actually ads for sex trafficking or other criminal

21  activity.

22         I'm not at all sure that that's going to give you a

23  defense to prior restraint of all ads.  And as I noted in the

24  TRO order, the action taken, you know, isn't limited to effect

25  on, you know, the adult services ads in any event.

1          So from the standpoint of what we're focused on for

2     the preliminary injunction hearing, I don't see that

3     information as being nearly as relevant as the information

4     with respect to the communications with the -- with and about

5     the actions of the credit card companies.  So I am not

6     inclined to compel the production of that information, which I

7     imagine could be substantially more voluminous than the other

8     information provided as well.

9          MR. HOLMSTEAD:  Your Honor.

10          THE COURT:  Yes.

11          MR. HOLMSTEAD:  On the relevance of that information,

12     the Rule 65 factors that are going to be central to the

13     analysis on Thursday include balancing of the equities and the

14     public's interests.  It seems all parties agree that

15     exhortations to illegal conduct are not protected speech.  And

16     if the --

17          THE COURT:  But that begs the question of whether any

18     particular ad is or is not an exhortation to illegal conduct.

19     And the problem that I think you have in this context is, you

20     know, the action is -- I'm not trying to be pejorative, but,

21     you know, it's a blunderbuss that has the effect or is alleged

22     to have the effect of suppressing not only exhortations to

23     illegal conduct but legitimate speech.  And I'm not

24     foreclosing the argument, and I'm not saying it has no

25     relevance, but -- particularly in terms of the balancing of

1    the equities.  But engaging in that discovery in this

2    expedited fashion I don't think is -- I think is overly

3    burdensome in this context given its minimum relevance to the

4    issues and given the fact that you're not going to be able to,

5    in all likelihood, you know, establish credibly that every ad

6    on the site is an exhortation to illegal conduct.

7           MR. HOLMSTEAD:  Understood, Your Honor.  We want to

8    preserve that argument for next Thursday.  And, you know,

9    certainly the site wasn't taken down.  The action was that

10   funding was discontinued.

11          THE COURT:  No, but --

12          MR. HOLMSTEAD:  And if that funding affected only

13   exhortations to illegal conduct or predominantly only

14   exhortations to illegal conduct, that's relevant to balance of

15   the equities in the public interest.

16          THE COURT:  All right.  Well, I'm sure you've got

17   some evidence that you're going to rely on to make that point.

18   And, again, I think my ruling here is colored by the

19   procedural posture of where we're at in the preliminary

20   hearing.

21          MR. HOLMSTEAD:  Thank you, Your Honor.

22          MS. KARIS:  Your Honor -- I'm sorry.

23          MR. GRANT:  May I, Your Honor?

24          THE COURT:  All right.  The ball is in your court

25   now, Mr. Grant.

1    MR. GRANT:  I just wanted to raise one point.  Going

2   back a moment, you had indicated that Backpage.com should

3   provide a privilege log by the end of business tomorrow.  And

4   that's fine.  Can we make that a mutual obligation?  Because

5   we have a number of documents that apparently have been

6   withheld, as well, based on the objections from the sheriff's

7   office, so that both parties need to provide privilege logs.

8        MR. GALLAGHER:  Judge, we --

9        MR. GRANT:  I'm sorry.  Someone is speaking and I

10   can't hear them.

11        MR. GALLAGHER:  I don't believe we will be able to do

12   it by tomorrow.  It's a large number of documents.  We

13   produced over 14,000 documents, and there's a number of other

14   documents that we have not produced.  And we're in the process

15   of -- we're in the process of creating the privilege log, but

16   I don't know if it will be done by tomorrow.

17        THE COURT:  Well, the issue is the volume not of

18   what's been produced but what hasn't been produced.

19        MR. GALLAGHER:  Right.  I understand.

20        MR. GRANT:  Well, Your Honor, in fairness, I mean,

21   that's as much an issue to us as it is to them.

22        THE COURT:  No, I understand.

23        What are you talking about, Mr. Gallagher?

24        MR. GALLAGHER:  Probably Monday.

25        THE COURT:  What are you talking about in terms of

1    volume?

2          MR. GALLAGHER:  Oh, I think it's about 4 or 5,000

3    documents, perhaps.

