IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

BACKPAGE.COM, LLC,                      )
                                        )
           Plaintiff,                   )
                                        )     No. 15 C 06340
           v.                           )
                                        )     Judge John J. Tharp, Jr.
SHERIFF THOMAS J. DART,                 )
                                        )
           Defendant.                   )

**REDACTED MEMORANDUM OPINION AND ORDER**

In its order of August 21, 2015, the Court denied plaintiff Backpage.com's motion for a preliminary injunction and allowed the temporary restraining order to expire, absent any agreement between the parties to voluntarily extend it. This opinion summarizes the Court's preliminary factual findings and its reasons for the ruling.

## I.      BACKGROUND

Backpage.com ("Backpage"), which operates a website devoted to online classified advertising, seeks an injunction against Cook County Sheriff Thomas Dart requiring him to notify credit card companies Visa and MasterCard of any ruling by this Court that it was likely unlawful for him to exhort them in a June 29 letter and follow-up communications thereafter to "cease and desist" allowing their cards to be used to process payments to Backpage. (Backpage no longer asks for a mandatory injunction requiring Dart to "retract" the letters.)

Last month, this Court entered a temporary restraining order prohibiting Sherriff Dart from further efforts to persuade others to "defund" Backpage, pending an evidentiary hearing on Backpage's claim that Dart's actions violated the First Amendment. The Court ruled that Backpage was entitled to a TRO because it had a better than negligible chance of prevailing on its claim based on the record at the time. In particular, the Court concluded that Backpage might

be able to demonstrate that Sheriff Dart's letter constituted the kind of informal prior restraint that the Supreme Court prohibited in *Bantam Books, Inc. v. Sullivan*, 372 U.S. 58 (1963). In that seminal case, the Court enjoined the Rhode Island Commission to Encourage Morality in Youth from its *de facto* censorship campaign of sending threatening letters to distributors of books it deemed obscene, followed up with visits from police officers. Rejecting the argument that the Commission, which lacked any direct investigative or prosecutorial authority, was simply "exhorting booksellers and advis[ing] them of their legal rights," the Court held that the Commission had effected a prior restraint because its "notices, phrased virtually as orders, reasonably understood to be such by the distributor, invariably followed up by police visitations, in fact stopped the circulation of the listed publications." *Id.* at 67, 68.

At the TRO stage, the Court also rejected Dart's challenge to Backpage.com's standing to challenge Dart's actions vis-à-vis the credit card companies, which, Dart argued, affected the expressive rights of Backpage.com users but not the forum itself. The Court rejected the argument that Backpage.com lacked an injury-in-fact, but it expressly reserved for further consideration the questions whether Dart's actions, rather than the credit card companies' voluntary decision to dissociate themselves from the content published by Backpage, caused that injury and whether injunctive relief could redress Backpage.com's alleged injuries.

Since the TRO issued, the parties have engaged in expedited discovery, including a limited number of depositions permitted by the Court. The parties submitted further briefs, and the Court held an evidentiary hearing on August 20, 2015, at which the parties presented additional documentary evidence and testimony through live witnesses and declarations. Based on the evidence of record, the Court preliminarily finds the facts as set forth below.

2

## II.  FACTS

Backpage.com's adult services section overwhelmingly contains advertisements for prostitution, including the prostitution of minors. Backpage uses filters that prevent certain words and phrases from being posted, but many of the advertisements nevertheless clearly solicit payments for sex. Symbols, photographs, and videos depict what words cannot. In over 800 sting operations responding to Backpage ads since 2009, Dart's officers have made arrests for prostitution, child trafficking, or a related crime 100% of the time. Evidence submitted by Dart from other law enforcement agencies and non-profit anti-trafficking groups, as well as evidence from a lawsuit by a trafficking victim against Backpage, establish that Backpage.com's adult section is the leading forum for unlawful sexual commerce on the Internet and that the majority of the advertisements there are for sex.[1] Backpage maintains that there is legitimate commerce

---

[1] The National Center for Missing and exploited Children ("NCMEC"), a national data clearing house and resource created by Congress in 1984 to help find missing children and to reduce the sexual exploitation and other victimization of children, reports that of the over 8,600 reports made to its "CyberTipline" in 2014, more than 64% related to classified ads placed on Backpage.com. *See* Affidavit of Staca Shehan, Executive Director of the Case Analysis Division of NCMEC, Def. Hearing Ex. 5, at ¶¶ 12-14. Consistent with this data, and with the experience of his own deputies, the Sheriff presented affidavits from law enforcement officials from Alameda County, California, Boston, Massachusetts, and Seattle, Washington, each of which attests to the same basic correlation between advertising on Backpage.com and unlawful sexual activity. *See* Def. Hearing Ex. 8 ("our experience in California is that Backpage.com is the number one online location where these victims of crime are bought and sold"); Ex. 9 ("Backpage.com is the go-to Web site in Boston for those looking to solicit a prostitute, post prostitution ads, and recruit and traffic young women and minors"); Ex. 10 ("every time the Seattle Police Department Vice/High Risk Victims Unit has responded to an ad in the adult section of Backpage.com, we have found that the ad was a posting for illegal activity"). This is only some of the evidence submitted by the Sheriff in support of his contention that the ads placed on Backpage.com's adult services site are solicitations to unlawful activity; others include affidavits and letters from the National Association of Attorneys General, the state of Masachusetts, and numerous articles appearing in print and other media. Against this collection of evidence, Backpage has produced no evidence whatsoever regarding the lawfulness of the ads placed on its adult services site.

advertised in the adult section, but it has adduced no evidence of what, if any, percentage of ads in the adult section relates to non-criminal "escort" or other legal "adult" activity.

