**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| BACKPAGE.COM, LLC, | ) | |
| | ) | |
| Plaintiff, | ) | Case No. 15-cv-06340 |
| | ) | |
| v. | ) | Judge John J. Tharp, Jr. |
| | ) | |
| THOMAS J. DART, Sheriff of Cook County, | ) | Magistrate Judge Young B. Kim |
| Illinois, | ) | |
| | ) | |
| Defendant. | ) | |

**SUPPLEMENTAL MEMORANDUM
IN SUPPORT OF SHERIFF DART'S MOTION TO COMPEL**

Thomas J. Dart, Sheriff of Cook County Illinois, by his undersigned Special Assistant

States Attorneys, respectfully submits this supplemental memorandum in support of his motion

to compel (Doc. No. 130) as required by the March 30, 2016 Order (Doc. No. 137):

**Introduction**

In the April 1 and April 5 discovery conferences among counsel, Backpage.com

confirmed that it would be producing documents and supplementing certain of its interrogatory

answers upon entry of a protective order, as well as investigating some follow-up inquiries.

Under the assumption that proves true, this supplemental memorandum addresses the two

general categories of discovery that Backpage.com completely refuses to produce.

**A.     WHO OWNS BACKPAGE.COM**

Backpage.com regards its ownership as irrelevant.  (*See* Response to Supplemental

Document Request 13.)  But could anything be more fundamental to a claim than identifying

who the plaintiff is?  Judge Posner thought so, albeit for recusal purposes.  Seventh Circuit Nov.

13, 2015 Transcript at 3—4.  But Sheriff Dart is entitled to learn who is seeking millions of

dollars in damages against him, if for no other reason than to learn what communications each owner had with, for example, Visa Europe, before Visa departed the business . . . or where important documents may be located . . . or who potential witnesses are within its decision-making or control group. *See, e.g.*, *Wachovia Securities, LLC v. Loop Corp.*, No. 05 C 3788, 2008 WL 26225907, at *1-2 (N.D. Ill. June 27, 2008) (recognizing the importance of discovery into affiliation and structure because documents may be deemed under a corporate party's control where they are in the possession of a non-party affiliate).

We respectfully submit "*who are the parties*" is the first discovery that any litigant customarily is entitled to. *See generally Laboratory Corp. of America Holdings v. Cardinal Health System, Inc.*, No. 10-cv-353-D, 2010 WL 3945111, at *2-3 (E.D.N.C. Oct. 6, 2010) (discovery into party's corporate structure and ownership, including documents reflecting "any owners, parents, affiliates, partners, members, subsidiaries, investors, and stockholders," was "not overbroad").

We view with some suspicion Backpage.com's refusal to provide this fundamental information, either to us, or to the United States Senate investigators. *See* Senate Report at 23-25, attached as Exhibit 9 to Sheriff Dart's motion to compel (Doc. 130). Do the actual owners know that their web platform hosts if not abets more than 70% of child prostitution and human trafficking in this country? We would like to ask them once their identities are learned, as that may affect the veracity of *their allegation* of engaging in protected speech. Do they own other criminal enterprises? We would like to ask them as that may affect the veracity of *their allegations* of self-policing and lawfulness. Are they themselves adjudged criminals? Are they sanctioned under Treasury Regulations or Executive Orders from conducting any business in the United States? How the owners conduct themselves *in toto* is germane to how their subsidiary

2

Backpage.com conducts itself—notice attributable to company affiliates is relevant to knowledge of the litigating affiliate. *Wedgewood Ltd. P'ship I v. Township of Liberty, Ohio*, No. 04-cv-1069, 2008 WL 1924254, at *3 (S.D. Ohio Apr. 29, 2008) (ordering plaintiffs to produce responsive documents showing "corporate structure, governance and ownership" which were "relevant to the issue of liability" inasmuch as affiliates may have knowledge of the activities upon the property *in quo* that would preclude the claims).

