# EXHIBIT A

## ORAL ARGUMENT NOT YET SCHEDULED

### No. 16-5232, consolidated with No. 16-5274

## IN THE UNITED STATES COURT OF APPEALS FOR THE DISTRICT OF COLUMBIA CIRCUIT

CARL FERRER,
*Appellant-Respondent,*

v.

SENATE PERMANENT SUBCOMMITTEE ON INVESTIGATIONS,
*Appellee-Applicant.*

On Appeal from the United States District Court
for the District of Columbia
Case No. 1:16-mc-00621-RMC (Judge Collyer)

## BRIEF OF *AMICI CURIAE* DKT LIBERTY PROJECT, CATO INSTITUTE, AND REASON FOUNDATION IN SUPPORT OF APPELLANT-RESPONDENT AND REVERSAL

Jessica Ring Amunson
Joshua M. Parker
JENNER & BLOCK LLP, Suite 900
1099 New York Avenue, NW
Washington, DC 20001
Telephone: (202) 639-6000
jamunson@jenner.com
jparker@jenner.com

*Counsel for* Amici Curiae

## CERTIFICATE AS TO PARTIES, RULINGS, AND RELATED CASES

1.    <u>Parties</u>.  All parties, intervenors, and *amici* appearing before the district court are listed in the Brief of Appellant Carl Ferrer.  All parties and intervenors before this Court are listed in the Brief of Appellant Carl Ferrer, and *amici* are identified herein.

Pursuant to Federal Rule of Appellate Procedure 26.1 and Circuit Rule 26.1, *amici* DKT Liberty Project, Cato Institute, and Reason Foundation certify as follows:

DKT Liberty Project is a 501(c)(3) non-profit corporation that is dedicated to securing the rights and liberties of American citizens, and helping to limit the American government to its legitimate constitutional role.  DKT Liberty Project has no parent company and no publicly-held company holds a 10% or greater ownership interest (such as stock or partnership shares) in the association.

The Cato Institute is a 501(c)(3) non-profit corporation and public policy research organization dedicated to the principles of individual liberty and limited government. Cato has no parent company and no publicly held company holds a 10% or greater ownership interest (such as stock or partnership shares) in the association.

Reason Foundation is a 501(c)(3) non-profit corporation and public policy think tank dedicated to developing, applying, and promoting libertarian principles,

including individual liberty, free markets, and the rule of law.  Reason Foundation has no parent company and no publicly held company holds a 10% or greater ownership interest (such as stock or partnership shares) in the association.

2.     <u>Rulings Under Review</u>.  References to the rulings at issue appear in the Brief of Appellant Carl Ferrer.

3.     <u>Related Cases</u>.  This case has not previously been before this Court or any other court other than the United States District Court for the District of Columbia, from which the appeal is taken.

# **TABLE OF CONTENTS**

CERTIFICATE AS TO PARTIES, RULINGS, AND RELATED CASES ..............i

TABLE OF AUTHORITIES ................................................................iv

GLOSSARY................................................................................ vii

INTEREST OF *AMICI CURIAE* ........................................................1

INTRODUCTION AND SUMMARY OF ARGUMENT .........................2

ARGUMENT ...............................................................................3

I.    The Subpoena Issued to Carl Ferrer Constitutes an Abuse of the
      Legislative Subpoena Power. ........................................................3

   A.    The Congressional Subpoena Power Is Circumscribed. ...........................4

   B.    The Subcommittee Issued Its Subpoena Pursuant to an
      Impermissible Punitive Scheme Against Backpage and Carl Ferrer ........7

II.   The Subject of the Subcommittee's Investigation Is Dangerously
      Broad..................................................................................16

   A.    The Breadth of the Subcommittee's Authorizing Resolution Has
      Led to Abuse of the Legislative Investigatory Power..............................17

   B.    This Case Is Part of a Disturbing Trend of Abuse of the Subpoena
      Power ................................................................................20

CONCLUSION ............................................................................23

CIRCUIT RULE 29(d) CERTIFICATION

CERTIFICATE OF COMPLIANCE

CERTIFICATE OF SERVICE

# TABLE OF AUTHORITIES[*]

**CASES**

*Backpage.com, LLC v. Dart*, 807 F.3d 229 (7th Cir. 2015), *cert. denied*, No. 15-1321, __ S. Ct. __, 2016 WL 1723950 (U.S. Oct. 3, 2016) ............................................................................... 11-12, 14, 15, 18, 19

*Brown v. Entertainment Merchants Ass'n*, 564 U.S. 786 (2011) ............................ 11

*Bursey v. United States*, 466 F.2d 1059 (9th Cir. 1972), *superseded by statute as stated in In re Grand jury Proceedings*, 863 F.2d 667 (9th Cir. 1988) .................................................................................... 7, 13

*Dart v. Craigslist, Inc.*, 665 F. Supp. 2d 961 (N.D. Ill. 2009)................................ 14

*Deutch v. United States*, 367 U.S. 456 (1961) ........................................................ 5, 8

*Gibson v. Florida Legislative Investigation Committee*, 372 U.S. 539 (1963) ................................................................... 4, 5, 6, 10, 11, 13

*Langdon v. Google, Inc.*, 474 F. Supp. 2d 622 (D. Del. 2007)................................ 11

*Sable Communications of California, Inc. v. FCC*, 492 U.S. 115 (1989) ................................................................................................... 19

*Shelton v. United States*, 404 F.2d 1292 (D.C. Cir. 1968)........................................ 5

*United States v. Fort*, 443 F.2d 670 (D.C. Cir. 1970) ............................................... 6

