IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| BACKPAGE.COM, LLC, | ) | |
| | ) | |
| Plaintiff, | ) | Case No. 15-cv-06340 |
| | ) | |
| v. | ) | Hon. John J. Tharp, Jr. |
| | ) | |
| THOMAS J. DART, Sheriff of Cook County, Illinois, | ) ) | Magistrate Judge Young B. Kim |
| | ) | |
| Defendant. | ) | |

**REPLY IN SUPPORT OF
SHERIFF'S MOTION FOR SANCTIONS
AGAINST BACKPAGE AND ITS ATTORNEYS**

Not surprisingly, Backpage failed to respond to the Sheriff's motion for sanctions. The guilty pleas of Backpage and its CEO, Carl Ferrer, conclusively establish that Backpage intentionally abused the judicial system by masquerading as an aggrieved freedom-of-speech plaintiff, and so the Court should sanction Backpage for its conduct. This fraud on this Court commenced at the inception of the lawsuit, and so all the Sheriff's fees incurred in this lawsuit from the beginning should be awarded. *Chambers v. NASCO,* 501 U.S. 32, 51, 57 (1991).

While Backpage failed to respond to the motion for sanctions, the response of the Davis Wright Tremaine, LLP firm ("DWT") took a different approach: it doubled down on its position that it did nothing wrong, even though there is an abundance of evidence from third parties demonstrating that DWT was acutely aware of the material lies being told by Backpage to this Court. The most telling aspect of DWT's response is that there is no sworn testimony from any DWT attorney stating that the firm was unaware of Backpage's false allegations. As already documented, this is with good reason.

No evidence has been offered to dispute that Backpage's entire action was based on lies from its inception or that DWT had no knowledge of this inescapable reality. This Court should summarily grant the motion for sanctions. *See, e.g., Langley by Langley v. Union Electric Co.*, 107 F.3d 510, 515 (7th Cir. 1997) (Rule 37 does not require an evidentiary hearing when the briefs and evidentiary submissions fully recount the violations); *Loctite Corporation v. Fel–Pro, Inc.*, 667 F.2d 577, 583 (7th Cir.1981) (same); *Margoles v. Johns,* 587 F.2d 885, 889 (7th Cir. 1978) (same).

I. **BACKPAGE'S ATTORNEYS KNEW OF MATERIAL FACTS THAT CONTRADICTED MATERIAL ALLEGATIONS IN BACKPAGE'S COMPLAINT AND FOUGHT AGAINST DISCLOSING THEM**

Throughout its First Amended Complaint, Backpage alleges that the Sheriff's letter to Visa and MasterCard, and his office's alleged communications with American Express, caused Backpage and its users irreparable damage because Backpage was no longer able to process credit card transactions. Because of this claimed harm, Backpage sought relief from this Court in the form of preliminary and permanent injunctions against the Sheriff so that those credit card services could be restored. *See* Amended Complaint, ECF No. 173, ¶ 4 (stating that due to the Sheriff's letters, American Express, Visa and Master Card all blocked use of their cards for any and all purchases on the website); ¶ 62 (stating that the Sheriff's actions caused the credit card companies to stop doing business with Backpage.com); ¶ 63 (stating the Sheriff's actions have threatened to preclude Backpage.com from doing business altogether); ¶ 64 (stating that without relief from this Court, Backpage will continue to suffer harm to its business); & Prayer for Relief A (requesting a temporary restraining order and preliminary injunction granting appropriate relief to return Backpage to the status quo prior to the Sheriff's letters—with "status

quo" being defined in paragraph 62 of the First Amended Complaint as the time period during which credit card companies would do business with Backpage.com).

The above litany demonstrates that the foundation of Backpage's complaint is that the Sheriff's actions caused Backpage no longer to be able to transact business through credit card companies, thereby driving Backpage out of business. The hitch with these allegations is that they were not true, and Backpage was not in need of the relief it was requesting from this Court because Backpage did not, in fact, stop transacting business through the credit card companies. And DWT had direct knowledge of this. *See* Motion for Sanctions at 16 (showing that DWT was provided with concrete evidence that Backpage was still transacting significant business through the credit card companies).