4          THE COURT:  4 or 5,000 documents that you're not

5    producing --

6          MR. GRANT:  Oh, my lord.  I'm sorry.

7          THE COURT:  -- based on privilege?

8          MR. GALLAGHER:  Yes.

9          THE COURT:  Can you give me any general sense at this

10   point of the nature of those documents?

11         MR. GALLAGHER:  They, again, are documents between

12   attorneys for the most part.  They're documents -- legal

13   documents or deliberate process or work product.

14         MR. GRANT:  Your Honor --

15         MS. KARIS:  Your Honor --

16         THE COURT:  Hold on, Mr. Grant.

17         MS. KARIS:  I'm sorry.  If I might, I mean, I will

18   say that it appears that the parties took a different approach

19   to their document productions as evidenced by the fact that

20   the State's Attorney's Office produced over 10,000 documents.

21   We took a pretty broad approach.  As a result, the collection

22   was much broader.  I don't know how many documents Backpage

23   has that are privileged, but clearly their view as to what

24   needed to be produced for an expedited hearing was quite

25   different.  And so while we're not objecting to producing a

1   privilege log, I think the amount of time that it's going to

2   take in order for the State's Attorney's Office to complete

3   it, where there really has been no issue or dispute that

4   they've gotten responsive documents, is slightly different.

5          THE COURT:  Mr. Grant, what are we talking about the

6   general idea with respect to the volume of materials that you

7   have asserted an privilege?

8          MR. GRANT:  More in the category of scores, 50,

9   something like that, maybe as much as 100, but certainly not 4

10  to 5,000, Your Honor.  And just, I suppose, as a point of

11  order, we've now actually seen 14,000 documents or thereabouts

12  produced by the sheriff's office reflecting a team of 20

13  people working on this campaign against Backpage for the span

14  of several months.  So it's not surprising that they have

15  considerably more documents than we do on our side.

16         And it's problematic, it seems to me, that they're

17  claiming that much privilege.  And it raises a very serious

18  issue for us because the Court will recall at the hearing not

19  long ago that they acknowledged the sheriff's office has no

20  legal authority to take action against the card companies.  So

21  claiming a privilege in that context and apparently claiming a

22  deliberate process privilege, which seems unheard of in a

23  circumstance like this, raises very serious issues for us.  So

24  if there's a requirement to provide privilege logs, it seems

25  to me it should be simultaneous.

1          THE COURT:  Those are all interesting questions.  It

2     will all get resolved at some point, perhaps.  Again, right

3     now what I'm pointed on -- and I will say I'm pointed on this

4     in the absence of any agreement between the parties to extend

5     either the TRO and/or the hearing date, that we're going to

6     have a hearing on August 20th, and we've got to do what is

7     reasonably practicable to get us to that point.

8          Given the difference in the productions and the

9     relative burdens that that will require on people, I don't

10    think it's unfair to require the production of the plaintiff's

11    privilege log by Friday, as I originally ordered.  I'll give

12    the State's Attorney's Office -- excuse me -- the sheriff

13    until Monday to produce his privilege log.

14         All right.  Is there anything else we -- was the

15    subject of depositions still in dispute?

16         MR. GALLAGHER:  Yes, sir.

17         MS. KARIS:  It is.

18         THE COURT:  All right.  And, Mr. Gallagher, or Ms.

19    Baker or Ms. Holmstead -- it's Ms. Baker, right?

20         MS. KARIS:  Karis.

21         THE COURT:  Karis, I'm sorry, whoever wants to

22    address that, what is your perspective on the status of

23    deposition scheduling?

24         MS. KARIS:  Sure.

25         Your Honor, in light of the limitations on the

1   document production, including accepting Mr. Grant's

2   representation that they just don't maintain many documents,

3   coupled with the communications that we've seen from

4   MasterCard, we believe it's necessary to take a limited number

5   of depositions, three, of two individuals and one corporate

6   rep, 30(b)(6) deposition, to get at these very issues, that

7   is, what communications existed and comparable information.

8   Since we can't get documents, we need at least some testimony.

9           We sent -- to be fair to Mr. Grant, he did not get

10  the notices for those depositions until late yesterday,

11  although we had discussed with him previously that we would be

12  requesting those depositions.  So I know now Mr. Grant has

13  received those notices.  Two are of individuals.  Again, the

14  other one is of a corporate rep.