###### A.    Sheriff Dart's Letters

Sheriff Dart has long worked against human trafficking, including prostitution and the sexual exploitation of women and children, in his capacity as Sheriff of Cook County. His efforts comprise law enforcement measures, attempts to curtail online trafficking through civil legal action,[2] assistance programs for trafficking victims, and vocal advocacy on this issue. As part of this initiative, Dart tried in several communications over a period of years to persuade Backpage to take measures to prevent the use of the "adult" section of its website for advertisements for prostitution (and the attendant human trafficking and exploitation). Frustrated with what he perceived as Backpage's lip service to his concerns, and hamstrung from taking legal action by statutory protections for forum websites such as Backpage,[3] Dart sought more creative ways to curtail the selling of sex on Backpage.

Dart had multiple employees working on trafficking issues in general and Backpage advertising in particular. In early 2015 he hired Stephanie Zugschwert as Assistant General Counsel for Policy and tasked her with working on sex trafficking issues. She reported to Director of Policy Joseph Ryan, who in turn reported to Cara Smith, a direct report of Sheriff Dart. Shortly into her tenure, Zugschwert drafted a strategy document entitled "Backpage.com:

---

[2] *See Dart v. Craigslist, Inc.*, 665 F. Supp. 2d 961 (N.D.Ill. 2009).

[3] Under The Communications Decency Act, the provider of an "interactive computer service" such as Backpage.com cannot be held liable as a publisher. 47 U.S.C. § 230(c). The Seventh Circuit has taken the position that § 230(c) "cannot be understood as a general prohibition of civil liability for web-site operators and other online content hosts," but it does preclude liability premised on treating the online information system as the publisher or speaker of any information provided by someone else. *Chicago Lawyers' Committee for Civil Rights Under Law, Inc. v. Craigslist, Inc.*, 519 F.3d 666 (7th Cir. 2008). The statute is not implicated in this case because Dart made no effort to impose liability on Backpage for the content of users' advertisements.

Approach Major Financial Institutions." The memo is addressed to Dart, Smith, and Ryan, and is dated May 7, 2015.

The memorandum sets forth a strategy of using the "National Day of Johns"[4] as a "launching pad to exert national pressure on the financial institutions," which are identified as "Visa, MasterCard, American Express, and Discover." The memorandum described a media event where the sheriff's office would partner with other law enforcement agencies to show the financial institutions how Backpage was being used "as a front for adult and minor prostitution." According to Zugschwert, "The goal would be to ultimately present this information in a streamlined media digestible form, with our National Day of Johns partners signing on and to release it with the National Day of Johns media effort."

The memorandum goes on to provide "context" for approaching the credit card companies. It notes the "self-serving concern of financial institutions [about] their own potential liability for allowing suspected illegal transactions to take place" as well as the concern of "banks" for "their business reputations and that of their investors." The memorandum then sets forth in more detail the financial institutions' "legal/moral and reputational responsibility" to disaffiliate with Backpage. It refers to the legal obligations of financial institutions to file suspicious activity reports if illegal activity is suspected, and concludes that "banks" that knowingly allow illegal transactions "are susceptible to money laundering prosecutions, reputational damage and/or hefty fines." The document next posits that use of Visa or

---

[4] The "National Day of Johns" is a coordinated effort among law enforcement agencies across the country and led by Sheriff Dart that targets prostitution and other sex crimes. The initial 2015 effort, which was timed to coincide with the Super Bowl, resulted in 570 arrests; more than 70% of the arrests resulted from responses to fake ads that had been placed on Backpages.com. Feb. 3, 2015, "Illinois sheriff posts fake ads for prostitiution that nab 570 men in nationwide sting," The Times-Picayune, (available at http://www.nola.com/news/index.ssf/2015/02/illinois_sheriff_posts_fake_ad.html (last visited August 24, 2015).

MasterCard to purchase advertising on Backpage violates the companies' user rules governing illegal activity. Finally, the memorandum collects examples of "similar situations" in which financial institutions, in some cases in response to government pressure, have dissociated themselves from "high-risk" industries.

Although Dart did not necessarily read or "approve" every aspect of the memorandum, he did green-light the idea of sending letters to the credit card companies about Backpage, and he signed the two letters that had been appended to the strategy memorandum with only minimal changes (likely made by Smith). Much of the content from the strategy memorandum is reproduced in the letters, including the discussion of the legal duties of "financial institutions" to report suspicious activity and the citation to the federal money laundering statute. The letters are dated June 29, 2015. One is addressed to the Chief Executive Officer of Visa, Inc. and all of the members of its Board of Directors, and is cc'd to the CEOs of the top five institutional investors in Visa. The other is addressed to the same personnel at, or affiliated with, MasterCard. The entire text of the otherwise identical letters is reproduced in the Appendix to this opinion.

The letters, which were distributed by email attachment, were sent to numerous personnel within Visa and MasterCard other than the nominal addressees; for example, lawyers and public relations officers. Despite the letters' closing request that each institution respond "in one week" with the identity of a person that Dart could work with, the sheriff's team followed up with various people at Visa and MasterCard almost immediately by email and telephone. Visa and MasterCard were informed that Dart would hold a press conference on July 1 to announce his campaign of pressure on the credit card companies.

American Express did not receive a June 29 letter from Dart because, as the letters to Visa and MasterCard note, it already had terminated the use of American Express credit cards for

6

payments to place ads in Backpage's "adult" section. American Express based its decision on the reputational harm that would inure from being associated with the distasteful and/or illegal content in that portion of the website. It withdrew from Backpage in April 2015, without having received any request or other communications from Dart.[5] Dart later sent a thank-you letter to American Express.