While the questions posed in the preceding paragraph may seem to be somewhat hyperbolic, Backpage.com's general counsel boasted in written testimony that her company was a champion of anti-trafficking self-policing, and that legislative efforts to curtail it (such as were then being considered in New York City) would only force its ownership to flee overseas and out of the visibility and reach of government regulators. *See* Senate Investigative Report at 24 (Backpage.com general counsel "Ms. McDougall has argued that were U.S. authorities to somehow shut down domestic escort advertising websites, the industry would simply move abroad, outside the reach of U.S. law enforcement") & App. 36, n.18 (McDougall Testimony decrying that Erotic Review (which rates prostitutes) "transferred its ownership to Europe"). Astonishingly, she was prescient because, according to Senate investigators, that is exactly what has happened. Sheriff Dart has a keen defensive interest in learning who is pulling the strings. *See, e.g., Guifu Li v. A Perfect Day Franchise, Inc.*, 281 F.R.D. 373, 382-94 (N.D. Cal. 2012) (sanctioning entity for willfully refusing to provide evidence regarding its corporate structure, ownership and control, which was especially relevant since during the relevant period, there were "several changes in [its] structure and ownership"); *Cox v. Sherman Capital, LLC*, 2014 WL 7409730 (S.D. Ind. Dec. 31, 2014) (corporate structure discovery relevant "particularly in

light of the changes in corporate structure that occurred after the case was filed") (citation omitted). This fundamental discovery should be compelled.

## B. MODERATION OR UNLAWFUL ADVANCEMENT OF PROSTITUTION

Backpage.com regards its self-policing and ad moderation practices irrelevant to discovery, although it trumpets it in twelve paragraphs of its complaint. (*See* Response to Interrogatories 4—10, Document Requests 7—8 and Supplemental Document Requests 7—11; *contra* Complaint, ¶¶ 3, 19—20, 23—26, 30, 33, 39, 45 & 47.) Backpage.com itself has put the matter into issue by alleging in its complaint that Sheriff Dart overzealously was seeking "to prevent the few improper ads that users may post." Complaint, ¶ 45. "Few" would be spot on, if only they had written a few million.

Putting the argument that gave this Court pause succinctly, if even one of a hundred ads is legitimate protected speech, is it not unconstitutional (actionable) to restrain the ninety-nine that advance child prostitution and sex trafficking? Judge Posner's opinion suggests that a prior restraint of even one legitimate ad is unconstitutional, although that only was in mandating the issuance of a preliminary injunction. 807 F.3d 229, 234-35. While there was nothing in the Seventh Circuit record indicating that even a single ad posted on Backpage.com's adult services pages was legitimate speech, this Court has indicated its initial concern that the Seventh Circuit's ruling may have taken "the 99% issue" off the table, albeit without the benefit of any briefing. The Court has invited Sheriff Dart to explain why the Seventh Circuit's opinion does not preclude discovery into the criminality of the posted advertisements, which means discovery about ad moderation/sanitization because that is the gravamen of Sheriff Dart's argument about why Backpage.com is actively involved in the underlying sex trafficking, ergo, why this discovery should be permitted. April 30, 2016 Transcript at 15. As shown below, the Seventh

4

Circuit's conclusions of law on the preliminary injunctive claim do not control the legal determinations that still have to be made by this Court; adjudication on a complete factual record is obligatory, especially given the new evidence of Backpage.com's complicity that has been uncovered after the appellate proceedings; and the United States Supreme Court repeatedly has held that an incidental effect on protected speech does not shield criminal activity.

### 1. The Law of the Case Doctrine Does Not Bind the Court to Preliminary Legal Conclusions

This Court struck Backpage.com's summary judgment motion because it followed the "legion" of authority that a court's—district or appellate—*factual* findings at preliminary injunctive hearings are not binding in the trial on the merits. April 30, 2016 Transcript at 9-10. That is because the findings often are made in a rush, on a very scant record, and under a different legal standard. Indeed, the Court remarked that the Seventh Circuit did not appear to have made any findings of fact whatsoever, *id*. at 9, rendering Backpage.com's summary judgment motion a bit brash.