*Watkins v. United States*, 354 U.S. 178 (1957)........................ 4, 5, 6, 8, 10, 11, 18

**LEGISLATIVE MATERIALS**

*Human Trafficking Investigation: Hearing Before the Permanent Subcomm. on Investigations of the Senate Comm. on Homeland Security and Governmental Affairs*, 114th Cong. (2015), https://www.gpo.gov/fdsys/pkg/CHRG-114shrg98445/pdf/CHRG-114shrg98445.pdf ...................................................................................... 8

S. Res. 73, §12(e)(1), 114th Cong. (2015)........................................................ 8, 18

---

[*] Authorities upon which we chiefly rely are marked with an asterisk.

iv

**OTHER AUTHORITIES**

Brief of Cato Institute, Reason Foundation, and DKT Liberty Project In
    Support Of Plaintiff-Appellant and Reversal, *Backpage.com, LLC v.
    Dart*, 807 F.3d 229 (7th Cir. 2015) (No. 15-3047), Dkt. No. 39.........................12

Certificate of Service of Notice, *Backpage, LLC v. Dart*, No. 15- 3047
    (7th Cir. Nov. 17, 2015), Dkt. No. 49.................................................................15

Civil Investigative Demand, Commonwealth of Massachusetts Office
    of the Attorney General (April 19, 2016), http://freebeacon.com/wp-
    content/uploads/2016/06/exxon-subpoena.pdf....................................................21

Noah Feldman, *Shady Sex Ads May Have Some First Amendment
    Protection*,    BloombergView    (Sept.    13,    2016),
    https://www.bloomberg.com/view/articles/2016-09-13/shady-sex-
    ads-may-have-some-first-amendment-protection......................................... 19-20

Carolyn Gramling, *House Science Committee Demands That NOAA
    Widen Its Internal Search For Climate Change Emails*, Science
    (Feb. 26, 2016), http://www.sciencemag.org/news/2016/02/house-
    science-committee-demands-noaa-widen-its-internal-search-
    climate-change-emails ........................................................................................22

Michael Halpern, *The House Science Committee's Witch Hunt Against
    NOAA Scientists*, Union of Concerned Scientists (Oct. 23, 2015),
    http://blog.ucsusa.org/michael-halpern/the-house-science-
    committees-witch-hunt-against-noaa-scientists-934 ..........................................22

James Hamilton, et al., *Congressional Investigations: Politics and
    Process*, 44 Am. Crim. L. Rev. 1115 (2007)........................................................4

Stephen Lemons, *California Judge Issues Tentative Ruling, Throws
    Out Criminal Charges Against CEO and Former Owners of
    Backpage.com*,    Phoenix    New    Times    (Nov.    16,    2016),
    http://www.phoenixnewtimes.com/news/california-judge-issues-
    tentative-ruling-throws-out-criminal-charges-against-ceo-and-
    former-owners-of-backpagecom-8833518 ...........................................................9

Carl Levin & Susan M. Collins, *Executive Sessions of the Senate Permanent Subcommittee On Investigations of the Committee of Government Operations,* Preface, U.S. Government Printing Office (2003)................................................................................................17

Claire Cain Miller, *Craigslist Blocks Access to 'Adult Services' Page,* N.Y. Times (Sept. 4, 2010), www.nytimes.com/2010/09/05/technology/ 05craigs.html................................14

Press Release, Mark Kirk, US Senator for Illinois, *Kirk Statement on Arrest of Backpage CEO* (Oct. 7, 2016), https://www.kirk.senate.gov/?p=press_release&id=1915.................................10

Press Release, Rob Portman, US Senator for Ohio, *Portman, McCaskill Statement on Arrest of Backpage.com CEO Ferrer* (Oct. 6, 2016), http://www.portman.senate.gov/public/index.cfm/press-releases?ID=FDF30838-55B1-470A-A555-580B1F43F147.........................9-10

Josh Siegel, *Virgin Islands AG Withdraws Climate Change Subpoena Against Think Tank,* The Daily Signal (May 23, 2016), http://dailysignal.com/2016/05/23/virgin-islands-ag-withdraws-climate-change-subpoena-against-think-tank/...................................................21

Subpoena, *In re Investigation of Violations of the Criminally Influenced and Corrupt Organizations Act,* United States Virgin Islands Office of the Attorney General (D.C. Super. Ct. April 7, 2016), https://cei.org/sites/default/files/CEI%20Subpoena%20from%20USVI%20AG%20Claude%20Walker%20April%207%202016%20%281%29.pdf.................................................................................21

# **GLOSSARY**

| | |
|---|---|
| Backpage | Backpage.com |
| Dist. Ct. Dkt. | District Court Docket |
| Ferrer | Carl Ferrer |
| NOAA | National Oceanic and Atmospheric Administration |
| Subcommittee | Senate Permanent Subcommittee on Investigations |

## INTEREST OF *AMICI CURIAE*[1]

*Amicus* DKT Liberty Project was founded in 1997 to promote individual liberty against all levels of government, and to defend the right to privacy. The Liberty Project is committed to protecting privacy, guarding against government overreaching, and protecting the freedom of all citizens to engage in expression without government interference. The Project has been particularly involved in defending the right to privacy, one of the most profound individual liberties and a critical aspect of every American's right (and responsibility) to function as an autonomous and independent individual.

*Amicus* Cato Institute was established in 1977 as a nonpartisan public policy research foundation dedicated to advancing the principles of individual liberty, free markets, and limited government. Cato's Center for Constitutional Studies was established in 1989 to promote the principles of limited constitutional government that are the foundation of liberty. Toward those ends, Cato conducts conferences, publishes books, studies, and the annual *Cato Supreme Court Review*, and files *amicus* briefs with the courts.