In DWT's response brief, rather than crying *mea culpa* and acknowledging that it withheld material evidence that bore directly on material allegations made by its client and the relief being requested from this Court, DWT merely states that the evidence provided in the California indictment "is simply not accurate, as Sheriff Dart knows from the actions of his office and discovery in this case." In support of its position, DWT cites to irrelevant testimony from its client, the preliminary injunction hearing and two e-mails between Sheriff's employees (the two Sheriff's e-mails from July 6 and July 7, 2015 state that AMEX could still be used to make purchases on Backpage as of those dates, and the testimony of its client, Carl Ferrer, states that as of August 8, 2015 AMEX could no longer be used to make purchases on Backpage).

DWT appears to be arguing that since their client, Carl Ferrer, told them three years ago that the credit card companies cut-off Backpage, DWT could ignore all other subsequent evidence to the contrary, and had no duty to turn over any of the contradictory

3

evidence that came to light. This is not how reasonably prudent attorneys are to act, and is sanctionable. *In re TCI Ltd.,* 769 F.2d 441, 445 (7th Cir. 1985).

The simple fact is that DWT was handed material evidence over eighteen months ago that, at the very least, showed that its client had lied about material allegations which significantly affected the relief being sought in this Court. DWT was required to turn over that evidence to this Court and the Sheriff's counsel. DWT also was required to amend its pleadings, to correct the false assertions and right the record. Rather than do so, DWT continuously pushed for entry of summary judgment based upon those false allegations, vigorously resisting any additional discovery. DWT chose to conceal critical evidence to help its client keep up its illegal charade and prolong this litigation, earning millions of dollars along the way. These facts alone justify sanctions against DWT and an award of all the Sheriff's attorneys' fees.

## II. THE RED FLAG EVENTS SHOW THAT BACKPAGE'S ATTORNEYS ACTED IN AN OBJECTIVELY UNREASONABLE MANNER

### A. *DWT does not even address the issue of whether it had knowledge that Backpage was an author of its on-line illegal speech.*

DWT has not made any response to two of the red flag events which the Sheriff put forth in his motion, and these events alone suffice for the Court to find that DWT conducted this litigation in an objectively unreasonable manner from the start.

DWT utterly failed to address **Red Flag No. 1**. In the month before Backpage filed its deceitful complaint, its general counsel Liz McDougall refused to answer questions about its screening and "moderation" practices before the Senate subcommittee investigating the proliferation of criminal advertisements on its website. On September 14, 2015 Robert Corn-Revere of DWT, along with other counsel for Backpage, met with the United States Senate Permanent Subcommittee on Investigations. ECF No. 130-10 at 3 n.5. Later, on January 10, 2017, Robert Corn-Revere submitted written testimony to the Senate indicating his firm had been

4

involved in issues pertaining to Backpage's editing functions for "20 months." *Backpage.com's Knowing Facilitation of Online Sex Trafficking: Hearing on S. 115-6 Before the Permanent Subcommittee on Investigations of the S. Comm. on Homeland Sec. and Gov't Aff.*, 115th Cong. No. 114 (2017) (statement of Corn-Revere, Robert). This means that DWT counseled Backpage about its editing practices—and thereby became charged with investigating those practices— no later than May 2015, two months *before* Backpage filed its deceitful civil rights complaint.

Then, on April 26, 2016, DWT filed a forty-five-page brief in the Senate Action,[1] again contending that Backpage did not provide any of the content in the advertisements alleged to be criminal. While the Senate was investigating numerous accusations that Backpage was facilitating child prostitution and the like, DWT was under a duty to investigate the truth of its client's pleadings which contrasted spectacularly with the stunning accusations lodged against Backpage. But no evidence has been put forth of DWT's requisite investigation, enabling this Court to soundly infer that no such investigation was made. "If a lawyer pursues a path that a reasonably careful attorney would have known, after appropriate inquiry, to be unsound, the conduct is objectively unreasonable and vexatious." *In re TCI Ltd.,* 769 F.2d 441, 445 (7th Cir. 1985).