15          We're prepared to go forward with those Monday and

16  Tuesday.  We're willing to work with them in terms of

17  location.  We'll go out to the sites where the witness is at.

18  We're flexible on time.  We don't think they need to be very

19  long.  However, we think they are essential to our ability to

20  present a case, especially when we have gotten very limited

21  other information and have reason to believe that there were,

22  in fact, communications between Backpage and MasterCard and

23  possibly Visa as well.

24          And so they're relevant.  They're responsive.  And we

25  think that they're essential, given the rest of the production

1    in this case.

2         THE COURT:  All right.

3         Mr. Grant?

4         MR. GRANT:  Your Honor, as I said, when we began this

5    process two weeks ago, we contacted the sheriff's counsel and

6    asked them whether they would be taking any depositions and

7    they said no.  That obviously had a great deal to do with us

8    trying to plan and do the work necessary to get to the hearing

9    a week from today.

10        So now here, very much the 11th hour, they have

11   suggested for the first time -- actually it was yesterday that

12   they wanted to take additional -- I beg your pardon -- two

13   days ago that they wanted to take additional depositions.  And

14   I asked the question then how is this relevant at all to the

15   preliminary injunction hearing.  If you note, the 30(b)(6)

16   deposition notice that they provided is essentially, you know,

17   everything having to do with everything in the case, all the

18   subject matters the Court just suggested are not relevant now,

19   maybe at some point later in the litigation.

20        And we are obviously very hamstrung to get these

21   requests at this stage.  And as I've indicated to defendant's

22   counsel, two of our lead counsel are both out currently.  So

23   for us to try to be covering depositions, subject matters that

24   appear to have nothing to do with the preliminary injunction

25   in such -- on short time notice is extremely prejudicial.

1          THE COURT:  All right.  Well, whatever the sheriff's

2     initial thought about the need for depositions may have been,

3     that's certainly not a binding waiver of the right to conduct

4     discovery.  I think what the sheriff has proposed is narrow

5     and consistent with the expedited scope of discovery, the

6     possible exception to that being I have not seen the 30(b)(6)

7     notice, so I'm not sure what is contemplated with respect to

8     that.  And I am sympathetic to an argument that a corporate

9     representative whose answers would be binding on the

10     corporation in the context of an expedited hearing that, while

11     they're -- technically everything is relevant because the

12     likelihood of success is one of the factors that the Court has

13     to consider, nevertheless is principally focused on a narrower

14     set of issues relating to these particular communications and

15     the reasons that the credit card companies took the action

16     that they did.  I'm not sure it's fair to put Backpage into

17     the position where those responses, which could be binding on

18     them for the remainder of the litigation, are required.

19          So what I am -- will do in that regard is in terms of

20     a 30(b)(6) deposition, I'll limit the scope of that deposition

21     to the issues that are consistent with the other discovery

22     requests relating to the Visa, MasterCard, American Express

23     communications.

24          MS. KARIS:  That's fine.

25          THE COURT:  Other 30(b)(6) issues can wait.

1    But with respect to the depositions of identified

2    individuals as to their specific knowledge, those could go

3    forward.  And the 30(b)(6) as I have just limited it can go

4    forward.

5         MS. KARIS:  Understood.  Thank you.

6         MR. GRANT:  Your Honor, if I may?

7         THE COURT:  Yes.

8         MR. GRANT:  The other depositions that they've

9    noticed are general counsel.  I have no idea why that has any

10   relevance to the decisions made by Visa and MasterCard and

11   American Express.

12        And as to our CEO, they have indicated they want to

13   depose our CEO on all the subject matters related to the

14   litigation.  It would seem to me that if any deposition is

15   relevant at this point, based on what they suggested, it would

16   be limited solely to the communications about the terminations

17   of Visa and MasterCard and American Express.  And the short

18   answer to that is we really have had few, if any,

19   communications.  But, as I say, we're very hard-pressed to be

20   preparing for a hearing next week.  To suggest at this late

21   date that there should be three depositions of a broad scale

22   seems to me extremely burdensome for our purposes and not

23   relevant to the preliminary injunction hearing.