     *B.    Actions by the Credit Card Companies*

     Unbeknownst to Dart, MasterCard had already taken steps to disaffiliate with Backpage. Indeed, the record shows that MasterCard had been discussing internally the propriety of authorizing payments using the card for ads in Backpage's adult services section since at least March of 2015, ███████████████████████████████████████████████████████████ ███████████████████████████████████████████.[6] Def. Hearing Exs. 77, 87. In response to MasterCard's concerns about complaints from investors and negative media reports about Backpage, ████████████████████████████████████████████████████ ██████████████████████████████████████████████████████████████ ██████████████████████████████████████████████████

---

     [5] Backpage has provided no evidentiary support for the allegations in its complaint, made "on information and belief," that American Express terminated use of its card for ads placed in the adult services portion of the web site at Dart's behest. Compl., Dkt. # 1 ¶¶ 4, 43. To the contrary, the evidence of record indicates that American Express told Backpage's CEO, Carl Ferrer, that it was taking this action based on negative media reports concerning Backpage.com and that its terms of use did not permit use of the card for "brand damaging or illegal transactions." McDougal Dep. at 188-192; Ferrer Dep. at 100-105. It is difficult to understand how these allegations of Sheriff Dart's involvement could have been made in view of the communications Mr. Ferrer had with American Express months before the complaint was filed.

     [6] No evidence was presented linking this call to anyone in Sheriff Dart's organization.

     [7] Visa and Mastercard provide the payment process which banks use to provide credit and debit card services to their customers; the banks, not Visa and Mastercard, extend credit and issue credit cards. The so-called acquiring banks also contract directly with merchants to provide credit card services. Thus merchants do not contract directly with Visa and Mastercard, but instead with the acquiring banks.

[REDACTED]

[REDACTED]

[REDACTED] Other communications followed, [REDACTED]

[REDACTED]

[REDACTED]

[REDACTED]

[REDACTED].

Nevertheless, MasterCard acted more quickly after receiving Dart's letter. After the letter went out, Cara Smith, Dart's aide, communicated with persons in MasterCard's legal department, and she was informed by midday on June 30 that the acquiring bank had terminated its relationship with Backpage. A MasterCard lawyer told Smith, "We were already fairly advanced with an investigation here." [REDACTED]

[REDACTED]

[REDACTED] All of the Backpage acquirers for MasterCard did in fact terminate in short order.

Visa took only a little longer. Dart's aide Cara Smith emailed Visa Inc. on June 30 to flag the June 29 letter and request "a brief call." Shortly after, Smith informed Visa that Mastercard had elected to terminate and expressed hope that "Visa will take similar immediate action." Visa informed Dart's staff that [REDACTED]

[REDACTED]

[REDACTED]

[REDACTED] In the meantime, Dart's office continued to exert pressure for a fast decision— informing Visa that it was the lone holdout and would be spoken of as such at the fast-

approaching July 1 press conference and in Dart's impending press release. ████████

████████████████████████████████████████████████████████████████

████████████████████ Visa informed Dart's office on the morning of July 1 that it would issue a statement announcing that it had "taken action to stop processing payments for Backpage.com and the merchant's acquirers have confirmed that they have suspended acquiring."

MasterCard's press statement stated that it severed ties with Backpage "based on a request from the Cook County Sheriff's office" that "confirmed" brand-damaging activities, and Visa publicly explained that it had "received allegations from U.S. law enforcement that the merchant backpage.com is linked to child prostitution and human trafficking."

Dart submitted the affidavit of Martin Elliott, Senior Director of Visa USA, Inc., and its Global Head of Brand Protection, stating that "following" Sheriff Dart's letter, members of the Global Risk group, in consultation with the legal department, "made the decision to request that Visa Europe, a separate and independent legal entity, contact Backpage.com's acquiring banks in order to terminate" the use of Visa cards on Backpage. According to Elliott, "[a]t no point did Visa perceive Sheriff Dart to be threatening Visa with prosecution or any other official state action, nor did Visa base its decision on any such threat." ████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████

Dart's office professes surprise at the speedy response from MasterCard and Visa, maintaining that the expectation had always been, in the words of Cara Smith, that the letters would initiate "marathon" discussions with the companies, rather than precipitate any immediate

9

action. Yet at least one member of the Sherriff's communications team, Benjamin Breit, stated in multiple contexts that the sheriff had "compelled" the credit card companies to act. And the sheriff's own press release was titled "Sheriff Dart's Demand to Defund Sex Trafficking Compels Visa and MasterCard to Sever Ties with Backpage.com." On July 10, Joseph Ryan circulated what he called "a proposed background for the impact of our successful efforts"; in that summary, he wrote: "Choked of its financial lifeline—and branded by the financial community as untouchable—Backpage will likely wither."

       *C.*     *Effects on Backpage*

The evidentiary record with respect to the effects of the companies' withdrawal from Backpage has not been meaningfully augmented since the TRO proceedings. At that point, Backpage's CEO attested that the company was in immediate financial jeopardy because the primary payment mechanisms of its ad-buyers had been cut off.

In the wake of the companies' decisions, Backpage elected to allow the free posting of ads throughout its website, and it is continuing to do so. It has also attempted to mitigate the effects of the credit card companies' decisions by promoting alternative payment methods, including Bitcoin and Backpage "credits," which can be purchased by mail. Prior to implementation of the TRO, Dart continued efforts to "defund" the adult section by, among other things, contacting the Governor of Texas, the FBI, and the Chief Postal Inspector to request scrutiny of the mail-order purchase of credits through Backpage's Texas-based post office box. He also contacted American Express to report that its cards could be used to buy credits which then could be used on the adult section. Dart's department continued to test the use of credit cards to purchase adult ads on Backpage and inform the credit card companies when a transaction succeeded.

10

Backpage did not set forth any evidence about whether any of Visa or MasterCard's acquiring banks would enter into merchant agreements with Backpage if informed that Dart acted (or likely acted) illegally in sending the letters to Visa and MasterCard. ▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮.