In its remarks, the Court indicated that it felt the Seventh Circuit's *legal* conclusions were binding on it. But those legal conclusions were based on the same rushed, scant record before the Court, and had to be analyzed under the standards applicable to preliminary injunctions, not a final trial on the merits. If this Court believes it is bound by the Seventh Circuit's legal conclusions made during the interlocutory preliminary injunction appeal proceedings, we respectfully contend that the Court is mistaken. The law of the case doctrine is not applicable to the trial on the merits because "findings of fact *and conclusions of law* made by a court granting a preliminary injunction are not binding at trial on the merits." *Univ. of Texas v. Camenisch*, 451 U.S. 390, 395 (1981) (Stewart, J.) (emphasis added). In that opinion written by our Circuit Justice, the Court held that during a final resolution of the merits of the case, the district court

remained free to decide the legal issue of whether a university should ultimately bear the costs of an interpreter for a deaf graduate student under § 504 of the Rehabilitation Act after the district court had granted and the circuit court upheld a preliminary injunction ordering the university to pay for the interpreter.  *See also Thomas & Betts Corp. v. Panduit Corp.*, 138 F.3d 277, 291-92 (7th Cir. 1998) (Bauer, J.) ("findings of fact and conclusions of law made at the preliminary injunction stage are often based on incomplete evidence and a hurried consideration of the issues"); *Gjertsen v. Bd. of Election,* 751 F.2d 199, 202 (7th Cir. 1984) (Posner, J.) (a "preliminary injunction has no preclusive effect—no formal effect at all—on the judge's decision whether to issue a permanent injunction" in a case where the motion for permanent injunction was still pending in the district court); *Lektro-Vend Corp. v. Vendo Co.*, 660 F.2d 255, 264 (7th Cir. 1981) (Pell, J.) (that "preliminary injunction determinations do not bind a court in the subsequent trial on the merits" is "so well-settled in this circuit, and in the other circuits as to discourage most modern-day litigation of this issue"); *Ayres v. City of Chicago,* 125 F.3d 1010 (7th Cir. 1997) (Posner, J.) (the Court "emphasizes that the granting of a preliminary injunction is not a decision on the merits of the plaintiff's suit" and "is merely a decision that the suit has enough merit—which need not be great merit—to justify an order that will freeze the situation, in the plaintiff's favor, for such time as it may take to determine whether the suit is, or is not, meritorious").  As a matter of law, the 99% issue should remain open and requires a thorough and complete record built through the discovery process.

### 2. New Evidence Precludes Application of the Law of the Case Doctrine

Even were this case remanded on non-preliminary determinations, the law of the case doctrine still would not apply if there is "substantial new evidence introduced after the first review."  *Parts & Elec. Motors, Inc. v. Sterling Elec., Inc*., 866 F.2d 228, 231 (7th Cir. 1988)

(Bauer, C.J.). All this Court had when it denied the preliminary injunctive request, and all the

Seventh Circuit had when it reversed that determination, was Sheriff Dart's 800/800 track record

on sting operations conducted for the advancement of suspected prostitution on Backpage.com's

site, and Backpage.com's complaint allegations that it self-policed itself through its

"moderation" procedures to cooperate with law enforcement efforts against human trafficking

and child prostitution. Neither this Court, nor the Seventh Circuit, were aware that

Backpage.com's complaint allegations were bald-faced lies. We know that now, not through any

meaningful participation of Backpage.com in discovery in this case, but through efforts of

investigators for the United States Senate, who have uncovered e-mails that were attached by

Sheriff Dart to his motion to strike Backpage's improvidently filed summary judgment motion

(Doc. 126), which are incorporated as though fully set forth herein, and prove

- Backpage.com would take ads that exhorted child prostitution, strip the ads of indicia of youth and criminality, and then blithely post the ads as if nothing criminal and immoral were taking place

- Backpage.com would take ads that referenced reviews in the prostitution-rating magazine The Erotic Review by a specific numerical identifier of the prostitute, *e.g.*, TER#123456, and post the ad after removing the "TER" prefix, leaving the exhortation for #123456 to a knowing audience.