---

[1] Pursuant to Rule 29(a), *amici* state that all parties consent to the filing of this brief. Pursuant to Rule 29(c)(5), *amici* state that no party's counsel authored this brief, in whole or in part; no party or its counsel contributed money intended to fund preparing or submitting this brief; and no person other than *amici* or their counsel contributed money intended to fund preparing or submitting this brief.

*Amicus* Reason Foundation is a nonpartisan public policy think tank founded in 1978. Its mission is to advance a free society by developing and promoting libertarian principles and policies. Reason supports market-based solutions that encourage individuals and voluntary institutions to flourish. Reason advances its mission by publishing *Reason* magazine, online commentary, and policy research reports. To further its commitment to "Free Minds and Free Markets," Reason files briefs on significant constitutional issues.

The present case concerns *amici* because the Subcommittee's investigation constitutes an abuse of the legislative investigatory power and poses a grave threat to the First Amendment rights of Carl Ferrer and Backpage.com.

## INTRODUCTION AND SUMMARY OF ARGUMENT

Congressional investigatory power is limited and must be used solely in service of Congress's legislative agenda. Congressional committees may not supplant the executive and judicial functions and may not use their subpoena power to target and punish those with whom they do not agree. Congressional subpoena power is particularly circumscribed when the First Amendment rights of the subpoena recipient are at issue, as they are here. The Senate Permanent Subcommittee on Investigations plainly exceeded the limits on its investigatory power when it issued its subpoena to Carl Ferrer. The Subcommittee wielded its investigatory authority in an unconstitutional manner by improperly engaging in an

2

effort to punish Carl Ferrer and Backpage for running a website that publishes third-party content that the Subcommittee finds offensive.  In doing so, the Subcommittee flouted separation of powers by acting like an executive, not a legislature, while working hand-in-hand with a state sheriff to bring down Backpage and Carl Ferrer.

The Subcommittee's overreach is not only reminiscent of the Subcommittee's past abuse of its investigatory authority but also emblematic of a disturbing pattern of legislative committees and state attorneys general brandishing their subpoena power as a weapon to attack individuals and entities that engage in speech or conduct disfavored by the entity issuing the subpoena.  An affirmance here would only serve to continue this trend; a reversal, however, would importantly signal that the legislative subpoena power is bounded, especially when the subpoena implicates the recipient's constitutional rights.

## ARGUMENT

### I.   The Subpoena Issued to Carl Ferrer Constitutes an Abuse of the Legislative Subpoena Power

Congress does not have unbounded power to issue whatever investigative demands it wishes.  Rather, the congressional subpoena power is subject to certain limits.  In every case, a legislative committee issuing a subpoena must identify a specific *legislative* need at the time of the investigation and must refrain from wielding the subpoena as a tool for punishing the subpoenaed party.  Moreover, when the subpoena implicates the subpoenaed party's constitutionally protected

3

speech, the legislative committee must additionally show a compelling interest in obtaining the information it seeks and a substantial nexus between the information sought and the compelling interest articulated. *See, e.g., Gibson v. Florida Legislative Investigation Comm.*, 372 U.S. 539, 546 (1963); *Watkins v. United States*, 354 U.S. 178, 187, 205 (1957). The Subcommittee exceeded each of these limits in its subpoena to Carl Ferrer.

## A. The Congressional Subpoena Power Is Circumscribed.

It is well-established that Congress's investigatory power has limits. Importantly, "Congress is not a law enforcement or trial agency." *Shelton v. United States*, 404 F.2d 1292, 1297 (D.C. Cir. 1968) (internal quotation marks omitted). Enforcing the law and conducting trials are "functions of the executive and judicial departments of government," not the legislature. *Watkins,* 354 U.S. at 187. Moreover, Congress must not use its subpoena power to punish anyone. "Investigations conducted solely for the personal aggrandizement of the investigators or to 'punish' those investigated are indefensible." *Id.; see also* James Hamilton, et al., *Congressional Investigations: Politics and Process*, 44 Am. Crim. L. Rev. 1115, 1122 (2007) ("Congress may not conduct a legislative trial where punishment is the goal.").

For that reason, whenever Congress undertakes an investigation and exercises its subpoena power, "[t]he object of the particular inquiry in question must be

4

examined"—from the resolution of Congress authorizing the inquiry, to the opening statement of the Chairperson, to the statements made by members of the committee—to ascertain whether the inquiry falls within Congress's investigative authority. *Shelton*, 404 F.2d at 1297 (citing *Watkins* 354 U.S. at 209). The Supreme Court has squarely held that courts should not engage in "retroactive rationalization" to justify the scope and subject of Congress's investigation; it must be clear from the outset that the investigation is within Congress's investigative authority. *Watkins*, 354 U.S. at 204 (rejecting argument that the court should "[l]ook[] backward from the events that transpired" and "uphold the Committee's actions unless it appears that they were clearly not authorized by the charter"); *Deutch v. United States*, 367 U.S. 456, 467-68 (1961) ("[T]he pertinency of the interrogation to the topic under the congressional committee's inquiry must be brought home to the witness at the time the questions are put to him.").