DWT also failed to make any response to **Red Flag No. 3**. On September 3, 2015, Backpage's chief "moderators" Andrew Padilla and Joyce Vaught asserted their fifth amendment privileges against self-incrimination rather than answer Senate committee inquiries

---

[1] *Senate Permanent Subcommittee on Investigations v. Ferrer,* 199 F. Supp. 3d 125, 128 (D.D.C. 2016) (overruling all objections and granting application to enforce subpoena), *stay denied,* No. 16-5232 (D.C. Cir. Sept. 2, 2016), *temporary stay pending Senate briefing allowed sub nom. Ferrer v. Senate Permanent Subcommittee on Investigations,* 137 S. Ct. 1 (Roberts, Ch. J.), *stay vacated,* 137 S. Ct. 28 (Sept. 13, 2016) (*per curiam*). The appeal later was vacated as moot after Backpage surrendered incriminating documents. 856 F.3d 1080 (D.C. Cir. 2017).

about Backpage's complicity in facilitating criminal conduct by, among other actions, editing and authoring advertisements to hide child prostitution from law enforcement. ECF No. 197-1 at 15. This incrimination goes to the heart of Backpage's deceitfulness in filing the complaint.

As the Court is aware, one of the underpinnings of Backpage's complaint is that the Sheriff's letters were in violation of the Communications Decency Act, 47 U.S.C. § 230 (the "CDA"). Amended Complaint, ¶ 1. According to Backpage, since it was merely a publisher—and not an author—of the illegal on-line content, it should receive immunity for any illegal content placed on its website. *See id.* ¶¶ 27—28 (Backpage comparing itself to Craigslist, a former on-line platform for prostitution services, which received immunity under the CDA in a separate lawsuit because Craigslist was found to be only a publisher of its on-line content).

The problem with Backpage comparing itself to Craigslist is that Backpage was not just a publisher of the advertisements on its web platform. By editing advertisements to conceal the illegal nature of those advertisements, Backpage became an author and lost any protections it might have been afforded under the CDA**.** *See Doe No. 1 v. Backpage.com, LLC,* No. CV 17-11069-LTS, 2018 WL 1542056, at *1 (D. Mass. Mar. 29, 2018) (stating that since Backpage redrafted an advertisement to suggest that the *Jane Doe* was an adult, it loses any protections it might have been afforded as a publisher under the Communications Decency Act). This is part of the import of **Red Flags Nos. 1 and 3**. These red flags provided DWT with sufficient information to require it to investigate the veracity of its client's claim that it was not an author of the content on its website.

DWT does not even discuss these red flags in its response. As a result, the Court should find that the DWT attorneys purposefully did not investigate their client's allegations after being confronted by contradictory evidence during the Senate hearings, and that DWT was

6

complicit in Backpage's attempt to hide the fact that Backpage was a content provider not entitled to the immunity under the CDA.

  **B.**  *The DWT attorneys do not deny they had knowledge of the remaining Red Flag events.*

  The DWT attorneys devote most of their response brief to a tired mantra that this motion is not about their ethical lapses, but about the Sheriff's asserted wrongful conduct in suppressing free speech. ECF No. 238 at 1, 2, 4—10 & 12—15. This is pure sophistry. The sole issue presented in the Sheriff's motion is whether the attorneys acted in an objectively unreasonable manner, which should be determined by adjudicating whether the attorneys knew or should have known that their client was lying to this Court, and by whether the attorneys withheld discoverable evidence in this case. This motion has nothing to do with the separate question of whether the Sheriff's actions were justified law enforcement activities or a first amendment violation. DWT's response brief is an effort to affect a monumental misdirection of what really is at issue in the Sheriff's motion for sanctions.

  Regarding the red flag events which the DWT attorneys do discuss—again, without offering evidence, or even arguing that the attorneys did not know about the red flag events at the time each respectively occurred—their responses are misleading at best.