24        MS. KARIS:  Your Honor, if I may, taking those in

25   order, first with respect to their general counsel,

1   Ms. McDougall.  Ms. McDougall has been very vocal on this very

2   issue, including very recently, this past weekend, giving an

3   interview to *Al Jazeera* relating to the topics at issue for

4   this preliminary injunction.  And so that, along with

5   interviews she's given to the *San Francisco Chronicle* and

6   other media outlets that go to the very heart of the issues,

7   including what Visa and MasterCard told her of what knowledge

8   she has about why they were terminated.

9           And so I recognize she's the general counsel.  It is

10  not our intention to ask her about privileged communications.

11  But she has taken these very issues on in the media, and we're

12  entitled to inquire the basis for the statements that she's

13  making.  That's with respect to the general counsel.

14          The CEO has submitted an affidavit in connection with

15  the issues in this case.  And I suspect that affidavit is part

16  of the evidence that Backpage will be putting forth to this

17  Court in consideration for the issues.  And so we're entitled

18  to a deposition certainly as to the issues before this Court

19  and his knowledge of related communications.  As I said, we do

20  not intend to make this a very broad deposition.  I will

21  represent to the Court that it very well may be possible that

22  as the case goes forward, if it goes forward, that another

23  deposition of the CEO will be required as to other issues

24  relating to merits.  We do not intend at this time in the

25  deposition -- we can't get ready for a deposition on Monday or

1    Tuesday that pertains to all issues, but there are issues

2    critical to this court that we would like to speak to the CEO

3    about and to their GC about, given their election --

4                MR. GRANT:  Your Honor, if I may.

5                THE COURT:  Hold on.

6                MS. KARIS:  Given their election to involve

7    themselves in these issues.

8                THE COURT:  All right.

9                Last word on this, Mr. Grant.

10               MR. GRANT:  Your Honor, the comments made by the

11   general counsel in interviews and the like are simply

12   defending the website and its practices and have nothing to do

13   with the issues for preliminary injunction and do not relate

14   to communications with MasterCard or Visa concerning their

15   termination of Backpage.com.

16               The focus of this -- and as regards to the CEO, the

17   fact that we provided background information that's already

18   been taken into account by the Court for purposes of the TRO,

19   the nature of the website and the posting rules and the like

20   and what we do, that's all well and good.  It has nothing to

21   do, again, with the key issues that the Court has identified

22   for the preliminary injunction, which is the nature of the

23   threats of Sheriff Dart, his actions, and the decisions of the

24   credit card companies to terminate their services.  Taking

25   depositions of our people has absolutely nothing to do with

1    that and at this point is extremely burdensome and prejudicial

2    to us.

3         THE COURT:  All right.

4         The fact of the matter is the plaintiff brought a

5    claim here and brought a motion for expedited injunctive

6    relief.  It is not unfair, therefore, to subject employees of

7    the plaintiff to expedited deposition on matters that are

8    relevant to the complaint and the motions for expedited relief

9    that the plaintiff has requested.  The fact that the CEO

10   presented an affidavit I think is a compelling reason to

11   conduct his deposition in advance of the preliminary

12   injunction hearing and certainly the defendant has the right

13   to test the assertions and question the assertions that are

14   made in that affidavit.

15        And to the extent that the general counsel is making

16   public comment about the case, about issues relating to the

17   case and perhaps most significantly would certainly be privy

18   to whatever communications have been made with third parties

19   in conjunction with the issues in this case, that is fair

20   ground for a deposition as well.

21        I understand it's burdensome.  It's burdensome for

22   both sides.  And I want to be clear, it was implicit in

23   Ms. Karis' comments, but these depositions are not -- will not

24   be deemed to foreclose further depositions of any witness.