### D.    Dart's proposed clarification

Dart and his staff testified uniformly that the goal of their campaign was to defund the "adult" section of Backpage to curtail human trafficking, although the June 29 letter speaks more generally to desisting from placing ads "on websites like Backpage.com." There is no evidence that Visa or MasterCard considered pulling their cards from the adult section only, as American Express had done. The record contains drafts of letters to MasterCard and Visa from Dart advising them that he takes no issue with Backpage.com generally and intended only to defund the adult section. In light of the TRO which restricted his communications with the credit card companies, however, Dart has not in fact given them notice of this clarification.

### III.    DISCUSSION

To obtain a preliminary injunction, the moving party must demonstrate that it has no adequate remedy at law, that it will suffer irreparable harm if relief is denied, and that it has

some likelihood of success on the merits. *See Ezell v. City of Chicago*, 651 F.3d 684, 694 (7th Cir. 2011). "If the moving party meets these threshold requirements, the district court weighs the factors against one another, assessing whether the balance of harms favors the moving party or whether the harm to the nonmoving party or the public is sufficiently weighty that the injunction should be denied." *Id*. "These considerations are interdependent: the greater the likelihood of success on the merits, the less net harm the injunction must prevent in order for preliminary relief."

A.      *Likelihood of Success on the Merits*

The key question remains whether Backpage can establish that Dart's actions amount to informal censorship in violation of the *Bantam Books* line of cases. The answer turns primarily on the issue of whether Dart can be said to have implicitly threatened the credit card with official action if they did not terminate their relationships with Backpage, and if so, whether the threat caused the intended result. *See Bantam Books*, 372 U.S. at 67 (explaining that Commission's actions were unconstitutional because it "deliberately set about to achieve the suppression of publications deemed 'objectionable' *and succeeded in its aim*."), 68 (further reasoning that the Commission "directly and designedly stopped the circulation of publications in many parts of Rhode Island" because the distributor's "compliance with the Commission's directives was *not voluntary*.") (emphasis supplied in both quotes). Under the direct holding of *Bantam Books*, an informal prior restraint is established where threatening government action causes a restraint on speech. But, the Court was careful to note, its ruling does not require law enforcement officials to "renounce all informal contacts with persons suspected of violating valid laws prohibiting obscenity." *Id*. at 71-72.

12

Subsequent cases have heeded this admonition and reaffirmed that government officials, including law enforcement officials, retain their own First Amendment rights to speak on matters of public concern. They may permissibly advocate for particular results, criticize conduct, and even threaten others with public embarrassment. *See American Family Ass'n, Inc. v. City and County of San Francisco*, 277 F.3d 1114, 1125 (9th Cir. 2002); *McLaughlin v. Watson*, 271 F.3d 566, 573 (3d Cir. 2001); *X-Men Sec., Inc. v. Pataki*, 196 F.3d 56, 69 (2d Cir. 1999); *Penthouse Int'l., Ltd. v. Meese*, 939 F.2d 1011, 1016 (D.C. Cir. 1991); *R.C. Maxwell Co. v. Borough of New Hope*, 735 F.2d 85 (3d Cir. 1984). They may not, however, make implied or explicit threats of government sanctions that have the effect of chilling protected speech. *American Family Ass'n*, 277 F.3d at 1125 ("public officials may criticize practices that they would have no constitutional ability to regulate, so long as there is no actual or threatened imposition of government power or sanction"); *McLaughlin*, 271 F.3d at 573 ("It is not enough that defendant speaks critically of plaintiff or even that defendant directly urges or influences the third party to take adverse action. Rather, defendant must "threaten" or "coerce" the third party to act"); *Penthouse Int'l*, 939 F.2d at 1015 ("[T]he Supreme Court has never found a government abridgement of First Amendment rights in the absence of some actual or threatened imposition of governmental power or sanction."). The doctrine of prior restraints on speech is implicated only where threats of official action are present. *See Bantam Books*, 372 U.S. at 72 (violation stemmed from the censorship effectuated by threats of "extralegal sanctions."). In short, attempts to convince must be distinguished from attempts to coerce; the former are perfectly legal. *Okwedy v. Molinari*, 333 F.3d 339, 344 (2d Cir. 2003).

As the Court previously concluded, Dart's letter to the credit card companies could reasonably be interpreted as an implied threat to take, or cause to be taken, some official action

13

against the companies if they declined his "request" to stop providing a method to pay for advertising on Backpage.com. Dart did not directly threaten the companies with an investigation or prosecution, and he admits that his department had no authority to take any official action with respect to Visa and MasterCard. But by writing in his official capacity, requesting a "cease and desist," invoking the legal obligations of financial institutions to cooperate with law enforcement, and requiring ongoing contact with the companies, among other things, Dart could reasonably be seen as implying that the companies would face some government sanction— specifically, investigation and prosecution—if they did not comply with his "request." This is true even if the companies understood the jurisdictional constraints on Dart's ability to proceed against them directly. As Dart admitted in the preliminary injunction hearing, his department often coordinates with other local law enforcement agencies and sometimes with other states and the federal government. There is no reason that he could not refer the credit card companies to the appropriate authority to investigate their suspected role in facilitating human trafficking. Dart's leadership in coordinating the National Day of Johns effort, for example, illustrates the ability of his office to bring to bear law enforcement activities on a national scale. And further, in this very case, Dart contacted the Inspector General of the United States Postal Service and the FBI, urging them to investigate the lawfulness of alternative payment methods for Backpage's sex ads.

Furthermore, Dart's pre- and post-letter statements are consistent with (though not conclusive proof of) an attempt at official coercion. The strategy memorandum expressly recommended appealing to the credit card companies' interest in avoiding liability and it cannot be credibly argued that the references to the federal money laundering statute and other regulations defining duties of financial institutions were not intended to suggest that the

14

companies could face civil or criminal liability for facilitating payments for unlawful ads placed on Backpage.com (even if Dart's department itself could not take direct action). And after the letters were sent, Dart's office was happy to take credit for "compelling" the companies' actions. Dart referred to his letter not as a "request" but as a "demand." A "demand" is consistent with his role as sheriff, but not "a father and a caring citizen." Finally, the urgency of the sheriff's department's follow-up communications imposed another layer of coercion due to its strong suggestion that the companies could not simply ignore Dart. Dart's letter asked for a response within "one week," and then only to identity a contact person, but within hours of sending the letter multiple staff members were hounding personnel within each company about terminating their relationships with Backpage.com.