New evidence uncovered by Senate investigators also shows that Backpage.com would rebuke

moderators (ad sanitizers) who too frequently rejected ads for suspected criminality. As set forth

in our contemporaneous memorandum on illegality and damage discovery, the fact that

Backpage.com earns millions of dollars for ad placement that makes it through its

moderation/sanitization procedures itself puts Backpage.com on constructive notice that it is in

the middle of illegal commerce. The new evidence may prove that Backpage.com has actual

notice of criminality and affirmatively "advances prostitution" which may constitute a crime

under 720 ILCS 5/11-14.3(a) & 720 ILCS 5/11-0.1 and not protected speech. Inasmuch as this evidence was not previously before the courts, Backpage.com should not benefit from hiding the ball.

### 3. The Supreme Court Has Ruled that 99% Is Enough

Another reason the law of the case doctrine does not apply in this matter is because of the "extraordinary circumstances such as where the initial decision was clearly erroneous and would work a manifest injustice." *Christianson v. Colt Indus. Operating Corp*., 486 U.S. 800, 817 (1988) (Brennan, J.). In this respect, there is some conflicting authority as to whether a district court should make such a determination about the legal conclusion of a *higher* court. While we respectfully suggest that the Seventh Circuit made no legal conclusions that are binding on the trial on the merits (per argument 1, above), and that the new evidence concealed by Backpage.com warrants reassessment (per argument 2, above), if this Court disagrees with our analyses, then the best course is to follow the presumed mandate but indicate respectfully to the higher court why its decision may have been misguided. And that is not only because of Backpage.com's deliberate misrepresentation of what its moderation/sanitization program is all about, but because the U.S. Supreme Court repeatedly has ruled that incidental restraints on first amendment rights do not abridge the constitution.

The Supreme Court has long recognized that when the government seeks to root out illegal activities unprotected by the first amendment, it will likely impose some burden on first amendment protected activities. As the Supreme Court ruled in *Arcara v. Cloud Books, Inc.,* 478 U.S. 697, 705 (1986), when an activity such as prostitution – which manifests no element of protected expression – is punished by shutting down an establishment, the fact that the establishment also sells literature protected by the first amendment makes no difference. A

contrary conclusion would be absurd: a house of prostitution could never be closed if it also

offered *The Grapes of Wrath* for sale to its clients. Chief Justice Burger scoffed at such an idea,

noting the "fallacy of seeking to use the First Amendment as a cloak for obviously unlawful

public sexual conduct by the diaphanous device of attributing protected expressive attributes to

that conduct. First Amendment values may not be invoked by merely linking the words 'sex' and

'books.'" *Id.* at 705.

Similarly, Backpage.com cannot cloak its advertisements for adult prostitution, child

prostitution and human trafficking in first amendment protection by alluding to legitimate

advertisements on its site that enjoy such protection. Mixing the legitimate advertisements in its

adult section (*e.g.,* massage services) with illegal advertisements for child prostitution and

human trafficking, does not give the advertisements for child prostitution or human trafficking

first amendment protection. As the Supreme Court recognized, this very argument is a

transparent scheme to shield unprotected, illegal activity with first amendment protection. *Id.*

Allowing such a result not only flies in the face of the Supreme Court's decision in *Acara,* it

produces an illogical result, protecting illegal conduct with no redeeming value, such as child

pornography or underage prostitution. *See also New York v. Ferber,* 458 U.S. 747 (1982)

(legislation precluding publishing of child nudity upheld against challenge by pornography

publisher that statute could have restrained certain NATIONAL GEOGRAPHIC cultural photography

or pictures of child infirmities in medical treatises); *Sequoia Books, Inc. v. Ingemunson,* 901 F.2d

630 (7th Cir. 1990) (upheld forfeiture provision of obscenity statute even though it may have a

chilling effect on some free speech by allowing forfeiture of non-obscene literature); *Berg v.*

*Health and Hosp. Corp. of Marion County, Ind.,* 865 F.2d 797 (7th Cir. 1989) (upheld statute

that allowed Indiana county to close establishments that did not have open picture viewing

9

booths designed to curb spread of HIV/AIDS even though materials viewed in booth likely be protected by first amendment).