When a subpoena implicates the constitutional rights of the subpoenaed party, Congress's subpoena power becomes even more constrained. "It is particularly important that the exercise of the power of compulsory process be carefully circumscribed when the investigative process tends to impinge upon such highly sensitive areas as freedom of speech or press, freedom of political a[ss]ociation, and freedom of communication of ideas." *Gibson*, 372 U.S. at 558 (quotation marks omitted). Accordingly, in the congressional context, "[p]rotected freedoms should

5

not be placed in danger in the absence of a clear determination by the House or the Senate that a particular inquiry is justified by a specific legislative need." *Watkins*, 354 U.S. at 205; *see also United States v. Fort*, 443 F.2d 670, 678 (D.C. Cir. 1970) ("[T]he consequence of the denial of [constitutional] rights are no less severe merely because there denial is brought about by a congressional subcommittee.").

More specifically, where the legislature seeks information about constitutionally protected speech and communications, it must show both an "overriding and compelling" interest in obtaining that information and a substantial nexus between the information sought and the interest of the legislature in order to survive constitutional scrutiny. *See Gibson*, 372 U.S. at 546 (holding that a state legislative committee's subpoena could not be enforced because "it is an essential prerequisite to the validity of an investigation which intrudes into the area of constitutionally protected rights of speech . . . that the State convincingly show a substantial relation between the information sought and a subject of overriding and compelling state interest"). And "[w]hen governmental activity collides with First Amendment rights, the Government has the burden of establishing that its interests are legitimate and compelling and that the incidental infringement upon First Amendment rights is no greater than is essential to vindicate its subordinating

6

interests." *Bursey v. United States*, 466 F.2d 1059, 1083 (9th Cir. 1972), *superseded by statute as stated in In re Grand Jury Proceedings*, 863 F.2d 667 (9th Cir. 1988).

### B. The Subcommittee Issued Its Subpoena Pursuant to an Impermissible Punitive Scheme Against Backpage and Carl Ferrer.

Here, the Subcommittee's subpoena to Carl Ferrer regarding Backpage plainly fails the standards set forth above for a valid exercise of the congressional subpoena power. Indeed, the Subcommittee falters at every step of the analysis. The Subcommittee did not identify a specific legislative need for the information at the time of the investigation; it did not show a compelling interest in obtaining the information nor a strong nexus between the information sought and the interest asserted; and it clearly wielded the subpoena as a tool for punishing Carl Ferrer for his operation of Backpage because it disfavored the content of the speech on Backpage. None of this is permissible.

First, the Subcommittee failed to articulate any *legislative* need for its investigation. Although the Subcommittee claimed in its briefing before the district court that an "important part[]" of its investigation was to explore whether Congress should modify the current safe harbor provision of the Communications Decency Act, (Dist. Ct. Dkt.[2] 1-1 at 7-8), this is plainly pretense. The Communications

---

[2] Citations to "Dist. Ct. Dkt. __" are to the district court docket below: No. 1:16-cmc-00621 (D.D.C., Collyer, J.).

Decency Act is mentioned nowhere in the Subcommittee's authorizing resolution nor in Chairman Senator Rob Portman's remarks when opening the investigation. *See* S. Res. 73, § 12(e)(1), 114th Cong. (2015); *Human Trafficking Investigation: Hearing Before the Permanent Subcomm. on Investigations of the Senate Comm. on Homeland Security and Governmental Affairs*, 114th Cong. 53-248 (2015), ("Human Trafficking Investigation Hearing").[3]  Indeed, when the Subcommittee issued its subpoenas to Backpage and its employees, it did not so much as mention the Communications Decency Act, nor any other legislative purpose, but instead described a law enforcement rationale for the investigation—stating that it was focused on "issues related to human trafficking." Dist. Ct. Dkt. 8 at 33 n.28. Nor was there any mention of the Act in the correspondence between Backpage and the Subcommittee's staff. *Id.* at 33. There are only two fleeting references to the Act in the entire hearing. *See generally* Human Trafficking Investigation Hearing.

As noted above, to ascertain whether the subject of the investigation is within Congress's authority, the subject of the investigation must be apparent from contemporaneous sources at the time the investigation is opened and the subpoenas are issued. "[R]etroactive rationalization" is impermissible. *Watkins*, 354 U.S. at 204; *see also Deutch*, 367 U.S. at 467-78. But that is all the Subcommittee offers—

---

[3] *Available at* https://www.gpo.gov/fdsys/pkg/CHRG-114shrg98445/pdf/CHRG-114shrg98445.pdf.

retroactive rationalization about a purported legislative purpose that was first set forth in briefing before the district court and that has no basis in the contemporaneous legislative record. The Subcommittee's need to engage in retroactive rationalization only further confirms that its investigation was undertaken to punish Backpage and Carl Ferrer rather than to explore the need for remedial legislation.

The punitive rather than legislative nature of the Subcommittee's investigation is further evidenced by the statements made by Subcommittee members after Carl Ferrer's recent arrest on charges that themselves collide with Ferrer's constitutional rights.[4] Senator Rob Portman and Senator Claire McCaskill, the chairman and ranking member of the Subcommittee, heralded the Subcommittee's specific role in bringing about the arrest in a joint statement in which they highlighted that the Subcommittee "was the first to uncover Backpage's practice of editing ads in a manner that serves to conceal evidence of criminality." Press Release, Rob Portman, U.S. Senator for Ohio, *Portman, McCaskill Statement*

---

[4] Ferrer is currently facing criminal charges for operating Backpage, and is contesting them on the basis that a prosecution would violate Section 230 of Communications Decency Act and his First Amendment rights. A California judge has tentatively ruled in Ferrer's favor. *See* Stephen Lemons, *California Judge Issues Tentative Ruling, Throws Out Criminal Charges Against CEO and Former Owners of Backpage.com*, Phoenix New Times (Nov. 16, 2016), http://www.phoenixnewtimes.com/news/california-judge-issues-tentative-ruling-throws-out-criminal-charges-against-ceo-and-former-owners-of-backpagecom-8833518.