  **1.**  **Red Flags 2 & 4.**

  The Senate subcommittee began investigating Backpage's role in the editing of advertisements before the complaint at issue was filed, by issuing a subpoena on July 7, 2015 (pared on October 1, 2015 to meet some objections). Backpage's attorneys interposed objections based on the Freedom of Speech Clause of the first amendment and claimed immunity under the Communications Decency Act because their client supposedly was not providing the information content of the challenged advertisements. The attorneys likewise vigorously resisted

7

enforcement of the Senate's subpoena on these same grounds in the Senate Action. Necessarily, the attorneys would have to review the documents before making their objections or touting their client's lack of involvement in editing or providing the information content of these advertisements, yet no evidence has been offered to this Court that the attorneys investigated and determined that their client's assertions were true. At a minimum, it appears that the attorneys failed to conduct a reasonable investigation into the veracity of their client's claims and thus are subject to sanctions under *In re TCI Ltd.,* 769 F.2d 441, 445 (7th Cir. 1985).

In its response, DWT argues that it was in good stead arguing against production of the sought-after Senate documents as it was pursuing "significant First Amendment challenges to the [Senate's] subpoenas and process seeking to compel discovery of an online publisher's **editorial practices** and decisions**.**" *See* Response at 14 (emphasis added).

However, the question now is not whether DWT was justified in making a first amendment challenge to the Senate's subpoena. The question is whether, as a result of representing Backpage in the Senate proceedings, the DWT attorneys became aware of, or should have become aware of, facts that showed Backpage was making misrepresentations to this Court in the prosecution of its claims against the Sheriff, or whether DWT became aware of evidence that should have been turned over in this case. And the simple answer is yes.

As cited above in bold, the DWT attorneys admit in the response that they knew that Backpage was editing its advertisements. Whether Backpage was an author of the illegal advertisements as a result of its editing practices was a key question in this case because it directly affected Backpage's rights to seek immunity under the CDA. Since DWT admits that it had knowledge of Backpage's editing practices, it had a duty to disclose those practices so that this Court could determine whether Backpage was entitled to immunity under the CDA.

**2. Red Flag No. 6.**

What the DWT attorneys say in their response about the Red Beauty Sting Operation demonstrates the lengths DWT travelled to hide or ignore Backpage's ongoing illegal conduct. DWT deliberately attempted to mislead this Court— through an affidavit of DWT's James Grant—by misrepresenting facts and falsely accusing the Sheriff's Office of wrongdoing. ECF No. 160 at 3—6 & 160-1. Backpage and DWT knew that the original ad posted by Investigator Brosnan stated that the poster had just graduated "grade school" and was between "14—18," and that Backpage illegally sanitized this advertisement by removing references to the poster's age of 14 and her recent graduation from grade school. The documentary evidence and affidavit submitted by the Sheriff clearly demonstrated these facts. ECF Nos. 161-3, 161-4. Rather than addressing this damning series of events, Backpage and DWT resorted to deflection and dishonesty.

The deflection began by DWT and Backpage refusing to even acknowledge the original ad posted by Investigator Brosnan. Instead, Backpage and DWT argued that the original ad posted by Investigator Brosnan was the version sanitized by Backpage (without reference to the girl being 14 and graduating from grade school). ECF No. 160 at 4. By advancing this false argument, DWT and Backpage argued that Backpage engaged in no illegal sanitization and could stick to the false narrative that Backpage was not a content provider. However, by taking this approach, DWT exposed its knowledge of and participation in the cover-up of Backpage's illegal activity. No other explanation exists for DWT taking the approach it did. Then, to further deflect from its client's illegal behavior, DWT accused the Sheriff of misconduct. Under these circumstances, a reasonable attorney should have investigated the facts and circumstances of the Red Beauty Sting to determine the veracity of her client's actions and assertions in this litigation.

DWT instead doubled down on the argument that Backpage had engaged in no illegal activity, and even offered to provide an affidavit of one of its attorneys in support of the same.