25   However, that doesn't mean you're going to get to replow the

1    same ground that you plow here.  That is another reason for
2    you to be circumspect with respect to the scope of the
3    deposition that you take, because to the extent that you
4    embark on covering a particular issue or area, you may well be
5    foreclosed from revisiting that area down the road.  So it
6    would be in your interests to focus your deposition on what
7    seems to be most relevant to the issues for the preliminary
8    injunction hearing.
9        All right.  Is there anything else we need to
10   address?
11       MR. GALLAGHER:  Tomorrow the trial brief is due.
12       THE COURT:  Correct.
13       MR. GALLAGHER:  And I was just asking, for a
14   housekeeping measure, you don't need the exhibits or any
15   exhibits we're going to use at the hearing attached to the
16   trial brief?
17       THE COURT:  No, except to the extent that it's
18   necessary for me to understand the trial brief.
19       MR. GALLAGHER:  Okay.
20       THE COURT:  I mean, to the extent you're referring to
21   an exhibit and offering an argument on that, having the trial
22   brief without that exhibit ahead of time won't do me any good.
23       MR. GALLAGHER:  Okay.
24       MR. GRANT:  Your Honor?
25       THE COURT:  Yes.

1          MR. GRANT:  Because we're trying to work through some

2     14,000 documents and apparently, according to Mr. Gallagher,

3     there is still more to come, our intention had been to at

4     least allude to a plan for documentary evidence for purposes

5     of the hearing coming on August 20, but to submit those

6     materials in advance of the hearing rather than with the

7     pleading tomorrow.  And we've agreed with plaintiff's

8     counsel -- I'm sorry -- defendant's counsel that because

9     there's confidentiality concerns throughout here that we would

10    give them notice 24 hours in advance of the documents we will

11    provide and they will do likewise.  So that would be

12    suggestion.  We're just not going to be in a position to have

13    a full collection of documents.  We haven't even begun to

14    review all of them at this point.

15          THE COURT:  That's fine.  Again, I'm not requiring

16    you to submit anything with the brief other than your

17    arguments.  Just understand I'm going to read the briefs

18    before the hearing.  And to the extent your argument is

19    founded on a document or some group of documents and I don't

20    have that document, your argument is going to suffer.  Now,

21    you know, maybe that can be remedied through the hearing and

22    argument at the hearing.  But if you want me to fully

23    comprehend an argument that is predicated on a document, I

24    suggest you give me the document.

25          Now, Mr. Grant, I also want to make clear -- or

1   clarify on the record, you had submitted -- or Backpage had

2   submitted a reply brief that was not authorized, and I had

3   issued an order either saying the reply brief should be

4   withdrawn or it would be treated as your submission.  Are you

5   intending to withdraw your reply brief?

6           MR. GRANT:  We intend to withdraw that and to

7   substitute the brief to be filed on the 14th.

8           THE COURT:  All right.

9           MR. GRANT:  Including some of that but then other

10  things as well.

11          THE COURT:  That's fine.

12          Okay.  Anything else?

13          MR. GALLAGHER:  I think that's it, Judge.

14          MR. GRANT:  Your Honor, I suppose point of order,

15  given the difficulties we face trying to prepare for the

16  hearing next week, we will -- I will do everything possible.

17  I ask cooperation with the defendant's counsel about these

18  depositions.  We essentially have no one to cover the

19  depositions, so we're going to have to do what we can to

20  scramble.  And I will do my best, but it's going to be

21  extremely difficult.

22          THE COURT:  All right.  I will leave that to you.  I

23  expect cooperation and professionalism on both sides, and I

24  expect the depositions to be completed in advance of the

25  hearing.  All right.

1          MR. GALLAGHER:  Thank you, Your Honor.

2          MR. GRANT:  Thank you, Your Honor.

3          MS. KARIS:  Your Honor, one housekeeping matter.

4          THE COURT:  Mr. Grant?

5          MR. GRANT:  I'm still here.

6          THE COURT:  Okay.

7          MS. KARIS:  I'm sorry.  Would you like us to submit

8    to the Court a proposed order based on the Court's findings,

9    or is that something that the Court is going to issue in a

10   minute order?

11         THE COURT:  No.  I will do that myself.

12         MS. KARIS:  Thank you very much.

13         THE COURT:  All right.  Thank you.

14         MR. GRANT:  Thank you, Your Honor.

15         (Which were all of the proceedings had.)

16

17

18
     I certify that the foregoing is a correct transcript from the
19   record of proceedings in the above-entitled matter.

20
     /s/ Kelly M. Fitzgerald                    August 14, 2015
21   Official Court Reporter

22

23

24

25