To the extent that the letter could reasonably be found to be a "threat," however, it does not clear the threshold with much room to spare. That a jury *could* find Dart's letters to contain a threat of official action does not mean that a jury *would* make such a finding. Backpage may prevail on this issue, but there is ample reason for doubt. Compared to the language of the threats, often coupled with police action, in *Bantam Books* itself and other cases where an informal prior restraint was found, Dart's oblique, footnoted, references to irrelevant statutes and clunky statements about legal duties seem unlikely to inspire fear of legal reprisals—particularly on the part of large, sophisticated corporations with immediate access to top-tier legal resources and advice. On the spectrum between "attempts to convince" and "attempts to coerce," the letter falls, in the Court's view, much closer to the former. Yet, even if Dart's actions pale in comparison to those described in cases where a prior restraint was found, at this stage the Court cannot hold as a matter of law that the letter, and subsequent aggressive follow-up communications, were *not* threatening.

15

But a threat alone is not a prior restraint. Under *Bantam Books* and its progeny, the threat must cause the intended result of censoring certain speech based on its content. As Backpage's counsel conceded at the hearing, the threat must produce some "consequence." And here is where Backpage's view and Court's part ways. Backpage contends that the requisite causal connection is established because Dart's letter caused the credit card companies to act. And while the Court does not quarrel with the premise that ***the letter*** precipitated the companies' actions—the Court has made the preliminary finding, consistent with the evidence, that the companies responded to Dart's letter—it is far from clear that any ***threat*** the letter may have contained caused the companies' action. Recall that Dart is permitted, and indeed, constitutionally entitled, to speak out on matters of public concern such as the online trafficking of women and children on Backpage.com. If his use of the bully pulpit to educate and even shame the companies persuaded them to act, then there has been no prior restraint of speech by the government. And there is plenty of evidence to suggest that this is what occurred. For example, the companies' public statements attested to their desire not to be associated with illegal transactions. ██████████████████████████████████████████

███████████████████████████████████████████████

████████████ Visa's affidavit states that it was not influenced by any threat.[8] And Mastercard

---

[8] Backpage's effort to minimize the affidavit of Visa's Global Head of Brand Protection, Martin Elliott, is unpersuasive. Elliott attests that Visa did not perceive a threat of "prosecution or any other official state action" and did not "base its decision on any such threat." Backpage insists that Elliott's affidavit "says nothing" and is irrelevant because "Sheriff Dart's office doesn't prosecute anyone. He can arrest people [and] [h]e can refer people to prosecution," and further because under *Bantam Books* the official's lack of authority to prosecute is not dispositive of the existence of a threat. These uncontroversial statements do not support the argument that the affidavit does not matter, however. Elliott's affidavit—which is not limited to potential "prosecution or any other official state action" ***by Dart himself***, as Backpage suggests— is relevant to establishing that even assuming the letter contained a threat of official action by any government authority, the threat was not what caused Visa's decision to request

16

had reason to terminate to Backpage before hearing anything from Dart because of its concerns about negative media attention; its acquirer merely advanced the termination date. Indeed, American Express needed no communication from Dart to abandon Backpage; this makes it even more plausible that for business reasons Visa and MasterCard simply did not want to be associated online sex trafficking.

Backpage insists, however, that it would be irrelevant if the credit card companies had acted "purely voluntarily." Backpage urges the Court to focus only on Dart's actions, not their effect on the credit card companies; according to Backpage, if there was a threat, then it does not matter whether the companies' actions were caused by the threats or by permissible advocacy or indeed by their own independent business considerations. But this is not consistent with the governing authorities. The involuntary nature of the third parties' actions—*i.e.,* action caused by a threat—has been deemed relevant in prior *Bantam Books* cases, including the seminal case itself. All of the cases cited by Backpage involved third parties' decisions to stop selling materials deemed obscene by some government official or body without any prior due process or judicial decision, and in each case, the voluntariness of the third parties' decisions was considered. In *Bantam Books*, the Supreme Court rejected the argument of Rhode Island's Commission to Encourage Morality in Youth that it "simply exhorts booksellers and advises them of their legal rights," in part because it was found as a fact—a finding the Court expressly noted that it was bound by—that the distributor's "compliance with the Commission's directives was not voluntary," in keeping with the "general rule" that "[p]eople do not lightly disregard public officers' thinly veiled threats to institute criminal proceedings against them if they do not come around." 372 U.S. at 68. Deeming it to have been "particularly relevant," *id*. at 63, the

that Visa Europe ask Backpage's acquiring banks to terminate their merchant agreements with Backpage.

Court highlighted and relied upon the factual finding that the book distributor was compelled by the Commission's threat to involuntarily comply with its directive; Backpage's insistence that the Court's focus on this fact was merely an idle "reference" is not persuasive.

The relevance of coercive effect as set forth in *Bantam Books* was highlighted in another case Backpage.com relies upon, *Penthouse Int'l, Ltd. v. McAuliffe*, 610 F.2d 1353, 1360 (5th Cir. 1980), in which the court noted: "The Supreme Court found that even though the distributors would violate no law if they refused to cooperate with the Commission, compliance with the directives was Not voluntary." In *McAuliffe*, the Fifth Circuit similarly concluded that "[i]t cannot be said that the retailers of the magazines in question 'voluntarily' removed the magazines from their shelves" because it resulted directly from a "calculated scheme of warrantless arrests and harassing visits to retailers." *Id.* at 1360. Likewise, the courts in *ACLU v. City of Pittsburgh*, 586 F. Supp. 417, 422 (W.D. Penn. 1984) and *Playboy Enterprises Inc. v. Meese*, 639 F. Supp. 581 (D.D.C. 1986), examined the voluntariness of third parties' decisions to take First-Amendment-protected materials out of circulation. In the first of these cases, the court relied on the plaintiff's proof by a preponderance of the evidence "that the distribution of a publication, which has not been judicially determined to be obscene, has been deterred by the Mayor's official pronouncements," specifically noting that "the vendors' compliance with Mayor Caliguiri's directives in this case was not voluntary." 639 F. Supp. at 422. In the *Playboy* case, the court also considered the issue of voluntariness when it noted the fact that "many of the decisions not to sell were made after [the defendant's] letters were sent out" in rejecting the argument that distributors voluntarily stopped selling the magazine. 639 F. Supp. at 585.