In sum, the suggestion that a prior restraint on even one legitimate ad is unconstitutional has no support in first amendment case law. Backpage.com cannot cloak all of its ads for prostitution and human trafficking in first amendment protection by merely suggesting the adult section has a few legitimate ads. Not only is there no basis in the law for this proposition, it simply defies common sense. The reality is that Sheriff Dart explicitly identified the advertisements that his office wanted to bring awareness to: those for prostitution and on-line sex trafficking, illegal services that damage thousands of lives and enjoy no first amendment protection. By targeting Backpage.com advertisements that promote adult prostitution, child prostitution and human trafficking, the Sheriff has not prohibited Backpage.com from running advertisements for massages or any other legal adult services. Any effect upon advertisements protected by the first amendment was incidental or at the very least we must determine through discovery this effect.

Supreme Court authority dictates that unprotected speech does not gain protection by being "lumped" with protected speech, and in order to prepare a proper record, discovery is necessary into Backpage.com's ad moderation. To prevail on its first amendment claim, Backpage.com must show that the Sheriff interfered with protected speech. To the extent that Backpage.com's moderation process "sanitized" ads that Backpage.com knew were for human trafficking, child prostitution and/or adult prostitution, this is not protected speech and Backpage.com cannot assert damage under the first amendment for such unprotected speech. Also, in the unlikely event that Backpage.com prevails, the Sheriff needs to determine what ads constituted protected speech in order to properly calculate damages. Ads that Backpage.com

knew were for child prostitution or the like and deliberately cleaned up to be placed on the site cannot form the basis of damages. This is addressed in Sheriff Dart's contemporaneously filed bench memorandum. This discovery should be allowed to proceed.

## **Proportionality**

Finally, this Court also observed that some care had to be exercised with respect to the proportionality of the discovery in this matter, given that millions of ads are posted on Backpage.com per month. April 30, 2016 Transcript at 17-18. Amended Federal Rule of Civil Procedure 26(b)(1) gives ample guidance on making this determination: "considering the importance of the issues at stake in the action, the amount in controversy, the parties' relative access to relevant information, the parties' resources, the importance of the discovery in resolving the issues, and whether the burden or expense of the proposed discovery outweighs its likely benefit."

*First*, as set forth above concerning liability, and as argued in our contemporaneous memorandum concerning damages, whether Backpage.com is involved in protected speech as it has alleged in the complaint, or unlawfully advancing prostitution, including child prostitution, as the Sheriff contends and 800 of 800 of his sting operations prove, is the ecumenical issue in the case. *See Morgan Hill Concerned Parents Ass'n v. California Dept. of Education*, No. 11-cv-3471 KJM AC, 2016 WL 304564, at *2-4 (E.D. Cal. Jan. 26, 2016) (discovery requests which sought information related to 1,022 school districts and over six million children over a period of eight years were proportional to the needs of the case in light of the burden and expense of the proposed discovery where what was at stake in the action was the alleged state-wide failure of defendant to educate the state's children with disabilities, even though the plaintiffs were only parents of 17 children in only seven school districts); *Carr v. State Farm Mutual Automobile Ins.*

11

*Co.*, 312 F.R.D. 459, 468-471 (N.D. Tex. 2015) (explaining that "a party seeking to resist discovery on these [proportionality] grounds still bears the burden of making a specific objection and showing that the discovery fails the proportionality calculation mandated by Rule 26(b) by coming forward with specific information"); *Pickett v. Experian Information Solutions, Inc.*, No. 15-cv-52-F, 2015 WL 7761075, at *5 (E.D.N.C. Dec. 2, 2015) (compelling plaintiffs' production where defendant's request "goes directly to [p]laintiffs' damages and is relevant and proportional to the needs of the case" because the request sought documents regarding whether plaintiffs' ability to obtain credit or the amount of credit extended to plaintiffs was impacted by defendant's credit reporting and the "action concerns [d]efendant's allegedly inaccurate reporting of [p]laintiffs' credit history and resulting damages").