*on Arrest of Backpage.com CEO Ferrer* (Oct. 6, 2016).[5]  Senator Mark Kirk, a member of the Subcommittee, was even more explicit, saying, "[t]his arrest means we are one step closer to holding Backpage accountable for underage internet sex trafficking through their site and stopping these illegal activities. Any business advertising with Backpage should know they are funding the lowest form of criminal."  Press Release, Mark Kirk, U.S. Senator for Illinois, *Kirk Statement on Arrest of Backpage CEO* (Oct. 7, 2016).[6]  It could hardly be more evident that the subpoena was issued pursuant to the Subcommittee's punitive aim of "holding Backpage accountable," *id.*, rather than pursuant to a desire to study the safe harbor provision of the Communications Decency Act or any other "specific *legislative* need." *Watkins*, 354 U.S. at 205 (emphasis added).

Second, given that the subpoena specifically targets Carl Ferrer and Backpage based on the content of the speech that they publish, the Subcommittee was required to show a compelling interest in obtaining the information and a strong nexus between the information sought and the interest asserted. *See Gibson*, 372 U.S. at 546; *Watkins*, 354 U.S. at 205.  As described above, the Subcommittee's requests are not even supported by a "specific legislative need," let alone an "overriding and

---

[5] *Available at* http://www.portman.senate.gov/public/index.cfm/press-releases?ID=FDF30838-55B1-470A-A555-580B1F43F147.

[6] *Available at* https://www.kirk.senate.gov/?p=press_release&id=1915.

compelling interest," as is necessary. *See Watkins*, 354 U.S. at 205; *Gibson*, 372 U.S. at 546.

Among other requests, the Subcommittee demands all documents concerning Backpage's review and editing of advertisements in its Adult section, including emails from and between Backpage employees who performed content review over a six-year period. Dist. Ct. Dkt. 8 at 2. The Subcommittee, in other words, is seeking documents and communications from moderators concerning an online intermediary's editorial decision-making, content plainly afforded First Amendment protection. *See Langdon v. Google, Inc.*, 474 F. Supp. 2d 622, 629-30 (D. Del. 2007). The Subcommittee, however, has not advanced any "overriding and compelling state interest" to justify the production of such documents. *Gibson,* 372 U.S. at 546. For an interest to be compelling, the government "must specifically identify an actual problem in need of solving." *Brown v. Entm't Merchants Ass'n*, 564 U.S. 786, 799 (2011) (internal quotation marks omitted).

The subpoena states merely that the Subcommittee is investigating "issues related to human trafficking." Dist. Ct. Dkt. 8 at 33 n.28. Even assuming that this were a legislative rather than a law enforcement rationale for the investigation (which it is not), the Subcommittee has not demonstrated that this is a compelling interest. As explained in more detail in a brief *amici* filed with the Seventh Circuit in *Backpage.com, LLC v. Dart*, 807 F.3d 229 (7th Cir. 2015), *cert. denied*, No. 15-

11

1321, __ S. Ct. __, 2016 WL 1723950 (U.S. Oct. 3, 2016), human trafficking in the United States has been on the decline in the past fifteen years. Brief of Cato Institute, Reason Foundation, and DKT Liberty Project In Support Of Plaintiff-Appellant and Reversal at 2-9, *Backpage.com, LLC v. Dart*, 807 F.3d 229 (7th Cir. 2015) (No. 15-3047), Dkt. 39. Indeed, according to State Department figures, human trafficking decreased over 70 percent between 2000 and 2005 and stayed level thereafter. *Id.* at 3 (citing U.S. Dep't of State, *Trafficking in Persons Report* 2 (2004); U.S. Dep't of State, *Trafficking in Persons* Report 2 (2000); Elizabeth Nolan Brown, *The War on Sex Trafficking Is the New War on Drugs,* Reason.com, Sept. 30, 2015, at 20; Alison Siskin & Liana Sun Wyler, *Trafficking in Persons: U.S. Policy and Issues for Congress*, Cong. Research Serv., RL34317, at 16 (2013)). Further belying the notion that the Committee has a compelling interest in exploring issues related to human trafficking, the Committee did not even seek to enforce the single subpoena request that actually sought documents concerning human trafficking and smuggling. *See* Opening Brief of Carl Ferrer at 12 n.5, 15. It accordingly is doubtful that, on the current record, the court could conclude that the Subcommittee's purported interest in "issues related to human trafficking" is a compelling one. Dist. Ct. Dkt. 8 at 33 n.28.

And even assuming the Subcommittee had an overriding and compelling interest in exploring issues relating to human trafficking, it is difficult to see how the

Subcommittee's review of *every* Backpage document or communication concerning moderation of the content in the Adult section over a six-year period is necessary to further that interest. Among the documents requested would be a broad array of communications regarding advertisements for entirely legal products or services that are in no way related to human trafficking. The nexus between the interest— compelling or not—and the subpoena requests simply is not "substantial" as constitutionally required. *Gibson*, 372 U.S. at 546. Because its broad subpoena requests clearly implicate lawful speech, the Subcommittee cannot show that its "infringement upon First Amendment rights is no greater than is essential to vindicate its subordinating interests." *Bursey*, 466 F.2d at 1083.