### 3. Red Flag No. 5.

What the DWT attorneys state about CEO Ferrer evading Senate testimony is demonstrably untrue. On October 1, 2015, before he left the country, CEO Ferrer knew that the Senate subcommittee was calling for his testimony. ECF No. 162-2. He failed to appear on November 19, 2015, supposedly because he previously was scheduled to be abroad. That "appointment" lasted almost a year, and when he returned on October 6, 2016, he was arrested in Houston on charges of facilitating prostitution. When he finally appeared before the Senate subcommittee on January 10, 2017, he asserted his privilege against self-incrimination, including in response to the question about where he was on November 19, 2015. *Backpage.com's Knowing Facilitation of Online Sex Trafficking: Hearing on S. 115-6 Before the Permanent Subcommittee on Investigations of the S. Comm. on Homeland Sec. and Gov't Aff.*, 115th Cong. 11—14 (2017) (statement of Ferrer, Carl).

## C. *The case law cited by DWT provides no support for avoiding sanctions.*

As shown above, the DWT attorneys knew that Backpage was editing advertisements, failed to provide the Sheriff's counsel with the relevant evidence, and even allowed its client to plead false allegations. Certainly, the attorneys have not offered any evidence to refute this. This Court has inherent authority under Rule 37 to assess fees against counsel for such litigation misconduct. *Hall v. Cole,* 412 U.S. 1, 15 (1973) ("'bad faith' may be found, not only in the actions that led to the lawsuit, but also in the conduct of the litigation"); *Roadway Express, Inc. v. Piper,* 100 S. Ct. 2455 (1980) (same, decided before 28 U.S.C. § 1927 was amended to allow attorneys' fees).

The cases DWT cites in its response brief provide no basis for its attorneys not being held responsible for the entirety of the Sheriff's fees. Nor have the attorneys effectively dealt with the cases cited in the Sheriff's motion. In fact, to say the cases cited by the Sheriff "bear no resemblance to this case" (ECF No. 228 at 10—11) is a gross understatement. Backpage's temerity in masquerading as an aggrieved civil-rights-plaintiff is unprecedented, its profiting from child prostitution and human trafficking sets a new low for depravity, and the complicity of its attorneys in scores of cases, for months before they signed off on the complaint at issue in this case, is widespread and comprehensive. The Sheriff agrees that no previous sanctions case has approached this nadir.

Finally, DWT does not claim that they cannot afford to reimburse the Sheriff for his attorneys' fees, nor could they since the letter Backpage's recently-appointed counsel shared with this Court (ECF No. 229) indicates they are sitting on a $6.25 million retainer. In any event, inability to pay is not a defense under 28 U.S.C. § 1927. *Shales v. General Chauffeurs, Sales Drivers & Helpers Local Union,* 557 F.3d 746, 749 (7th Cir. 2009).

### III. THE ATTORNEYS HAVE WAIVED THEIR RIGHT TO INTRODUCE ALLEGED EXONERATING ATTORNEY-CLIENT COMMUNICATIONS

The DWT attorneys claim in a footnote that they have the right to defend themselves with privileged attorney-client communications, and purport to reserve the right to do so (ECF No. 238 at 1 n.1), but there are two fatal problems with this supposed reservation. *First*, the Sheriff agrees the attorneys have the right to defend themselves with privileged communications pursuant to Northern District of Illinois Local Rule 83.51.6(c)(3), but their time for doing so was in response to the very serious accusations made against them in the sanctions motion. The attorneys have waived their right to defend themselves with attorney-client communications by making the tactical decision—perhaps based on what foreknowledge the

attorney-client communications would demonstrate—not to defend themselves when called on. Because they failed to proffer evidence in opposition to assessing sanctions, there is no need for an evidentiary hearing. *United States v. Villegas,* 388 F.3d 317, 324 (7th Cir.2004) (because "the purpose of an evidentiary hearing is to resolve material factual disputes among the parties, a hearing is not required in the absence of such disputes"); *cf. Kellett v. Roberts,* 276 Ill. App. 3d 164 (2d Dist. 1995) (applying Illinois procedural law and concluding that an evidentiary hearing was not required because the respondents failed to contest the substantive assertions made in the motion for sanctions).