The Second Circuit cases that Backpage cites also support the view that only action involuntarily taken in response to a threat of official action would show a prior restraint. In

*Hammerhead Enterprises, Inc. v. Brezenoff*, 707 F.2d 33, 39 (2d Cir. 1983), which involved a campaign to stop retailers from selling an offensive board game, the court held that the challenged communication was not part of "an informal system of censorship" because it did not refer to "adverse consequences that might be suffered"; because the agency lacked authority to impose sanctions; and because "not a single store was influenced." The reasoning supports the view that a threat (a reference to "adverse consequences") that in fact influences conduct is required. In *Rattner v. Netburn*, 930 F.2d 204, 210 (2d Cir. 1991), the Court reversed the district court's finding that the challenged communication was not threatening or coercive because, in contrast to *Hammerhead*, "a threat was perceived and its impact was demonstrable." Again, therefore, the Court reasoned that a prior restraint is shown where there is a threat (there, a letter from a village trustee to a Chamber of Commerce publication criticizing an advertisement and intimating that the member businesses might be boycotted as a result) that caused the limitation of speech (the Chamber discontinued its newspaper). Backpage also cites *Okwedy*, but that case does not support the argument that voluntariness is irrelevant; indeed the opinion does not address the question of causation other than to recite the fact that the government official's letter caused the billboard owner to remove the signs to which the official objected. *See* 333 F.3d at 340.

Although addressing different factual contexts, Seventh Circuit case law also supports the view that there is no prior restraint unless a threat causes involuntary action. *Fairley v. Andrews*, 578 F.3d 518 (7th Cir. 2009) defines a prior restraint as "threatening penalties for future speech." *Id.* at 525. In order to actually recover for such a threat, however, the plaintiff must establish two more elements, and "[o]ne is proof of causation." *Id.* at 525. In *Fairley*, that meant that prison guards who were assaulted and threatened had to show it was because of their potential

19

testimony against the jail, not another reason. *Id. Surita v. Hyde*, 665 F.3d 860 (7th Cir. 2011) also addresses the issue of causation. In the relevant part of that case, objectors to a proposed local towing ordinance were threatened with assessment of a fee for a planned protest and a ban on future protests if they did not pay. The court held that because "a reasonable jury could find that prohibiting [plaintiff's] speech was the motivating, or even but-for, cause of [the] threats," the plaintiff's claim survived summary judgment. However, if the objector's speech was chilled for another reason—the evidence suggested that perhaps she voluntarily was not planning a rally for the date in question—then she would have no damages ensuing from the threats, and her claim would fail. *See id*. at 879. And, finally, in *Henderson v. Huibregtse,* 281 Fed. App'x 577 (7th Cir. 2008), the Seventh Circuit again addressed the question of causation where a prison inmate sued over a newspaper's refusal to supply his subscription. The court held that an advisory city resolution urging the publisher to prohibit sales to inmates was not a prior restraint because in addition to lacking a "threat," he could not establish that the resolution had coercive effect on the publisher. *Id*. at 580-81. Because the publisher, of its own volition, did not want to sell subscriptions to inmates, there was no restraint caused by the government action.

In light of this precedent, Backpage cannot credibly contend that it is "irrelevant" that Visa and Mastercard, much like the newspaper in *Henderson* vis-à-vis prisoners, simply did not want to do business with a website where advertisers peddle flesh. Once a threat is established, the plaintiff must further prove that the threat restrained speech. If something other than the government's threat caused the restraint, then the plaintiff's case fails. And in this case, in contrast to the cases on which Backpage relies, there is abundant affirmative evidence of

voluntary action by the credit card companies to dissociate themselves from Backpage's seedy offerings.[9]

To be clear: the Court does not doubt that Dart's *letter* caused action by Visa and MasterCard, or at least the timing of that action. But the letter was primarily information and advocacy, at most obliquely hinting that some official sanction might result from inaction, and so cannot be wholly equated with whatever implicit threat of government sanction it also contained. The record to date, which includes no contradictory evidence from Backpage, amply establishes that the credit card companies caused the termination of their agreements with the website voluntarily and not because they were coerced by threats from Dart. Based on that evidence, there is no basis to infer that the response of the credit card companies to Dart's letters would have been any different had they not contained the language to which Backpage points as carrying coercive import. There is, therefore, no basis to conclude that the threat of official action caused any restraint on speech.

Dart's actions cannot be deemed "informal censorship" to the extent that the credit card companies made a rational business decision that is in keeping with clear policies to protect their brands from reputational harm. And only censorship, albeit informal—the "restraint" part of "prior restraint"—is prohibited by the First Amendment. *See Blue Canary Corp. v. City of Milwaukee*, 251 F.3d 1121, 1123 (7th Cir. 2001) ("By 'prior restraint' Blackstone and modern courts alike mean censorship—an effort by administrative methods to prevent the dissemination of ideas or opinions thought dangerous or offensive."). No matter what Dart's methods, if his threat did not coerce the companies' actions—and the evidence suggests it did not—he cannot be liable for censoring the content on Backpage.com.