*Second*, the amount in controversy, according to Backpage.com, is millions of dollars. *See Kleen Products LLC v. Packaging Corp. of America*, No. 10-cv-5711, 2012 WL 4498465, at *14 (N.D. Ill. Sept. 28, 2012) ("[w]hile the record does not afford a precise calculation, the Court can presume, given the nature of the antitrust claims and the size of the companies involved, that the amount in controversy is very large and that [d]efendants' resources are greater than [p]laintiffs'. Further, claims of collusion in the containerboard and corrugated box industries raise important, vital issues of public importance. Thus, these factors weigh in favor of the discovery sought"); *U.S. ex rel. McBride v. Halliburton Co.*, 272 F.R.D. 235, 240-41 (D.D.C. 2011) ("that the amount in controversy is great and that the defendants' resources are greater than the relater's" and that "[c]laims of fraud in providing services to military personnel raise important, vital issues of governmental supervision and public trust," are factors that weigh in favor of the discovery sought), *appeal pending*, No. 15-7144 (D.C. Cir. Nov. 25, 2015); *Arredondo v. Delano Farms Co.*, No. 09-cv-01247 MJS, 2014 WL 5106401, at

12

*9 (E.D. Cal. Oct. 10, 2014) (refusing to limit the taking of some 200 depositions "given the extraordinary characteristics of this case, including . . . the large amount in controversy"); *Zubulake v. UBS Warburg LLC*, 217 F.R.D. 309, 321 (S.D.N.Y. 2003) (a "response to a discovery request costing $100,000 sounds (and is) costly, but in a case potentially worth millions of dollars, the cost of responding may not be unduly burdensome").

> *Third*, according to the Senate Action to hold Backpage.com in contempt of Congress, its fair market value is around $620 million (though its overarching ownership may be multiples more), so it certainly can afford this *in a case where it has chosen to be plaintiff. See Wiginton v. CB Richard Ellis, Inc.*, 229 F.R.D 568, 575-76 (N.D. Ill. 2004) (permitting discovery costing "several hundred thousand dollars" where producing party "had net revenues of 1.6 billion dollars" and the case was "potentially worth millions").

> *Fourth*, the public interest compels this, because in every case to date where Backpage.com is a defendant, it has skirted liability under what we respectfully contend is misapplied immunity under the Communications Decency Act (misapplied because evidence of sanitization was lacking). *See Kleen Products*, No. 10-cv-5711, 2012 WL 4498465, at *14, *supra*; *McBride*, 272 F.R.D. at 240-41, *supra*. This is the only case in the nation where Backpage.com is a plaintiff seeking substantial damages, and as a plaintiff, it has to prove its case. If we are not allowed to look behind the curtain in this singular matter where Backpage.com is on the offensive, and test the truth of allegations in its very complaint, Backpage.com will achieve an unjust award. In the words of its general counsel, "[d]oes NCMEC think there are problems with Backpage and other online sites in the context of sex trafficking and domestic minor sex trafficking? Absolutely. And nobody denies that there are

13

problems." August 18, 2015 McDougall Deposition Transcript at 161. Well, that is not entirely true—Backpage.com, *as a plaintiff*, appears to be in denial.

Respectfully submitted,

THOMAS J. DART,
SHERIFF OF COOK COUNTY, ILLINOIS


By:  /s/ Paul J. Kozacky

One of his attorneys

Paul J. Kozacky
Alastar S. McGrath
Jerome R. Weitzel
KOZACKY WEITZEL McGRATH, P.C.
55 West Monroe, 24th Floor
Chicago, Illinois  60603
312-696-0900

**CERTIFICATE OF SERVICE**

The undersigned attorney, on oath, certifies that on April 6, 2016, he served the foregoing SUPPLEMENTAL MEMORANDUM IN SUPPORT OF SHERIFF DART'S MOTION TO COMPEL via the ECF system to all parties that have consented to same in accordance with applicable Federal Rules of Civil Procedure and Local Rules of the U.S. District Court for the Northern District of Illinois.

/s/ Paul J. Kozacky