Third, the Subcommittee impermissibly wielded its subpoena power in an effort to punish Carl Ferrer and Backpage. It is now known that the Subcommittee explicitly coordinated with the Sherriff of Cook County, Illinois, Thomas J. Dart, who was indisputably engaged in an effort to punish Backpage. Sheriff Dart and numerous state attorneys general have long pursued a campaign to take down Backpage.com. Indeed, they have long sought to shut down the "Adult" sections of classified websites more generally because they find them distasteful.

In 2009, Sheriff Dart filed a suit in federal court to force Craigslist to eliminate its adult section, which he alleged was a violation of criminal laws against prostitution. The court dismissed the claim, explaining that the adult section "is not

unlawful in itself nor does it necessarily call for unlawful content." *Dart v. Craigslist, Inc.*, 665 F. Supp. 2d 961, 968 (N.D. Ill. 2009). Craigslist nonetheless shut down its adult section in September 2010, relenting to pressure from a group of 17 state attorneys general, Claire Cain Miller, *Craigslist Blocks Access to 'Adult Services' Page*, N.Y. Times (Sept. 4, 2010)[7], providing a textbook example of the state inducing a chilling effect on lawful content.

Sheriff Dart and the state attorneys general next turned their attention to Backpage. After a number of state laws designed to shut down Backpage were enjoined as unconstitutional, Sheriff Dart persisted, "embark[ing] on a campaign intend to crush Backpage's adult section – crush Backpage, period, it seems – by demanding that firms such as Visa and MasterCard prohibit the use of their credit cards to purchase any ads on Backpage, since the ads might be for illegal sex-related products or services." *Backpage.com, LLC*, 807 F.3d at 230. Visa and MasterCard relented, "refusing to process transactions in which their credit cards are used to purchase any ads on Backpage, even those that advertise indisputably legal activities." *Id.* The Seventh Circuit ultimately concluded that Sheriff Dart's campaign against Backpage constituted unlawful censorship in violation of the First Amendment. *Id.* at 235-38. In reaching this conclusion, the court explained that "censorship – an effort by administrative methods to prevent the dissemination of

---

[7] *Available at* http://www.nytimes.com/2010/09/05/technology/05craigs.html.

14

ideas or opinions thought dangerous or offensive . . . is prohibited by the First Amendment as it has been understood by the courts." *Id.* at 235 (internal quotation marks omitted).

Despite the fact that Sheriff Dart was clearly engaging in unlawful and unconstitutional activity, the Subcommittee nonetheless specifically coordinated with him, partaking in and continuing the Sheriff's unconstitutional attack. Sheriff Dart sent the Visa and MasterCard cease-and-desist letters to members of the Permanent Subcommittee Staff. *See* Certificate of Service of Notice, *Backpage, LLC v. Dart*, No. 15-3047 (7th Cir. Nov. 17, 2015), Dkt. No. 49. And before the Subcommittee served its first subpoena on Backpage, Subcommittee counsel corresponded with Sheriff Dart's staff, praising the Sheriff for his work against Backpage and garnering Sheriff Dart's staff's support for the Subcommittee's investigation. Dist. Ct. Dkt. 8 at 19-21. Subcommittee counsel assured the Sheriff's office that the Subcommittee's investigation was "rapidly progressing down a parallel track" to the Sheriff's. *Id.* at 20. Among other things, at Subcommittee counsel's request, Sheriff Dart's staff provided Subcommittee counsel with copies of document requests the Sheriff's office had sent to Backpage.

After following up to ask how Backpage responded to those requests, the Subcommittee continued Sherriff Dart's campaign of "suffocation," *Backpage*, 807 F.3d at 231, and issued its initial July 7, 2015 document subpoena, with five sets of

15

demands that were *identical* to those served by Sheriff Dart.  Dist. Ct. Dkt. 8 at 20-21.  After Backpage objected, the Subcommittee issued a new subpoena on October 1, 2015—the subpoena before this Court.

The Subcommittee's admission that it was running a "parallel" investigation to the one run by Sheriff Dart is of course troubling given that the Seventh Circuit found Sheriff Dart's actions unconstitutional.  But it is even more troubling because Sheriff Dart was at least pursuing his core role as a law enforcement officer—albeit in an impermissible manner.  The Subcommittee is not a law enforcement officer.  It is part of Congress, which is supposed to be making laws, not enforcing them.  For these reasons, the Subcommittee's use of the subpoena to punish Carl Ferrer and Backpage for their publication of third-party content that the Subcomittee disfavors cannot be sustained.

## II.    The Subject of the Subcommittee's Investigation Is Dangerously Broad.

In the event this Court were to affirm the decision below, the breadth of the Subcommittee's authorizing resolution would open the door for the Subcommittee to further abuse its subpoena power by serving burdensome subpoenas on individuals and corporations who engage in any protected speech and lawful market activity that the Subcommittee finds distasteful.  The Subcommittee's lamentable history of abusing the subpoena power as well as the present overreach of other

government entities wielding the subpoena power should make this Court wary of condoning the Subcommittee's misuse of the power in this case.

### A. The Breadth of the Subcommittee's Authorizing Resolution Has Led to Abuse of the Legislative Investigatory Power.

The importance of bounding the legislative investigatory power is made apparent by the past abuse of the power by this very same committee, which under the Chairmanship of Senator Joseph McCarthy, led a series of several closed-door anti-communist hearings, marked by "Senator McCarthy's zeal to uncover subversion and espionage," which "led to disturbing excesses." Carl Levin & Susan M. Collins, *Executive Sessions of the Senate Permanent Subcommittee On Investigations of the Committee of Government Operations,* Preface at XI, U.S. Government Printing Office (2003). While many of those excesses are no doubt exceptional and not present in the Subcommittee's current investigation, the Subcommittee's targeting of unpopular speech, with a punitive aim, regrettably harks back to these hearings. As Senators Levin and Collins have themselves admonished, these "hearings are a part of our national past that we can neither afford to forget nor permit to reoccur." *Id.* at XII.