*Second,* on information and belief, Backpage waived its attorney-client communications privilege in conjunction with entering its guilty plea on April 5, 2018, before the response brief was due.[2] So, nothing stopped the DWT attorneys from offering evidence to prove they were unaware Backpage was feeding them lies and that the entire lawsuit was deceptive from the beginning. Absent any evidentiary denial, the Court should draw inferences from the red flag events which amply support awarding sanctions.

### IV. IF SANCTIONS ARE NOT SUMMARILY AWARDED, THIS COURT SHOULD PERMIT DISCOVERY AND CONDUCT AN EVIDENTIARY HEARING

If this Court determines that the evidence introduced by the Sheriff, combined with DWT's failure effectively to refute it, does not warrant the immediate and summary award of sanctions against Davis Wright Tremaine, LLP and attorneys James Grant and Robert Corn-Revere, then the Sheriff requests an opportunity to conduct discovery (starting with production

---

[2] The District Court for the District of Columbia also held that Backpage waived any attorney-client privilege as to documents subpoenaed by the Senate by failing to produce a privilege log. *Senate Permanent Subcommittee on Investigations v. Ferrer,* 199 F. Supp. 3d 125, 143 (D.D.C. 2016). Further, since Backpage engaged counsel to assist it with committing crimes and fraud, there never was any attorney-client privilege in the first place. *United States v. Zolin,* 491 U.S. 554, 563 (1989).

12

of all communications between Backpage and its attorneys, and possibly requiring the depositions of DWT attorneys including James Grant and Robert Corn-Revere), followed by an appropriate evidentiary hearing and appropriate supplemental briefing. In cases where respondents contest the underlying grounds for the entry of sanctions, evidentiary hearings are appropriate. *See, e.g., Godlove v. Bamberger,* 903 F.2d 1145, 1149 (7th Cir. 1990) (whether to conduct an evidentiary hearing rests in the sound discretion of the district court).

## Conclusion

When Backpage filed this now-dismissed lawsuit almost three years ago, it did so knowing the lawsuit was based on false pretenses and was done with the sole purpose of trying to ensure it could continue to profit from its criminal conduct. For almost three years, Backpage continued to sanitize ads and cover up human trafficking and the prostitution of children and adults but claimed time and again it did no such thing. And for almost three years, the lives of those children and adults so trafficked and raped through Backpage.com were forever altered and destroyed. This plain truth is not a lie.

And for far more than three years, Sheriff Dart was a voice and advocate for those children and adults forced into sexual slavery and advertised like bicycles on Backpage.com. As a result, Backpage and its attorneys attempted to villainize and quiet him through this lawsuit, and all so that its owners could continue to make millions upon millions of dollars from Backpage's illegal conduct. How many children and adults could not escape the horrors of sex trafficking and involuntary prostitution over the last three years because of the greed of Backpage's owners, and ultimately the greed of their counsel who helped Backpage maintain this sham of a lawsuit? This is the time to punish those who abused the legal system for wealth and greed, and all at the physical and mental expense of their victims. This is the type of conduct

that sanctions are intended to punish, including against attorneys who fail to conduct the investigations required by law.

                                                    Respectfully submitted,

                                                    THOMAS J. DART,
                                                    SHERIFF OF COOK COUNTY, ILLINOIS

                                                    By:      Paul J. Kozacky
                                                                One of his attorneys

Paul J. Kozacky
Alastar S. McGrath
Jerome R. Weitzel
KOZACKY WEITZEL MCGRATH, P.C.
55 West Monroe Street, 24th Floor
Chicago, Illinois 60603
(312) 696-0900

**CERTIFICATE OF SERVICE**

      The undersigned attorney, on oath, certifies that May 31, 2018 he served the foregoing REPLY IN SUPPORT OF SHERIFF'S MOTION FOR SANCTIONS AGAINST BACKPAGE AND ITS ATTORNEYS via the ECF system to all parties that have consented to same in accordance with applicable Federal Rules of Civil Procedure and Local Rules of the U.S. District Court for the Northern District of Illinois.

                                                                       /s/ Paul J. Kozacky