---

[9] The evidence presented regarding the contents of ads appearing in the adult services portion of the web site warrant this description.

21

*Bantam Books* and the other cases relied upon Backpage simply do not address the situation before this Court, where there is affirmative evidence, not just the defendant's conjecture, that the third parties upon whom the government official prevailed acted voluntarily for reasons independent of any threat. Backpage wants the Court simply to ignore this evidence, but none of its cited authorities imposes liability for a prior restraint in the face of evidence that the public official's action did not cause the subsequent curtailment of expression. Because no evidence has been presented to establish that credit card companies acted out of concern that Dart would initiate, or cause to be initiated, any enforcement proceedings or other legal action against them, the Court concludes, on this record, that Backpage's likelihood of success on the merits is nil.

Even if Backpage were correct, and it was not required to show that Dart's alleged threats had any coercive effect, the decision by the companies to terminate their relationships with Backpage because of the illegal and brand-damaging activity taking place in the adult section of Backpage.com is nevertheless relevant to show that injunctive relief is not appropriate here. To establish its standing to seek an injunction, Backpage must show that: (1) it is under threat of an actual and imminent injury in fact; (2) there is a causal relation between that injury and the conduct to be enjoined; and (3) it is likely, rather than speculative or hypothetical, that a favorable judicial decision will prevent or redress that injury. *Schirmer v. Nagode*, 621 F.3d 581, 585 (7th Cir. 2010). The Court's prior order explained why Backpage's injury in fact is established, but left open the questions of causation and redressability. Order, Dkt. # 29 at 4 n.4 (July 25, 2015). The absence of evidence that any implicit threat in Dart's letters caused the credit card companies to act could call into question whether Backpage has shown a sufficient causal connection even to establish standing (much less to establish a substantive violation of the

22

First Amendment), but there is a causal connection, at least in the but-for sense, that is sufficient to satisfy the requirement of an injury "fairly traceable" to the defendant's *letter*, if not specifically to any objectionable statements in the letter, though it was the credit card companies' actions that proximately caused the injury. *See Lexmark Int'l, Inc. v. Static Control Components, Inc.*, 134 S. Ct. 1377, 1391 n.6 (2014) ("Proximate causation is not a requirement of Article III standing, which requires only that the plaintiff's injury be fairly traceable to the defendant's conduct."). Success on the merits requires a higher threshold of causation, sufficient to establish not just a link between the injury and *some* conduct by the defendant, but a causal connection between the injury and the claimed threat of official action.

Redressability, however, is very much in doubt in light of the evidence now before the Court. Even though Dart's letters precipitated their speedy action, there is evidence that the credit card companies ceased doing business with Backpage.com because they did not want their products to be associated with the content posted there. Therefore, the Court's preliminary statement in the TRO order that the credit card companies might reprise the relationship if they knew Dart could not legally coerce them to stay away from Backpage now appears to be unwarranted. At the very least, Backpage has provided no evidence in support of the proposition.

Indeed, there is no way to know how the credit card companies would proceed if informed that Dart had acted unlawfully in threatening them. And that alone is enough to defeat the claim for injunctive relief; "such speculation is not enough to turn this into a case and controversy with a redressable injury." *Cabral v. City of Evansville, Ind.*, 759 F.3d 639, 642-43 (7th Cir. 2014) (citing *ASARCO, Inc. v. Kadish*, 490 U.S. 605, 615 (1989)). It is Backpage's burden to produce proof that an injunction would produce a favorable outcome to its injury, but

it produced nothing whatsoever to support the element of redressability.[10] *See Cabral*, 759 F.3d at 643. Backpage's assumption that a retraction from Dart, or a requirement that Dart send the companies a copy of this Court's opinion (assuming it were favorable regarding Backpage's First Amendment argument), would change the current state of affairs is, as far as the record shows, pure and unwarranted speculation. So, too, any inference that any other payment processor would be coerced by concern that Dart would take any official sanction against them— particularly now that Dart has publicly disavowed any intention or ability to do so. The evidence that the credit card companies caused the acquiring banks to terminate their agreements with Backpage for independent business reasons leaves no reason to believe that removing the specter of government sanction from Dart's anti-trafficking advocacy would alter the behavior of American Express, MasterCard, Visa, or any other comparable payment processor.

Because Backpage has failed to establish a causal link between the companies' actions and Dart's threats, it is unlikely to prevail on the merits of its claim that Dart imposed an informal prior restraint on speech published on Backpage.com.

      *B.    Irreparable Harm*

Perhaps assuming that the emergency showing made in support of the TRO sufficed to establish irreparable harm, Backpage has done little to support this required element. While it seems quite reasonable to infer that Backpage has sustained financial losses as a result of the withdrawal by the credit card companies, it is also clear that no irreparable harm—either to Backpage or to its customers—has yet occurred. Backpage remains in business, and more rather than fewer ads have been placed since the acquiring banks dropped Backpage. This spike is

---

[10] Of course, redressability is an element of standing to seek an injunction, not damages. Standing is evaluated separately for each form of relief requested, *see Summers v. Earth Island Institute*, 555 U.S. 488, 493 (2009), and Backpage's standing to seek damages is not at issue here.

likely attributable to the fact that Backpage made its ads free, however, and no company can expect to continue to operate without a source of revenue. But Backpage has failed to supplement the evidentiary record with any further evidence of the financial impact of the deauthorization by the credit card companies, or the lack of success of alternative methods of arranging payments by its customers (such as through Bitcoin or other private payment services, or by arrangements to facilitate payments by "Backpage credits" purchased with checks, money orders, or cash).