Indeed, in reversing a contempt conviction by the Permanent Subcommittee's anti-communist counterpart, the House Un-American Activities Committee, the Supreme Court warned that, though the Committee's core focus was on "efforts to overthrow the Government by force and violence so that that adequate legislative

safeguards [could] be erected," "[f]rom this core . . . the Committee can radiate outward infinitely to any topic thought to be related in some way to armed insurrection." *Watkins,* 35 U.S. at 204.

It is easy to see how the Subcommittee's authorizing resolution to investigate matters related to "organized criminal activity which may operate in or otherwise utilize the facilities of interstate or international commerce," Section 12(e)(1)(C) of S. Res. 73, 114th Cong. (2015), can, too, "radiate outward infinitely to any topic thought to be related in some way" to the criminal activity being investigated. *Watkins,* 35 U.S. at 204. On the subject of sex trafficking, the Committee might serve onerous subpoenas, like the one served to Mr. Ferrer, on any newspaper, magazine, or website (and their editors or officers) that runs advertisements for sex-related services or products, on the theory that *some* of the ads run *might* be for unlawful sex-related services.

Beyond sex trafficking, "[s]ome public officials doubtless disapprove of bars, or pets and therefore pet supplies, or yard sales, or lawyers . . . or men dating men or women dating women—but ads for all these things can be found in non-adult sections of Backpage." *Backpage.com,* 807 F.3d at 235. An affirmance here would permit the Subcommittee to use any tenuous hook to illegality—say, the allegation that some advertisers are selling alcohol to underage customers—to target an activity the Subcommittee disfavors, by way of a burdensome investigation.

18

It is similarly easy to see why a newspaper, magazine, or website would choose to shutter its entire "adult" section (and, by consequence, the accompanying ads) to avoid the burden and cost imposed by an investigation—even if the section consists entirely of legal content. Indeed, Craigslist did just this. *See supra.* The result is the deterrence of lawful market activity. In the course of deeming Sheriff Dart's campaign against Backpage unconstitutional, the Seventh Circuit highlighted the lawful nature of the content of Backpage's "Adult" section:

> Nor is Sheriff Dart on solid ground in suggesting that everything in the adult section of Backpage's website is criminal, violent, or exploitive. Fetishism? Phone sex? Performances by striptease artists? (Vulgar is not violent.) One ad in the category "dom & fetish" is for the services of a "professional dominatrix"—a woman who is paid to whip or otherwise humiliate a customer in order to arouse him sexually . . . It's not obvious that such conduct endangers women or children or violates any laws, including laws against prostitution.

*Backpage.com*, 807 F.3d at 234; *see also Sable Commc'ns of Cal., Inc. v. FCC*, 492 U.S. 115, 126 (1989) ("Sexual expression which is indecent but not obscene is protected by the First Amendment"). The court continued, explaining that "not all advertisements for sex are advertisements for illegal sex." *Backpage.com*, 807 F.3d at 234. Commentators have similarly observed that "some, maybe many of" the classified ads on Backpage are "subject to full First Amendment protection." Noah

19

Feldman, *Shady Sex Ads May Have Some First Amendment Protection*, BloombergView (Sept. 13, 2016).[8]

And while Backpage and Craigslist are service providers with significant revenue, the Subcommittee could of course serve analogous subpoenas on smaller providers or media companies that do not have sufficient resources to adequately respond to or challenge the subpoena, potentially driving them out of business. The prospect of such subpoenas could well deter such parties from hosting *any* content, however lawful, that might spark an investigation. This case thus has very important implications for First Amendment protections well beyond the particular circumstances presented here.

### B. This Case Is Part of a Disturbing Trend of Abuse of the Subpoena Power.

The subpoena here unfortunately appears to be part of a disturbing trend of federal and state authorities using their subpoena power to target those who engage in controversial speech and promote ideas disfavored by those in power. A number of subpoenas issued on the subject of climate change are illustrative. For example, pursuant to a multi-state investigation, the New York and Massachusetts attorneys general recently issued a civil investigative demand requiring ExxonMobil to produce all of its climate change research analysis, its internal communications

---

[8] *Available at* https://www.bloomberg.com/view/articles/2016-09-13/shady-sex-ads-may-have-some-first-amendment-protection.

regarding climate change, as well as its communications with a dozen conservative and libertarian non-profit groups. *See* Civil Investigative Demand, Commonwealth of Massachusetts Office of the Attorney General (April 19, 2016).[9]

Piggybacking on this investigation, the Virgin Islands attorney general issued a subpoena to the Competitive Enterprise Institute demanding that the Institute turn over its research, communications, emails, statements, and drafts (over a nearly ten-year period) regarding climate change and energy policy. Subpoena, *In re Investigation of Violations of the Criminally Influenced and Corrupt Organizations Act*, United States Virgin Islands Office of the Attorney General (D.C. Super. Ct. April 7, 2016).[10] Only after the Institute moved for sanctions under the D.C. Anti-SLAPP Act did the Attorney General withdraw the subpoena. Josh Siegel, *Virgin Islands AG Withdraws Climate Change Subpoena Against Think Tank*, The Daily Signal (May 23, 2016).[11]

Government entities whose members hold different viewpoints serve equally onerous, politically-motivated subpoenas on supporters of climate change regulation. For example, in October 2015, the Chair of the House Science

_____

[9] *Available at* http://freebeacon.com/wp-content/uploads/2016/06/exxon-subpoena.pdf.