Thus, whether the financial losses that Backpage sustains while grappling with the withdrawal of credit card processors will result in Backpage's demise has not yet been established. That may well be the result, but the evidence that Backpage has adduced to date— which consists entirely and only of a statement by its CEO that the action by the credit card companies has "cut off nearly all revenue to Backpage.com"—does not establish that it is more probable than not that Backpage will be *irreparably* harmed—that is, that it will be forced to shut down before a claim for damages could be resolved. In that regard, NCMEC has reported that "Backpage executives have told NCMEC that they charge for escort ads only because law enforcement asked them to do so"—thus seemingly disavowing any claim that the revenue from adult services advertising is critical to its survival. *See* Brief of *Amicus Curiae* NCMEC in *J.S. et al. v. Village Voice Media Holdings, L.L.C.,* d/b/a *Backpage.com,* No. 4492-02-II (Supreme Court of Washington), Def. Ex. 6, at 11. Plainly, there are prominent examples of companies that operate web-based classified advertising services that do not depend on payments for ads for "adult services," whether those services be lawful or unlawful. The undisputed evidence, for example, indicates that the largest such business, Craigslist.com, eliminated its adult services advertising in 2010 and remains the leading classified advertising website. Furthermore, given

25

the continued availability of the forum and no evidence that collapse is imminent, Backpage has not shown any irreparable impact on the expressive rights of its users.

Only speculation and conjecture support Backpage's argument that an injunction is required to prevent irreparable harm. It has failed to set forth evidence that its business, and a forum for speech, will disappear without preliminary injunctive relief.

### C.    *Balance of Harms and Public Interest*

Even if it could be said on this record that there were some small chance that a jury could find that the card companies acted as a result of a threat implicit in Dart's letter, and even if the credit card companies were likely to reprise their relationship with Backpage if injunctive relief were granted, Backpage's request for a preliminary injunction would still fall short. The sliding scale provides that "the greater the likelihood of success on the merits, the less heavily the balance of harms must tip in the moving party's favor," *Korte v. Sebelius*, 735 F.3d 654, 665 (7th Cir. 2013), whereas "a lesser likelihood of success can be made sufficient by a greater predominance of the balance of harms," *AM General Corp. v. DaimlerChrysler Corp.*, 311 F.3d 796, 804 (7th Cir. 2002). With its small likelihood of success on the merits, then, Backpage must establish that the balance of harms in this falls decisively on its side. It has failed to make this showing. Notwithstanding the fact that loss of any First Amendment right injures the public, the countervailing weight of the public's interest in preventing human trafficking and its associated criminal activity is also substantial.

Although neither party has presented definitive evidence on this point to date, the uncontroverted evidence that has been presented establishes, at least, that a large percentage of the ads in the adult services portion of the Backpage.com website are ads for prostitution and further, that these prostitution ads are connected to human trafficking. There is no First

26

Amendment interest in that material, and whatever other speech exists in the adult section is not a matter of record. Indeed, Backpage argues only that it cannot be assumed, *a priori*, that all ads in the adult services are for unlawful activity. That is true enough, and the Court is willing to assume that some portion of the ads appearing in that section at a given time offer lawful services.[11] Furthermore, Visa and MasterCard now cannot be used on any part of Backpage.com, and it is undisputed that much of the content posted outside the "adult" section is lawful, and therefore protected, speech. Official action that results in the elimination of a forum for that lawful speech (assuming, contrary to the Court's conclusion, that a case had been made in that regard) would therefore inflict harm upon the public. *Smith v. Exec. Dir. of Ind. War Memorials Com'n*, 742 F.3d 282, 286 (7th Cir. 2014) ("[R]estrictions on speech are generally understood not to be in the public interest."). The only other harm Backpage alleges is its loss of revenue. This is not a minor concern, but it is much more relevant to the issues of damages than to Backpage's request for an injunction. Moreover, Backpage presented no evidence as to how much revenue from lawful activity, as opposed its total revenue, is in jeopardy.

Although the interest of speakers and the public generally in preventing the suppression of *any* lawful speech is significant, in this context that interest can be found on both sides of the scale. As noted previously, the Sheriff's own First Amendment rights are at stake in this case and the Court must therefore also consider the risk that erroneously entering an injunction would chill Dart's own right to speak out on issues of public concern. Sheriff Dart has a First

---

[11] For the record, the Court has not accepted the invitation issued by the Sheriff's counsel to peruse the Backpage.com adult services site on its own. Happily, it would be inappropriate for the Court to conduct its own *ex parte* investigation of the Backpage.com website in order to supplement the evidence presented by the parties. The Court's findings rely exclusively on the evidence of record that has been presented by the parties. As noted above, however, that record is sufficient to warrant the finding that a substantial majority of the ads appearing in that section are "exhortations to illegal conduct" unprotected by the First Amendment.

Amendment right to publicly criticize the credit card companies for any connection to illegal activity, as long as he stops short of threats. Therefore the Court must also account for the risk of improperly curtailing Dart's ability to engage in lawful advocacy. To this side of the scale must also be added the profound interests of the victims of the human trafficking that Backpage's advertising facilitates, including their safety, their dignity, and their very lives.[12] The facilitation of such trafficking and the other criminal activity with advertisements on Backpage's adult section harms those victims and also the public at large.

On this record, there is no clear basis to conclude that the balance of private and public harms favors Backpage's position or that of the Sheriff. The interests supported by both sides in this dispute are weighty and the scale does not, in the Court's view, tilt decisively in one direction or the other. Where Backpage has demonstrated little or no prospect for success on the merits, however, its failure to demonstrate that the balance of harms falls decisively in its favor provides further reason to conclude that preliminary injunctive relief is not appropriate.

*     *     *

For all of the reasons, Backpage has failed to meet its burden of establishing its entitlement to a preliminary injunction. The Court notes again, however, that this preliminary ruling is not dispositive of any factual issue in the case.

Date: August 24, 2015

John J. Tharp, Jr.
United States District Judge

---

[12] Whatever countervailing arguments could be hypothesized—for example, that online trafficking is safer for the enslaved adult or child victim than street prostitution, or that Backpage can be used as a tool by law enforcement officials—have not been supported with evidence by Backpage.