[10] *Available at* https://cei.org/sites/default/files/CEI%20Subpoena%20from%20USVI%20AG%20Claude%20Walker%20April%207%202016%20%281%29.pdf

[11] *Available at* http://dailysignal.com/2016/05/23/virgin-islands-ag-withdraws-climate-change-subpoena-against-think-tank/.

Committee "subpoenaed nearly seven years of internal deliberations and communications among scientists at the National Oceanic and Atmospheric Administration, including 'all documents and communications' related to NOAA's measurement of our climate." Michael Halpern, *The House Science Committee's Witch Hunt Against NOAA Scientists*, Union of Concerned Scientists (Oct. 23, 2015).[12] The House Science Committee supplemented its demand a few months later, requiring the NOAA to expand its search of emails and other documents to include any documents that feature the words "Obama", "President", "change", and "White House", among other exceedingly generic terms. Carolyn Gramling, *House Science Committee Demands That NOAA Widen Its Internal Search For Climate Change Emails*, Science (Feb. 26, 2016).[13]

These climate change subpoenas, considered together, highlight a disturbing trend in which legislative committees and state attorneys general use their subpoena authority as a tool to go after those with views on hot-button issues not consonant with their own. This punitive, viewpoint-oriented approach constitutes an abuse of the legislative subpoena authority. A reversal in this case would serve as an important step in cabining this authority.

_____

[12] *Available at* http://blog.ucsusa.org/michael-halpern/the-house-science-committees-witch-hunt-against-noaa-scientists-934.
[13] *Available at* http://www.sciencemag.org/news/2016/02/house-science-committee-demands-noaa-widen-its-internal-search-climate-change-emails.

## CONCLUSION

The Subcommittee used its subpoena power not as a tool to further a legitimate legislative investigation, but instead as a weapon to punish Carl Ferrer and Backpage for engaging in protected speech and lawful market activity the Subcommittee found distasteful. In doing so, the Subcommittee transgressed the bounds of Congress's investigatory authority and violated Ferrer's First Amendment rights. To rectify the current injustice and to ensure the Subcommittee and other government entities do not continue to abuse the subpoena power, *amici* respectfully request that this Court reverse the decision below.

Dated: November 22, 2016

Respectfully submitted,

By: */s/ Jessica Ring Amunson*
Jessica Ring Amunson
Joshua M. Parker
JENNER & BLOCK LLP
Suite 900
1099 New York Avenue, NW
Washington, DC 20001
Telephone: 202-639-6000
Facsimile: 202-639-6066
jamunson@jenner.com
jparker@jenner.com

*Counsel for* Amici Curiae

23

## CIRCUIT RULE 29(d) CERTIFICATION

Pursuant to Circuit Rule 29(d), counsel for *amici curiae* DKT Liberty Project, Cato Institute, and Reason Foundation herein states that it would not be practical for all *amici* supporting Appellant-Respondent Ferrer to file a single brief. Each *amicus* intends to address a distinct set of important and complex issues from a distinct perspective. *Amici* could not give these issues appropriate attention in a single brief. *Amici* DKT Liberty Project, Cato Institute, and Reason Foundation are dedicated to and have much experience in working to secure individual liberty and resist government overreach. Their brief is accordingly focused on the ways in which the Subcommittee's investigation constitutes an abuse of the legislative investigatory power. Other *amici* in this case wish to focus on the issues facing Internet hosts of third-party content. This brief therefore makes a unique contribution that will assist the Court in resolving the instant matter.

Dated:   November 22, 2016          By:  */s/ Jessica Ring Amunson*
                                    Jessica Ring Amunson
                                    Jenner & Block LLP
                                    1099 New York Avenue, NW
                                    Suite 900
                                    Washington, DC  20001
                                    (202) 639-6023
                                    jamunson@jenner.com

                                    *Counsel for* Amici Curiae

24

## CERTIFICATE OF COMPLIANCE

I, Jessica Ring Amunson, in reliance on the word count of the word processing system used to prepare this brief, certify that the foregoing complies with the type-volume limitations set forth in Fed. R. App. P. 29(d) because it contains 5,005 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(a)(7)(B)(iii).

I further certify that the foregoing brief complies with the typeface requirements of Fed. R. App. P. 32(a)(6) and the type style requirements of Fed. R. App. P. 32(a)(6), because it has been prepared in a proportionally spaced typeface using Microsoft Word in Times New Roman 14-point font.

Dated: November 22, 2016

By: /s/ Jessica Ring Amunson
Jessica Ring Amunson
JENNER & BLOCK LLP
Suite 900
1099 New York Avenue, NW
Washington, DC 20001
Telephone: 202-639-6000
Facsimile: 202-639-6066
jamunson@jenner.com

*Counsel for* Amici Curiae

25

## CERTIFICATE OF SERVICE

I, Jessica Ring Amunson, hereby certify that on this 22nd day of November 2016, I caused a true and correct copy of the foregoing to be filed electronically using the Court's CM/ECF system pursuant to Circuit Rule 25, causing a true and correct copy to be served on all counsel of record.

By: */s/ Jessica Ring Amunson*
Jessica Ring Amunson
JENNER & BLOCK LLP
Suite 900
1099 New York Avenue, NW
Washington, DC 20001
Telephone: 202-639-6000
Facsimile: 202-639-6066
jamunson@jenner.com

*Counsel for* Amici Curiae

26